1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------------x

3  SAMUEL SMOLEN,

4              Plaintiff,

5         -against-                17 7494(PMH)
                                   Final Pretrial Conference
6

7  SHANIKQUA HARRISON, MICHAEL
   CAPRA, MARK ROYCE and SHERRY
8  IZQUERDO,

9              Defendants.

10 ------------------------------------x

11                             United States Courthouse
12                             White Plains, New York
                               December 8, 2022
13

14

15 B e f o r e:  THE HONORABLE PHILIP M. HALPERN,
                               District Judge
16

17

18
   COVINGTON & BURLING
19         Attorneys for Plaintiff
   BY:  JORDAN S. JOACHIM
20       KATHERINE P. ONYSHKO

21

22 NYS OFFICE of the ATTORNEY GENERAL
           Attorneys for Defendants
23 BY:  AMANDA YOON
         JOHN R. DORAN
24

25

1          THE COURT:  All right, counsel, be seated.  Good

2     morning everybody.  All right, two things on my mind.  One is

3     in our joint pretrial order we have -- look who's here.  Good

4     morning, Ms. Yoon?

5          MS. YOON:  Good morning, your Honor.  Good to see

6     you.

7          THE COURT:  Welcome to the fray.

8          In the joint pretrial order we have a stipulated set

9     of facts Román VIII, and my question, concern is are you going

10    to do anything with them, are you going to present them to the

11    jury by way of exhibit, or want to read them to the jury or do

12    you want to ignore them?  We should think about it.  The one

13    that's on my mind in particular is the joint and several

14    liability.  So up to you.

15         Yes, Ms. Onyshko.

16         MS. ONYSHKO:  Good morning, your Honor.  We propose,

17    one of us, Jordan or myself, read it in at the end of the case

18    in our chief.

19         MS. YOON:  Your Honor, we have no objection.

20         THE COURT:  All right, good.

21         All right, Juror Number 8 mentioned to Mr. Cangelosi

22    this morning she wanted me to hear something.  The sums and

23    substance was, in effect, that she recalled last evening that

24    she thinks 20 years ago she may have worked for a third-party

25    employer either at Sing Sing or in the building next door to

1  Sing Sing, words to that effect.  I'll leave it to the both of

2  you, but if you want me to bring her in and just clarify what

3  her intention is in communicating with me through

4  Mr. Cangelosi, I'm happy to do that.  I don't think it amounts

5  to anything.

6          MS. ONYSHKO:  I agree tentatively, your Honor, but

7  we'd like some clarification from her.

8          MS. YOON:  As for us.

9          THE COURT:  Mr. Cangelosi, why don't you go get Juror

10  Number 8 and tell her I'd like to talk to her in the courtroom.

11  Not a big deal, nothing to worry about.

12          (Juror Number 8 enters courtroom)

13          JUROR NUMBER 8:  Good morning.

14          THE COURT:  Good morning.  I understand from

15  Mr. Cangelosi that you mentioned to him that you were

16  reflecting last evening about an employment that you had 20

17  years ago, and so first, would you just kind of repeat what you

18  said to Mr. Cangelosi.

19          JUROR NUMBER 8:  Of course.  So about 20 years ago I

20  did a lot of temporary work.  I would have two-week, three-week

21  stints in various locations.  I don't remember if this

22  temporary employment was for Sing Sing to be quite honest or if

23  it was in a building next to Sing Sing, it's just that I guess

24  yesterday when I was seeing Sing Sing on the paperwork, it

25  jogged my memory, but I truly do not remember if it was Sing

1  Sing that I worked for.  I'm not sure.  But I just thought, in

2  the interest of transparency, I would share that.

3          THE COURT:  I very much appreciate you doing that.

4          JUROR NUMBER 8:  Thank you, sir.

5          THE COURT:  Would the fact that you may or may not

6  have had a temporary job in Sing Sing or nearby Sing Sing

7  impact on your ability to be fair and impartial in this case?

8          JUROR NUMBER 8:  Not in any way, no.  No, your Honor.

9          THE COURT:  All right, thank you.

10         JUROR NUMBER 8:  You're very welcome.

11         THE COURT:  You may go back to the jury room.

12  Mr. Cangelosi will take you back.  Thank you.

13         JUROR NUMBER 8:  You're welcome.

14         THE COURT:  Thanks for being conscientious.

15         JUROR NUMBER 8:  Oh, thank you, sir.

16         (Juror Number 8 excused from courtroom)

17         THE COURT:  Counsel, I don't think there's anything

18  there.  You know the options are to ask me to release her from

19  the panel, I don't see any reason to, but I'm happy to hear

20  argument if you think it's appropriate.

21         MS. ONYSHKO:  No argument from us.

22         MS. YOON:  I don't see any reason to.

23         THE COURT:  All right, good.

24         I've given you the jury charge this morning and I

25  thought, just so you understand where I am in your requests, I

1    thought I'd just let you know now, because I'm hoping we're

2    going to get done with this promptly this morning so that

3    there's the possibility that we could charge later or -- later

4    is what I'm thinking.

5         Just so you know, on your proposed charges, I'm

6    granting, meaning I'm going to use your language, charges 6

7    through 26, 29 through 39, and I'm granting in substance

8    charges 1 through 5., 27, 28 and 36, meaning, yes, I agree with

9    the concept but I'm using my own language.

10        I've also added, as you'll see in the charge you

11   have, under Román II, section H and I; H being all persons are

12   equal before the law, and I, uncalled witnesses.

13        All right?  So that's where we are on the charge.  I

14   don't anticipate there will be any other additions or

15   deletions, but having said that, we'll see what happens.

16        We're ready to go?

17        We ready to go, counsel.

18        MS. ONYSHKO:  Your Honor, we were hoping to very

19   quickly resolve the deposition designation issue.  We couldn't

20   reach a compromise, though I tried.  I can hand you a

21   highlighted copy.

22        THE COURT:  I have the pages at issue.

23        MS. ONYSHKO:  Okay.

24        THE COURT:  So it's really your objections to the

25   defendant's reading.  I've ruled on two, so let's go through.

1    What is it that you're --

2              MS. ONYSHKO:  Page 32.

3              THE COURT:  Yes.

4              MS. ONYSHKO:  -- is the first outstanding language.

5    We're willing to compromise on 2 through 5 but we're

6    maintaining our objection on 6 through 20 because it deals with

7    the officers at issue in this case.  In no way are Mr. Smolen's

8    interactions with the corrections officers, including if he was

9    a threat -- did he need to be in IPC because the officers were

10   going to beat him up?

11             THE COURT:  I don't mean to cut you off, but the

12   witness yesterday testified about it, so why wouldn't I permit

13   Mr. Tyer's deposition?  He talked about harassing and inmates,

14   officers.  He said it.  I heard him say it.  So another witness

15   kind of saying the same thing but in different words, I don't

16   see any issue and I don't see any issue with it referring to

17   officers either.

18             MS. ONYSHKO:  I think the specific language on 12

19   through 17, quite frankly, I'm also concerned a little bit

20   about the reference to his lawyer, it's not to either of us,

21   but I don't want to color the jury's view that we were involved

22   or any part of this.

23             THE COURT:  That may be.  Those are nitpicky kind of

24   things.

25             Ms. Yoon, the purpose of this is simply to identify

1  that this witness never saw him get in a physical fight, never

2  start a fight, but that threats had been made, which is already

3  before the jury.

4          MS. ONYSHKO:  And the first part of this quote, your

5  Honor.

6          MS. YOON:  Your Honor.

7          THE COURT:  I'm sorry?

8          MS. ONYSHKO:  Your Honor, that's also part of the 12

9  through 5 that we're willing to let in.  It's really just the

10  substance --

11          THE COURT:  2 through 5.

12          MS. ONYSHKO:  Sorry, 2 through 5 that we're willing

13  to let in.

14          MS. YOON:  Which is about his fights, arguments he

15  had with other incarcerated individuals, which is clearly

16  relevant to the issue.

17          Your Honor, just one point on that.  Security is one

18  of the reasons why an inmate is placed in protective custody,

19  and the fact that Mr. Smolen had personal information about

20  other officers and was posting that out, that was one of the

21  factors that the parties considered in keeping him in

22  protective custody.

23          THE COURT:  I mean, I don't think you want the jury

24  to brief that they're protecting him from the corrections

25  officers, that's not the point.  But I don't think this is

1  significant enough to make a big to-do out of it.

2         Ms. Yoon, do you really need to have a hanging piece

3  of paper?  How does it help your defense?  I mean, honestly,

4  how does it help your defense?

5         MS. YOON:  It shows Officer Tyer's interaction,

6  observation of Mr. Smolen, which is a big portion of his

7  testimony, your Honor.  He was the officer who observed

8  Mr. Smolen on a daily basis and part of the testimony he's

9  going -- we're going to be reading is his observation of

10 Mr. Smolen, what he was doing, the pile of paper that was in

11 his room.  This is all part of what he --

12        THE COURT:  I'm going to overrule the objection.  I

13 think this is a minor point.  I don't think it's worth

14 sustaining the objection or cutting and pasting.  I don't want

15 to impact on the testimony given.  Every case has positive

16 points and negative points from the other side's witnesses.  I

17 don't see this as a big to-do.  I'm overruling the objection.

18        What's next?

19        MS. ONYSHKO:  Page 46.

20        THE COURT:  Page 46.

21        MS. ONYSHKO:  Here's another attempt to compromise.

22 I'll note Ms. Yoon didn't like my questions then but is fine

23 with it now, if we go to 12 to 14, I think it's a reference to

24 his crime.  I think it's another attempt at defendants to try

25 and get this in.  There is plenty of testimony not objected to

1   about the fact he was making threats or receiving threats.  I

2   think this borderline hearsay is pretty prejudicial, we can

3   just strike the last sentence.

4          THE COURT:  It's not hearsay if it's a statement made

5   by a party, right, so that's --

6          MS. ONYSHKO:  He's quoting back the inmates.

7          THE COURT:  Oh, I see.

8          MS. ONYSHKO:  And I think we can just -- I understand

9   where the threats are coming in and where we are on that.  I

10  just think this last sentence, 12 through 14, we don't need.

11  That's prejudicial.

12         MS. YOON:  Your Honor, if I just may say one thing.

13  The same statement, baby sniper, baby diaper, that was

14  referenced page 26, 12 through line 20, and plaintiff's counsel

15  did not object to that same comment, and I believe plaintiff's

16  counsel waived that objection because, in other portions we

17  designated she had no objection to it.

18         THE COURT:  Wait, slow down now.  I'm glad you're

19  well rested Ms. Yoon, and you always go quickly, but you need

20  to slow down so I can try to catch up to you, okay?

21         The comment that is offensive is lines 12 through 14.

22  My first question is, Ms. Yoon, is that going to be read in

23  some other designation?  Yes or no.

24         MS. YOON:  Yes, your Honor.

25         THE COURT:  Where?  What page?

1          MS. YOON:  So page 26.

2          THE COURT:  Yes.

3          MS. YOON:  Line 12.

4          THE COURT:  Okay, I don't have --

5          MS. ONYSHKO:  It's 18 through 20.

6          MS. YOON:  "Question:  So how did you know the inmate

7     doesn't like him.

8     "Answer:  Because they were threatening him and everything when

9     he was in HBC because he started down in HBC.  They would

10    threaten him and tell him to come to the yard and call him

11    baby, sniper baby, baby diaper, something like that.

12         THE COURT:  You're getting it in once.  Do we need it

13    twice?  I don't think so.  I'm going toe strike 12 through 14.

14    I'm going to sustain the objection as cumulative and

15    unnecessary.  Since it is already coming in once, I don't think

16    we need to -- I'm not even sure what it means, frankly, but

17    it's in evidence once, we don't need it twice.

18         All, right are there any other objections?

19         MS. ONYSHKO:  One more and this is another -- so we

20    initially objected to 47, 23 through 49/12.

21         THE COURT:  Yes.

22         MS. ONYSHKO:  But understanding where the evidence

23    stands, I just want to direct your attention to 49, 2 through

24    12.  I don't think defendants are alleging that the priest was

25    a safety and security issue to Mr. Smolen or the law library

1 officer, the testimony is pretty cumulative on the existing

2 threat so far --

3          THE COURT:  Tell me the page and line again.

4          MS. ONYSHKO:  49, 2 through 12.

5          THE COURT:  2 through 12.  Let me just read it.

6          Ms. Yoon, so the objection is withdrawn to everything

7 except page 49, 2 through 12.

8          Ms. Yoon.

9          MS. YOON:  Your Honor, I think this goes right into

10 the element of the claim that Mr. Smolen was causing animosity

11 creating hostile environment to the area that he was housed in.

12 The fact that he was yelling at a priest, that he was cursing

13 at other people who was there, I think that just shows that he

14 was creating hostile environment and that was the ground for

15 placing him in protective custody, your Honor.

16          MS. ONYSHKO:  Your Honor, you think they're trying to

17 use this to prejudice, he was yelling at a priest, what a

18 horrible person.  I don't think the priest is the animosity

19 Sergeant Nevins was concerned about when he wrote that IPC

20 recommendation.

21          MS. YOON:  And the verbal argument can be with

22 anybody.  Depends on how he's feeling that day.  This is

23 exactly what we want to present it to the jurors.

24          MS. ONYSHKO:  We already have pages of the threats

25 and arguments that we are willing to withdraw our objection to.

1          MS. YOON:  The problem with this is that we can't

2    just talk about animosity and not talk about the details.  If

3    we say he was causing animosity without talking about the

4    details, the jurors are not getting the details and this is for

5    three and a half years.  It's so important to the defendant's

6    defense because this was the basis for placing him in

7    protective custody and keeping it in there.

8          MS. ONYSHKO:  I would say we have pages and pages of

9    details.  They called him baby, sniper, something, who knows.

10   They said to bring him to the yard.  We have talks about what

11   his cell looked like.

12         THE COURT:  I think in fairness --

13         MS. YOON:  Your Honor, just one more thing, if I may.

14         Officer Tyer's is a witness we have to prove he was

15   entitled to due process at the hearing.  Officer Tyer is the

16   one Mr. Smolen wanted to call at the hearing, and I think it's

17   important to show what he would have testified --

18         THE COURT:  I've got it.  I'm done.  You may be

19   seated.

20         I'm going to overrule the objection.  I understand

21   plaintiff's concern about yelling at a priest in a library,

22   officer.  I also understand that the plaintiff is complaining

23   that this individual was not called as a witness.  I don't

24   think on balance the defendant should be inhibited from

25   presenting their point of view albeit in this case this brief

1    snippet of testimony.  Again, I don't think this is a big to-do

2    in terms of what's being presented to the jury, but that there

3    is a library officer and a priest being yelled at allegedly by

4    the plaintiff is not something that I'm going to preclude.  So

5    I'm overruling the objection.

6              All right, Mr. Cangelosi, let's get the jury.

7              How are you going to do this?  Who's going to read?

8    How are we going to do that, do you have a plan?

9              MS. ONYSHKO:  I understand that Ms. Yoon and I we

10   could read from our seats.  I could play the role of myself.

11             MS. YOON:  I'll read from the desk, your Honor.  I

12   think we're doing that after Superintendent Capra's testimony.

13             MS. ONYSHKO:  Yes, we intend to call the deposition

14   of Officer Tyer at the end of our case.

15             MR. JOACHIM:  We're calling defendant Sherry

16   Izquierdo.

17             THE DEPUTY CLERK:  Jurors entering the courtroom.

18             (In open court; jury present)

19             THE COURT:  Morning ladies and gentlemen.  Everybody

20   please be seated.  I know you were here promptly and early, I

21   appreciate it.  We had a legal work the lawyers and I needed

22   the address.

23             As I reminded you last night and continue to

24   emphasize today, it is important that you decide this case

25   based solely on the evidence and the law presented.  You must

Izquierdo - Direct - Joachim

1    not learn any additional information about the case from

2    outside sources.  To ensure fairness to all parties in this

3    trial, I'll now ask each of you whether you learned about or

4    shared any information about this case outside the courtroom

5    last evening, even if it was accidental.  If you did, please

6    raise your hand.

7            I see no hands, so I very much appreciate you

8    adhering to my direction, and I hope you had a good rest, and

9    we'll get a full day of testimony in today.  We are going to

10   end about 3:45.  I have a sentencing that I need to do at 4:00.

11           All right, counsel, you may proceed.  We need to

12   swear the witness in.

13           Mr. Cangelosi.

14           THE DEPUTY CLERK:  Yes.
     SHERRY IZQUIERDO,
15
        called as a witness by the plaintiff,
16
        having been duly sworn, testified as follows:
17

18           THE DEPUTY CLERK:  Please states your name for the

19   record and spell it.

20           THE WITNESS:  Serry Izquierdo, S-H-E-R-R-Y,

21   I-Z-Q-U-I-E-R-D-O.

22           THE COURT:  You may proceed, counsel.

23   DIRECT EXAMINATION

24   BY MR. JOACHIM:

25   Q.    SORC Izquierdo, can you hear me okay?

Izquierdo - Direct - Joachim

1   A.   Yes.

2   Q.   You are an offender rehabilitation coordinator at Sing

3   Sing Correctional Facility, correct?

4   A.   Yes.

5   Q.   Offender rehabilitation coordinator is also referred to as

6   ORC, right?

7   A.   Yes.

8   Q.   And you are the ORC at Sing Sing from 2005 until 2018?

9   A.   Correct.

10  Q.   As an ORC at Sing Sing, you are assigned to involuntary

11  protective custody or IPC, correct?

12  A.   Yes.

13  Q.   You were the only ORC specifically assigned to IPC while

14  you were at Sing Sing, correct?

15  A.   During that time, yes.  Not from 2005.

16  Q.   Were you the only ORC specifically assigned to IPC from

17  2014 until 2018 when you left?

18  A.   Yes.

19  Q.   Mr. Smolen was an inmate at IPC Sing Sing for part of the

20  time you were assigned there, correct?

21  A.   Yes.

22  Q.   And as part of your role as a ORC assigned to IPC, you did

23  daily rounds of IPC?

24  A.   Correct.

25  Q.   That means you talked to each of the inmates housed in

Izquierdo - Direct - Joachim

1    IPC?

2    A.    Yes.

3    Q.    You'd see if they needed anything?

4    A.    Yes.

5    Q.    Sorry, didn't hear your comment.

6    A.    Yes.

7    Q.    And inmates in IPC at Sing Sing were segregated from

8    inmates in the general population, correct?

9    A.    Yes.

10   Q.    Inmates in IPC were generally not allowed to go outside of

11   IPC, right?

12   A.    Yes.

13   Q.    You attended protective custody review meetings while in

14   ORC at Sing Sing, correct?

15   A.    Yes.

16   Q.    And at those review meeting you sometimes discussed

17   inmates in IPC?

18   A.    Correct.

19   Q.    You generally attended those review meetings if you were

20   available?

21   A.    Yes.

22   Q.    And your review meetings were typically 20 or 30 minutes

23   long?

24   A.    It varies, depends how many people is in IPC, PC, and

25   Special Housing Unit.

1  Q.   I'm sorry, could you repeat -- could you speak a little

2  louder?  I'm having trouble hearing you.

3  A.   It depends how many inmates are on the unit at the time.

4  It's not always full, so depending who's there and what needs

5  to be discussed, so there's no timeframe, it just varies.

6  Q.   And those review meetings were typically 20 or 30 minutes

7  long, correct?

8  A.   Yes, sometimes, yeah.

9  Q.   And the review meetings were not just for inmates in IPC,

10 right?

11 A.   Right.

12 Q.   The review meetings were for all inmates in IPC, protect

13 protective custody and special housing unit, correct?

14 A.   Yes.

15 Q.   And there are 30 cells for inmates in both IPC and

16 protective custody?

17 A.   I believe so, I'm not sure.  I don't remember.

18 Q.   The cell for inmates in IPC or protective custody were

19 generally full or close to full when you were doing your

20 rounds?

21 A.   Yes.

22 Q.   And there were 30 cells for inmates in disciplinary

23 special housing unit, correct?

24 A.   Again, I'm not sure how many cells.  I forgot.

25 Q.   Inmates in IPC and protective custody are supposed to have

1  their status reviewed at least every 30 days, correct?

2  A.   Yes.  The first two months it's every week and then every

3  30 days after.

4  Q.   And the results of those reviews are supposed to be

5  documented in a protective custody review form, correct?

6  A.   Yes.

7        MR. JOACHIM:  Your Honor, I'd like to publish Exhibit

8  G to the jury, it's been admitted into evidence.

9        THE COURT:  Certainly.

10  Q.   Ms. Izquierdo, if you could open the defendant's exhibit

11  binder to Exhibit G.  Let me know when you're there.

12  A.   The yellow?

13        THE COURT:  No, it's the other one, ma'am.  That one.

14  Not that one.

15        THE WITNESS:  Not this one.

16        THE COURT:  The one under the yellow one.

17        THE WITNESS:  This one?

18        THE COURT:  Yes.

19  A.   Okay.  Where am I going?

20  Q.   Exhibit G, please.

21  A.   Okay.

22  Q.   And this is a protective custody review form for

23  Mr. Smolen, correct?

24  A.   Yes.

25  Q.   And halfway down the page there's a line that says

1   offender rehabilitation coordinator and a signature above it.

2   Do you see that?

3   A.    Yes, I do.

4   Q.    That's your signature, correct?

5   A.    Yes, it is.

6   Q.    And going back to the top of the page, this form has a

7   review date of July 7, 2017, do you see that?

8   A.    Yes.

9   Q.    And that's almost two years after Mr. Smolen was first

10  placed in IPC, correct?

11  A.    Yes.

12  Q.    And you don't recall any protective custody review before

13  July 7, 2017, which you discussed Mr. Smolen, correct?

14  A.    I remember one was done every time in every meeting.

15  Q.    SORC Izquierdo, do you remember giving a deposition in

16  this case?

17  A.    Yes.

18  Q.    And during that deposition I asked you questions, correct?

19  A.    Yes.

20  Q.    And your lawyer was there, too?

21  A.    Yes.

22  Q.    And a court reporter was there writing everything down?

23  A.    It was through Webex, so I didn't see the other side, I

24  just saw you.

25  Q.    But it was recorded, correct?

1   A.   I believe so.

2   Q.   And you sworn under oath to tell the truth at that

3   deposition, correct?

4   A.   Yes, I did.

5   Q.   I didn't hear an answer.

6   A.   Yes, I did.

7   Q.   I'd like to show you a copy of your deposition transcript,

8   which I'll mark for identification as Exhibit 12.

9            MS. YOON:  Objection, your Honor.

10           THE COURT:  No, it's overruled.  You can mark a

11  deposition.

12           MR. JOACHIM:  I'm just marking for identification.

13           THE COURT:  Yeah, I got it.  It's okay, you can do

14  that.

15           MR. JOACHIM:  Michelle, if you could bring up a copy.

16           THE COURT:  Mark it as 12 for identification,

17  Mr. Cangelosi, please.

18  Q.   And SORC Izquierdo, if you could turn to page 57 of that

19  deposition transcript.

20  A.   Okay.

21  Q.   And look at line 18 of page 57.

22  A.   Yes, I see.

23           MR. JOACHIM:  And your Honor, there's a prior

24  inconsistent statement and I'd like to impeach the witness

25  with --

1          MS. YOON:  Objection.

2          THE COURT:  No, no, no, we're not making speeches.

3     The objection is sustained.

4          Ask your question, counsel, and I'll rule on your

5     question.

6          MR. JOACHIM:  Your Honor, I'm sorry.

7     Q.   Ms. Izquierdo, at this deposition, I asked you, if you

8     recall any protective custody review before July 7, 2017, in

9     which you discussed Mr. Smolen, correct?

10         MS. YOON:  Objection.

11         THE COURT:  Overruled.

12         The question, ma'am, is did he ask you that question?

13         THE WITNESS:  Yes, I was reading, yes.

14    Q.   And you answered you don't recall, correct?

15    A.   Correct.

16    Q.   That was your sworn testimony at your deposition.

17    A.   Correct.  At that time that's what I --

18    Q.   I'd like to turn back to Exhibit G, please.  SORC

19    Izquierdo, do you have Exhibit G in front of you?

20    A.   Yes, I do.

21    Q.   There's a section that says distribution.  Do you see

22    that?

23    A.   Yes.

24    Q.   It says, original, inmate, correct?

25    A.   Yes, it does.

1  Q.   That indicates that the original of this form is supposed

2  to be given to inmate, correct?

3  A.   Yes.

4  Q.   It indicates that two copies of this form are supposed to

5  be made, correct?

6  A.   Yes.

7  Q.   And those copies are supposed to be given to the

8  disciplinary department and the ADS Prea Compliance Manager,

9  correct?

10 A.   Correct.

11       MR. JOACHIM:  Your Honor, I'd like to move on to

12 Exhibit H, which has been admitted into evidence.

13       THE COURT:  Quickly.

14       MR. JOACHIM:  Yes.

15 Q.   This is another protective custody review form for

16 Mr. Smolen, correct?

17       THE COURT:  H, ma'am.

18 A.   Yes.

19 Q.   And halfway down the page there's a line for offender

20 rehabilitation coordinator, correct?

21 A.   Yes.

22 Q.   And that's your signature, correct?

23 A.   Yes, it is.

24 Q.   And this form has a review date of August 7, 2017,

25 correct?

1  A.    Correct.

2         MR. JOACHIM:  Your Honor, I'd like to move to Exhibit

3  I.

4         THE COURT:  Please.

5         MR. JOACHIM:  This is another protective custody

6  review form for Mr. Smolen correct.

7  A.    Yes.

8  Q.    And in this form there's a line that says offender

9  rehabilitation coordinator but that is not your signature,

10 correct?

11 A.    Correct, that is not my signature.

12 Q.    And this form has a review date of December 8, 2017,

13 correct?

14 A.    Correct.

15 Q.    And the last form we looked at Exhibit H had a review date

16 of August 7, 2017, correct?

17 A.    Correct.

18 Q.    You don't recall any protective custody review meetings in

19 which you discuss Mr. Smolen between August and December 2017,

20 correct?

21 A.    I'm sorry, can you repeat your question?

22 Q.    Do you recall any protective custody review meetings

23 between August and December of 2017 in which you discuss

24 Mr. Smolen?

25 A.    Mr. Smolen was discussed in every meeting.

Izquierdo - Direct - Joachim

1   Q.   Do you have any recollection of a review meeting in which

2   you discussed Mr. Smolen between August and December of 2017?

3   A.   Yes.

4   Q.   I'd like to refer back to your deposition in this matter

5   and ask you to turn to page 64 of that deposition.

6        Do you have page 64 in front of you?

7   A.   Yes, I do.

8   Q.   I'd like to refer you to lines 17 through 20 on page 64.

9        THE COURT:   Counsel, let's sharpen this up a little

10  bit.  Is it your question that does it refresh your

11  recollection, was that her -- you've got to do better than

12  trying to read the question, okay?

13  BY MR. JOACHIM:

14  Q.   Do you recall that I asked you during your deposition if

15  there were any protective custody reviews between August and

16  December of 2017?

17  A.   Yes.

18  Q.   Do you recall you answered you don't recall any such

19  protective custody review meetings?

20  A.   Yes, at that time I did not, but I had time to review and

21  remember the case now.

22  Q.   Ms. Izquierdo, I'd like to move to Exhibit 9, which is in

23  plaintiff's binder.

24        THE COURT:   That's the yellow, the yellow jacket.

25  A.   Okay.

1    Q.   And this is a memo you wrote, correct?

2    A.   Yes.

3    Q.   And the memo is dated June 8, 2015?

4    A.   Correct.

5    Q.   And this memo was in response to a request made by

6    Mr. Smolen for his IPC hearing review paperwork, correct?

7    A.   Yes.

8    Q.   And you wrote that you were going to follow up with DSS

9    Royce about this, correct?

10   A.   I wrote that I did follow up with him and that he should

11   direct his inquiries to him, because I was not the keeper of

12   the IPC form.  It does not stay in my office.  I don't have

13   access to it once I -- I'm in a meeting, after that I don't see

14   that form again.  It's not kept if my office or in my area, so

15   that's why I reached out to the DSS.

16   Q.   You don't know if DSS Royce ever responded to this letter.

17   A.   To Mr. Smolen?

18   Q.   Correct.

19   A.   No, I don't, I don't remember that.

20   Q.   Ms. Izquierdo, Mr. Smolen was kept in IPC for over three

21   and a half years, correct?

22   A.   Yes.

23   Q.   And you're not aware of any other inmates besides

24   Mr. Smolen who was kept in IPC in Sing Sing for more than three

25   years, correct?

1   A.   Not to my recollection, no.

2           MR. JOACHIM:  No further questions.

3           MS. YOON:  Your Honor, may I?

4           THE COURT:  Yes, Ms. Yoon, please.

5           MS. YOON:  Good morning.

6   CROSS-EXAMINATION

7   BY MS. YOON:

8   Q.   Good morning, Ms. Izquierdo.

9   A.   Good morning.

10          THE COURT:  Keep your voice up.

11          MS. YOON:  May I remove my mask?

12          THE COURT:  Yes, in the booth, you may.

13  Q.   Mrs. Izquierdo, when you were the ORC at Sing Sing, what

14  were your responsibilities.

15  A.   As an ORC I had a caseload.  I was responsible for IPC,

16  PC, special housing, honor block, and population incarcerated

17  individuals.

18  Q.   And what kind of work did you provide for the incarcerated

19  individuals who were assigned to you?

20  A.   I was responsible for making sure that they're in their

21  programming, that they were in -- they was getting the services

22  that DOCCS has to offer.  So I was their counselor, I was

23  making sure their phone list was up to dated, they was in

24  school, they was in programming.  Anything that they needed.

25  Q.   What do you mean by the phone list?

1   A.   Incarcerated individual had a phone list to add numbers.

2   They could reach out to their family, their friends, their

3   loved ones.  So I was responsible for putting those phone

4   numbers on the list.

5   Q.   Is there a limit how many numbers they can call?

6   A.   Yes, 15 is the max.

7   Q.   If they need to change the number or add, they would ask

8   you to help them with that?

9   A.   Yes.

10  Q.   How is ORC different than a correction officer who works

11  at Sing Sing?

12  A.   Officers are there nor security.  We are there for any of

13  the services the incarcerated individual needs.  Officers are

14  on the unit with the incarcerated individual daily.  They don't

15  see us daily, but in IPC they see me daily every day.  In

16  population they do not see me every day.

17  Q.   Were you helping with the welfare of the incarcerated

18  individuals?

19  A.   I'm sorry.

20  Q.   Were you helping the incarcerated individuals with their

21  social life?

22  A.   Yes.

23  Q.   Their relationship with family?

24  A.   Yes.

25  Q.   And you said that the officers are there all the time,

1    every day; is that correct?

2    A.    Yes.  Certain officers are stationed in one area every

3    day, yes.

4    Q.    Is that 24 hours a day?

5    A.    They're not on that shift for 24 hours, but there's an

6    officer there 24 hours, correct.

7    Q.    For security purposes.

8    A.    Correct.

9    Q.    Now, as a ORC, did you also attend review meetings for

10   involuntary protective custody status?

11   A.    Yes, I did.

12   Q.    How often would you attend these review meetings?

13   A.    Once a month.

14   Q.    And who attended these review meetings, if you recall?

15   A.    Dep of security, myself, and another security staff.

16   Q.    And why would you, as an ORC, be part of this review

17   meeting?

18   A.    Because I see the incarcerated individual every day, I

19   have more knowledge, I would say, about them and the things

20   that happen with them daily.

21   Q.    How would you see them every day?

22   A.    I did rounds every day on the unit.

23   Q.    And you said that there will be somebody from security; is

24   that right?

25   A.    In the meeting?  Yes.

1  Q.   And who from the security department would attend these

2  review meetings?

3  A.   The dep of security, it will sometimes be the sergeant of

4  the unit, and sometimes all med staff, mental health.

5  Q.   How would the sergeant or the lieutenant from the security

6  department help with the review process in the meetings?

7  A.   They would give the security input and I would give the

8  counseling input.

9  Q.   And are these sergeants and lieutenants assigned to the

10  housing block where incarcerated individuals who are housed in

11  involuntary protective custody are located?

12  A.   Yes, it will be that sergeant.

13  Q.   So would they, would the sergeant and lieutenant provide

14  information that they gather from correction officers who work

15  at the housing block where incarcerated individuals in

16  protective custody are housed?

17  A.   Yes.

18  Q.   Now, currently, are you still an ORC at Sing Sing

19  Correctional Facility?

20  A.   No, I'm not.

21  Q.   What is your current tile?

22  A.   Supervising offender rehabilitation coordinator.

23  Q.   And how is the supervising offender correctional

24  rehabilitation coordinator different from ORC?

25  A.   I supervise the ORCs now.

1   Q.   And which facility?

2   A.   Bedford Hills.

3   Q.   Why did you -- is that where you moved when you left Sing

4   Sing Correctional Facility?

5   A.   Yes.

6   Q.   And why did you move from Sing Sing Correctional Facility

7   to Bedford Hills Correctional Facility?

8   A.   I wanted to learn a different population.  I'm in a female

9   facility now.

10  Q.   What kind of facility is Sing Sing?

11  A.   A male facility.

12  Q.   At what year did you leave Sing Sing Correctional

13  Facility?

14  A.   2018.

15  Q.   Is it the beginning of the 2018, end of 2018?

16  A.   February, the beginning.

17  Q.   Of 2018.

18  A.   Correct.

19  Q.   Do you know the plaintiff, Mr. Smolen?

20  A.   Yes.

21  Q.   How do you know him?

22  A.   When he first arrived to special housing unit, I was the

23  counselor in 2014.

24  Q.   And that was in 2014.

25  A.   '14, yes, and then he was moved upstairs to IPC and then

Izquierdo - Cross - Yoon

1   PC and IPC.

2   Q.   When he moved to protective custody and involuntary

3   protective custody, were you his counselor?

4   A.   Yes.

5   Q.   And what if any incidents do you remember about

6   Mr. Smolen?

7   A.   There's many incidents with Mr. Smolen.  When I did

8   rounds, we had a good rapport, he would talk to me and tell me

9   everything, his concern.  I would hear him on the unit arguing

10  with other incarcerated individual.  As I'm passing PC and IPC,

11  I could hear him yelling back and forth with other incarcerated

12  individual, just yelling, cursing the other individual.  He's

13  threatening other incarcerated individual.

14  Q.   What kind of threats would he make?  What kind of threats?

15  A.   I have heard -- I don't know if I could say.  Like he

16  would invite people to his private part.  He would say suck my

17  dick to other incarcerated individual.  They would yell back

18  calling hum names in regards to his offense, back and forth.

19  Q.   Was that type of interaction common in the housing block?

20  A.   It's common in special housing unit downstairs.

21  Q.   How about --

22       THE WITNESS:  Because they're disciplinary, but

23  upstairs where it's IPC and PC it's always Mr. Smolen and other

24  incarcerated individual.

25  Q.   How often would you hear him having had verbal arguments

1    with other incarcerated individuals?

2    A.    It was often.  I remember doing rounds one time and I

3    couldn't go on that side of the unit because they told me

4    they're cleaning it up because Mr. Smolen just got feces thrown

5    on him.  And I was just thinking, when they told me it was a

6    bucket of feces, I was like, wow, somebody must really hated

7    him to save a bucket of feces to throw it to him.

8    Q.    That was saved so he could --

9    A.    Yes.

10   Q.    To have enough to throw it at Mr. Smolen?

11   A.    Yes, I was told by the officer on the unit was a bucket

12   full of feces.

13   Q.    Do you know if Mr. Smolen was perceived as a snitch by

14   other incarcerated individuals?

15   A.    Yes.

16   Q.    And how do you know that?

17   A.    Officers, other incarcerated individuals, and I heard him

18   tell on other people, and he would tell other inmates stuff

19   about each other so they would fight with each other.  And I

20   think he got a kick out of it.

21   Q.    So you felt like he was enjoying seeing those --

22   A.    Yes.

23             MR. JOACHIM:  Objection.

24             THE COURT:  Overruled.

25   Q.    When you were the ORC for Mr. Smolen, was Mr. Smolen ever

1    again attacked?

2    A.    There was an incident, I believe it was around 2015, he

3    got assaulted by an incarcerated individual on his unit.

4    Q.    Do you recall how he was assaulted?

5    A.    I think he was hit in his face.

6    Q.    And do you know if he sustained any injuries?

7    A.    He went out to medical.

8    Q.    Like medical in the facility or outside -- like outside

9    hospital?

10   A.    He left the unit to medical, I didn't follow up.  He

11   wasn't there, so I don't know if they took him out.  He did go

12   out to medical.

13   Q.    I see.  When you were doing the rounds, did you see if

14   Mr. Smolen was interacting, socializing with any incarcerated

15   individuals housed in his area?

16   A.    During rec time he was always in his cell, he didn't come

17   out.

18   Q.    And was that by his choice?

19   A.    Yes, no one told him to stay in his cell.  He stays in his

20   cell.  There was no interaction.

21   Q.    Do you know why he was staying in his cell?

22   A.    Because of the animosity that he caused on the unit.  I

23   think he was afraid to come out his cell.

24   Q.    Now you said that he was moved from the involuntary

25   protective custody area to protective custody area; is that

1  correct?

2  A.   Yes, he did, because the situation that goes on his side

3  with the other incarcerated individual, they were moving him to

4  the other side temporarily until they could move the other

5  individual.

6  Q.   He would have an issue with one incarcerated individual in

7  his housing area, so because that of that the facility would

8  move him to a different side.

9  A.   Yes, there's two sides on the unit.  It's IPC and PC, it

10  goes around in like a half a circle.  On his side, he would

11  cause issues there, so that they'll just move him to the other

12  side, the PC side, temporarily.  That happened a couple of

13  times, a few times.

14  Q.   That's not because he chose to be in the protective

15  custody.

16  A.   No.

17  Q.   That was just for his own safety.

18  A.   For safety.

19  Q.   For security.

20  A.   Yes.

21  Q.   Now at these review meetings, do you remember reviewing

22  Mr. Smolen's protective custody status?

23  A.   Yes.

24  Q.   How often would you discuss Mr. Smolen at these review

25  meetings?

1  A.    Often.  He came up a lot in the meetings.

2  Q.    Who would talk about Mr. Smolen, would it be you or

3  somebody from the security?

4  A.    Everyone had something to say; security, myself, sometimes

5  the OMH person that does rounds.

6  Q.    What kind of things were discussed at these review

7  meetings?

8  A.    His interaction on the unit, the animosity that he caused

9  on the unit, and the need to keep him in protective custody in

10  IPC for his safety.

11  Q.    And would the team from the security, would they have any

12  specific information about Mr. Smolen?

13  A.    Yes, they'll get the report from the officer, the regular

14  officer on the unit.

15  Q.    Would these lieutenants and sergeants also have

16  information from confidential informants outside the protective

17  custody housing?

18  A.    Yes, they will give their part which will include whatever

19  they receive, whether it's confidential or a letter from

20  another incarcerated individual.

21  Q.    So they would gather information from all the officers in

22  the Sing Sing facility.

23          MR. JOACHIM:  Objection.  Foundation.

24          THE COURT:  Overruled.

25  A.    Yes.

1  Q.  While you were at the ORC, and specifically from 2014

2  through the end of 2017, at all the review meetings that you

3  attended, was Mr. Smolen discussed?

4  A.  Yes.

5  Q.  Was he discussed at these meetings?

6  A.  Yes, he was.

7  Q.  Do you have any idea why we currently only have seven

8  forms?

9  A.  I remember more than seven forms being done.

10  Q.  Now, during your position as ORC for Mr. Smolen from 2014

11  through the beginning of 2018, did Mr. Smolen's behavior change

12  at all?

13  A.  His behavior was consistent, was the same.

14  Q.  What way?

15  A.  Causing issues on the unit, the animosity that he caused.

16  Same thing.

17  Q.  And this was based on your personal observation of seeing

18  him; is that true?

19  A.  Correct.

20  Q.  As was all the discussions you had at the review meetings.

21  A.  Yes.

22          MS. YOON:  Nothing further.

23          THE COURT:  Mr. Joachim.  Just keep your voice up,

24  please, okay?

25          MR. JOACHIM:  Yes, I'll do my best.

1    THE COURT:  Young lungs, keep them up.  Keep the

2  voice up

3  REDIRECT EXAMINATION

4  BY MR. JOACHIM:

5  Q.  SORC Izquierdo, you interacted with Mr. Smolen when he was

6  first placed in disciplinary special housing unit before he was

7  placed in IPC, correct?

8  A.  Yes.

9  Q.  And you didn't witness any threats by Mr. Smolen when he

10  was housed in disciplinary Special Housing Unit, correct?

11  A.  Can you be more specific?

12  Q.  You did not witness any threats by Mr. Smolen when he was

13  housed in disciplinary Special Housing Unit, correct?

14  A.  I didn't witness it, no.

15  Q.  And you didn't witness any threats being made against

16  Mr. Smolen while he was housed in disciplinary Special Housing

17  Unit, correct?

18  A.  Correct.

19  Q.  And it's common for inmates to yell obscenities at other

20  inmates, correct?

21  A.  Special housing unit, yes.

22  Q.  And you never wrote a misbehavior report for Mr. Smolen,

23  correct?

24  A.  I don't think so.

25  Q.  And Mr. Smolen was never disciplined after he was placed

1  on IPC, correct?

2  A.   Can you repeat the question?

3  Q.   Mr. Smolen was never disciplined after he was placed in

4  IPC, correct?

5  A.   Are you referring to receiving a misbehavior report?

6  Q.   Correct.

7  A.   Yes, he did receive a misbehavior report.

8  Q.   He never received a misbehavior report related to any

9  threats, correct?

10 A.   I don't recall all his misbehavior report and what they

11 was for.

12 Q.   You don't recall any misbehavior report related to any

13 threats made by or against Mr. Smolen, correct?

14 A.   I don't recall.

15          MR. JOACHIM:  No further questions.

16          THE COURT:  Ms. Yoon.

17          MS. YOON:  One second.

18          Your Honor, just briefly.

19          THE COURT:  I'm going to hold you to that, Ms. Yoon.

20 RECROSS EXAMINATION

21 BY MS. YOON:

22 Q.   Ms. Izquierdo, the threats that you heard personally or

23 through other staff at Sing Sing, was that recorded in any form

24 such as a transfer request?

25 A.   Yes.

1    MS. YOON: Your Honor, at this time I would like to
2  publish defendant's Exhibit A to the jurors.
3    THE COURT: A has been admitted into evidence, so you
4  may publish it.
5    MS. YOON: We'll wait for that to show up. And for
6  the record, we're looking at Defendant's 182 in Defendant's
7  Exhibit A.
8  Q.  Ms. Izquierdo, do you see Defendant's Exhibit A
9  Defendant's 182?
10  A.  Yes.
11  Q.  It's also on the screen.
12    And did you put this information into the screen?
13  A.  Are you on page 181?
14  Q.  182?
15    THE COURT: 182, the next page.
16    THE WITNESS: Sorry.
17    THE COURT: That's okay.
18  A.  Yes.
19  Q.  Did you put in the information for explanation for
20  transfer?
21  A.  Yes, I submitted this transfer to central office.
22  Q.  And what -- can you just read what you wrote for
23  explanation of transfer?
24  A.  Inmate has been in Sing Sing SHU/IPC since 2013-2014.
25  He's verbally abusive towards staff and inmate. IPC inmates

Izquierdo - Recross - Yoon

1    are aware of his crime, has been attacked by other inmates in

2    IPC several times.

3    Q.   And this is information that you put in, is that based on

4    your personal, personal knowledge?

5    A.   Yes, it is, from my personal, from what I saw, from what

6    was given to me my security staff and myself.

7    Q.   And this is what you observed since Mr. Smolen was placed

8    in SHU in February of 2014 through when the transfer request

9    was submitted; is that correct?

10   A.   Correct.

11   Q.   And when this was this transfer request submitted?

12   A.   7/14/2015.

13   Q.   Thank you.

14        MS. YOON:  Nothing further, your Honor.

15        THE COURT:  All right, you may step down, ma'am.

16        (Witness excused)

17        THE COURT:  Call your next witness, plaintiff.

18        MR. JOACHIM:  We call defendant Capra.

19        THE COURT:  All right.

20        MS. YOON:  Your Honor, may I have a quick Sidebar on

21   this, very quick one, your Honor.

22        (Following discussion was held at sidebar:

23        MS. YOON:  Your Honor, I wasn't here yesterday but I

24   know you had made a decision regarding the term past release

25   date.

Izquierdo - Recross - Yoon

1    THE COURT:  Yes.

2    MS. YOON:  I was reading the transcript and I think

3  there needs to be a clarification as to the fact that he was in

4  protective custody did not cause him to stay past his release

5  date.  I want to have one question regarding that.  Nothing to

6  do with his condition or the fact that he was --

7    THE COURT:  I understand your point.

8    MR. JOACHIM:  What's the question?

9    THE COURT:  Do you have a specific question you want

10  to ask?

11    MS. YOON:  The specific question would be:  Did the

12  fact that Mr. Smolen was in protective custody have anything to

13  do with the fact that he was staying incarcerated past his jail

14  sentence?

15    MS. ONYSHKO:  That's --

16    MR. JOACHIM:  I think that will let the jury

17  speculate he's staying for some other unit.

18    MS. ONYSHKO:  We haven't argued he's being kept past,

19  what he said, because of protective custody it's not something

20  that's been suggested to the jury.

21    MR. DORAN:  Yesterday they published multiple review

22  forms and I believe it was Mr. Joachim kept saying past review

23  dates and they never asked that clarifying question.  Now the

24  jury is clearly -- we have to clarify this because it has

25  absolutely nothing to do -- we have no intention asking what

1  the underlying crime is.  No intention of going into any of

2  that.

3           THE COURT:  The answer to your immediate question is

4  unless and until I have a question that is acceptable, the

5  answer is I'm not going to permit you to do it.  This is the

6  type of thing you prepare overnight, not while I have a jury in

7  the box.  You talk to your adversary, come up with a solution,

8  or come up with a very precise issue.  We're not going to do

9  this by the seat of our pants.  If you can come up with a

10 question that doesn't implicate the entirety of that which we

11 discussed yesterday, okay by me.  I'll consider it but.  We're

12 not going to spend my time, the jury's time, because you just

13 decided you wanted to ask a question now.

14           The application is denied.

15           MR. DORAN:  Your Honor, what about --

16           THE COURT:  I said it's denied.  Go back to your

17 seat.

18           End of sidebar discussion)

19           THE COURT:  Okay, the next witness.  Please come into

20 the box.

21           THE DEPUTY CLERK:  Step into the box, remain

22 standing, and raise your right hand.

   MICHAEL CAPRA,

23

      called as a witness by the plaintiff, having been duly

24

   sworn, testified as follows:

25

Capra - Direct - Joachim

1     THE DEPUTY CLERK:  Please be seated plead.  State

2  your full name for the record and spell it.

3     THE WITNESS:  Michael Capra, C-A-P-R-A.

4     MR. JOACHIM:  May I proceed, your Honor?

5     THE COURT:  Yes, please.

6  DIRECT EXAMINATION

7  BY MR. JOACHIM:

8  Q.   Superintendent Capra, can you hear me okay?

9  A.   Yes, sir.

10  Q.   You are the superintendent at Sing Sing Correctional

11  facility, correct?

12  A.   Yes, I am.

13  Q.   You were the superintendent at Sing Sing 2014 through

14  2018?

15  A.   Yes I am.

16  Q.   And as superintendent you oversaw the operations at Sing

17  Sing; is that correct?

18  A.   That is correct.

19  Q.   And in that role you are required to follow the Department

20  of Corrections directives and corrections law, correct?

21  A.   That's correct.

22  Q.   And you expect your subordinates to follow the Department

23  of Corrections directive and corrections law, correct?

24  A.   That is correct.

25  Q.   At Sing Sing, there are 30 cells for inmates in protective

Capra - Direct - Joachim

1   custody and IPC, correct?

2   A.    There are 15 cells for involuntary protective custody at

3   Sing Sing.

4   Q.    And another 15 cells for protective custody, correct?

5   A.    For voluntary protective custody, correct.

6   Q.    There are 30 cells in disciplinary special housing unit,

7   correct?

8   A.    That's correct.

9   Q.    And the number of cells in IPC, protective custody, and

10  disciplinary and special housing unit has been the same since

11  2014, correct?

12  A.    The disciplinary unit has changed.

13  Q.    How has that changed?

14  A.    There's only a 15 cells in the disciplinary unit now.

15  Q.    And there were 30 between 2014 and 2018?

16  A.    That is correct.

17  Q.    And there are typically over a thousand inmates housed in

18  general population at Sing Sing, correct?

19  A.    That is correct.

20  Q.    Between 2014 and 2018 your standard count was more than

21  1700 inmates in general population, correct?

22  A.    That is correct.

23  Q.    And most inmates in general population are out of their

24  cell for 16 hours a day, correct?

25  A.    That is not correct.

1  Q.   Superintendent Capra, you had your deposition taken in

2  this case, correct?

3  A.   I did.

4  Q.   And during that deposition a lawyer asked you questions?

5  A.   They did.

6  Q.   And your lawyer was there, too, correct?

7  A.   Pardon?

8  Q.   Your lawyer was there too, correct?

9  A.   Yes, that's correct.

10 Q.   And a court reporter was there writing everything down?

11 A.   That's correct.

12 Q.   And you swore an oath to tell the truth at that

13 deposition.

14 A.   I did.

15 Q.   I'd like you to show you a copy of your deposition

16 transcript, which I'll mark for identification as Exhibit 13, I

17 believe.

18         THE COURT:  We'll get it to you in a minute.

19 Q.   Do you recall at that deposition you testified that most

20 people at Sing Sing are out for 16 hours a day?

21 A.   Okay.

22 Q.   You recall that testimony?

23 A.   Not really.

24 Q.   If you look at page 50 of your deposition and your answer

25 that runs from lines 24 to the next page, 51 line 4, you see

1    that?

2    A.    24 through what?

3    Q.    50, line 24 through page 51 --

4    A.    I see it.

5    Q.    -- line 4.

6    A.    I see it.  Yes.

7    Q.    Does that refresh your recollection testified most people

8    are out for 16 hours a day?

9    A.    Yes.

10   Q.    That was your sworn deposition testimony, correct?

11   A.    It was.

12   Q.    Most inmates in general population are allowed to go to

13   classes for educational programs?

14   A.    They are.

15   Q.    And most inmates in general population are allowed to go

16   the library, correct?

17   A.    That's correct.

18   Q.    Most inmates in general population are allowed to go to

19   the chapel, correct?

20   A.    That's correct.

21   Q.    Most inmates in general population are allowed to go to

22   the gym, correct?

23   A.    Correct.

24   Q.    Most inmates are allowed to go to the general population

25   yard, correct?

1  A.   Correct.

2  Q.   I'm going to talk about the process for protective custody

3  reviews.  As part of your responsibilities you sign off on

4  protective custody reviews, correct?

5  A.   That's correct.

6  Q.   And the status of each inmate in IPC is supposed to be

7  reviewed at least every 30 days, correct?

8  A.   Correct.

9  Q.   And the first step in that process is a three member

10  committee is supposed to meet?

11  A.   Yes.

12  Q.   And that committee is supposed to discuss the status of

13  each inmate in IPC, correct?

14  A.   Yes.

15  Q.   And then that committee is supposed to fill out a review

16  form, correct?

17  A.   Correct.

18  Q.   And the committee is supposed to fill out one form for

19  each inmate in protective custody, correct?

20  A.   Yes.

21  Q.   And then after the meeting you receive the review forms,

22  correct?

23  A.   Correct.

24  Q.   And you were supposed to review the review forms, correct?

25  A.   Yes.

Capra - Direct - Joachim

1  Q.   And you make the ultimate decision whether to release the

2  inmates from IPC or to continue their protective custody

3  status, correct?

4  A.   That's correct.

5  Q.   In making that determination, you're supposed to fill out

6  part of the form, correct?

7  A.   Yes.

8  Q.   And you're supposed to sign the form, correct?

9  A.   Correct.

10  Q.   In making that determination for Mr. Smolen, you did not

11  review any documents other than the review forms you received,

12  correct?

13  A.   What does that mean?

14  Q.   In making the determination whether to continue

15  Mr. Smolen's protective custody review status, you did not

16  review any documents besides the review forms you received,

17  correct?

18  A.   No, I have the responsibility to -- for the entire

19  facility.  I get briefed daily on things that are important,

20  one of those are the behaviors in both protective custody in

21  SHU, a small amount of people, when you have 1700 people in the

22  institution.  So I'm briefed by my executive staff, by my

23  captains, by my lieutenants, by my sergeants, by my officers

24  when I'm on rounds.  So there's a number of things that go into

25  the consideration, as well as that form at the end of the

Capra - Direct - Joachim

1   month.  That form is a formality, it is a piece of the puzzle.

2   It is authorization to my staff as to whether or not to change

3   his custody status.  So no, that's not the only information.

4           MR. JOACHIM:  Your Honor, move to strike that

5   response as irrelevant.

6           THE COURT:  Overruled.

7   Q.   Superintendent Capra, do you recall at your deposition you

8   testified you would not review anything other than the review

9   form for Mr. Smolen?

10  A.   No, I don't.

11  Q.   I'd like you to turn to page 75 of your deposition

12  transcript, and look at lines 4 through 6.  Do you have that in

13  front of you?

14  A.   Yes, I do.

15  Q.   And does that refresh your recollection that you were

16  asked whether you reviewed anything other than the review forms

17  and you responded, not for Mr. Smolen?

18  A.   And then I went on to say other things further down if you

19  see that on line 9.

20  Q.   Superintendent Capra, you didn't attend any protective

21  custody review meetings regarding Mr. Smolen, correct?

22  A.   That's correct.

23  Q.   And you didn't spend a lot of time looking at the forms

24  for Mr. Smolen, correct?

25  A.   That's correct, I don't spend a lot of time looking at a

1  redundant form.

2  Q.   Let's look at a few of the forms.  I'd like to publish

3  Exhibit G to the jury?

4           THE COURT:  G is in the binder that looks like this.

5           You may.

6  A.   Yes.

7  Q.   And this is a protective custody review form for

8  Mr. Smolen, correct?

9  A.   That's correct.

10  Q.   And this form has a review date of July 7, 2017?

11  A.   Yes.

12  Q.   And Section A is filled out by the review committee,

13  correct?

14  A.   Yes.

15  Q.   Section B is the area you're supposed to fill out,

16  correct?

17  A.   Yes.

18  Q.   That's your signature at the bottom of this form?

19  A.   It is.

20  Q.   And there are two check boxes under section B, correct?

21  A.   That's correct.

22  Q.   And first is release from PC, correct?

23  A.   Correct.

24  Q.   And you're supposed to check that box if you decide to

25  release the inmate from protective custody?

1    A.    Correct.

2    Q.    And in the second check box is a determination has been

3    made to continue your PC status for the following reasons,

4    correct?

5    A.    Correct.

6    Q.    You're supposed to check that box if you decide to keep

7    the inmate in protective custody.

8    A.    Correct.

9    Q.    And here neither box is checked, correct?

10   A.    Correct.

11   Q.    And the space after the second checked box is also left

12   blank, correct?

13   A.    Yes.

14   Q.    So you didn't fill out section B of this form, correct?

15   A.    That's correct.

16          MR. JOACHIM:  I'd like to publish Exhibit H to the

17   jury.

18          THE COURT:  Okay, let's move this along.  The

19   document says what it says.

20          MR. JOACHIM:  Yes, your Honor.

21   Q.    And here in section B the space to fill out after a

22   determination has been made to continue your PC status for the

23   following reasons is blank again, correct?

24   A.    That's correct.

25   Q.    And that's your signature at the bottom?

1    A.   It is.

2           MR. JOACHIM:  I'd like to publish Exhibit I to the

3    jury.

4           THE COURT:  Yes, please.

5    Q.   And this is another protective custody review form for

6    Mr. Smolen, correct?

7           MS. YOON:  Objection.  The record speaks for itself,

8    your Honor.

9           THE COURT:  Overruled.

10   Q.   Correct?

11   A.   Yes.

12   Q.   And this form has a review date of December 8, 2017,

13   correct?

14   A.   Yes.

15   Q.   And that's your signature at the bottom of this form?

16   A.   It is.

17   Q.   And here your signature is dated January 8, 2018, correct?

18   A.   Yes.

19   Q.   That's a month after the review date of the form, correct?

20   A.   Okay, yes.

21   Q.   Did you wait a month before reviewing this sheet or was

22   that an error?

23   A.   Pardon?

24   Q.   Did you wait a month after reviewing -- before reviewing

25   this form or was that an error.

Capra - Direct - Joachim

1    A.   I'm not sure what you mean.

2    Q.   The review date is --

3    A.   Let me go -- let me refer back, because you went through a

4    whole lot real quick.  What was that --

5    Q.   Exhibit I.

6    A.   -- G?

7         THE COURT:  I?

8    A.   I, I'm sorry.  All right, I'm here, 1/8/18.  Yes.

9    Q.   So the review date at the top says 12/8/17, correct?

10   A.   Yes, it does.

11   Q.   And at the bottom it says 1/8/18, correct?

12   A.   Correct.

13   Q.   1/8/18 is a month after 12/8/17, correct?

14   A.   Yes.

15   Q.   Did you wait a month before reviewing this form or was

16   that --

17   A.   I have no knowledge as to whether I waited or not.  The

18   form was presented to me, I reviewed it, and I signed it.

19   Q.   So you don't recall if that was an error or you waited a

20   month?

21   A.   As I just said, I have no idea.

22   Q.   One more question about this form.  It says date placed in

23   PC at the top, 9/23/16, correct?

24   A.   9/23/16, that's correct.

25   Q.   Mr. Smolen was placed in IPC on 9/23/14, correct?

Capra - Direct - Joachim

1    A.    If that's what the record reflects, yes.

2    Q.    So that's an error, correct?

3    A.    Correct.

4    Q.    I'd like to publish Exhibit K to the jury.

5              THE COURT:  Okay.

6              MR. JOACHIM:  This is my last one, your Honor.

7              THE COURT:  Good.

8    Q.    This is another protective custody review form for

9    Mr. Smolen, correct?

10   A.    Yes.

11   Q.    And this form has a review date of February 7, 2018?

12   A.    Yes.

13   Q.    And in this form that's not your signature at the bottom,

14   correct?

15   A.    That's my first deputy superintendent's signature.

16   Q.    So you designated someone else to sign this form on your

17   behalf?

18   A.    I was probably out.

19   Q.    And in this form section B is left blank again, correct?

20   A.    Correct.

21   Q.    So you didn't even look at this form, correct?

22   A.    That's correct.

23             MR. JOACHIM:  No further questions, your Honor.

24             THE COURT:  All right.

25             Ms. Yoon.

Capra - Cross - Yoon

1          MS. YOON:  Thank you, your Honor.

2     CROSS-EXAMINATION

3     BY MS. YOON:

4     Q.   Good morning, Superintendent Capra.

5     A.   Good morning.

6          THE COURT:  You can take your mask off, Ms. Yoon.

7          MS. YOON:  Thank you very much, your Honor.

8     Q.   Superintendent Capra, what is your current title?

9     A.   My current tile is supervising superintendent for the New

10    York City hub.

11    Q.   Are you also superintendent for Sing Sing Correctional

12    Facility?

13    A.   Yes, I am.

14    Q.   Back to your prior answer, what is superintendent

15    supervisor?  What does that mean?

16    A.   I have oversight of the other correctional facilities in

17    the New York City hub.

18    Q.   And how do you get that position?

19    A.   I'm appointed by the commissioner and the deputy

20    commissioner of New York State DOCCS.

21    Q.   And how long have you worked for Department of Corrections

22    and Community Supervision?

23    A.   Since 1981.

24    Q.   And how many years is that?

25    A.   I think that's going -- 41 plus years.

Angela O'Donnell, Official Court Reporter
(914)390-4025

Capra - Cross - Yoon

1  Q.   And what was your first position when you first started in
2  1981?

3  A.   My first position?  I started at correction officer.

4  Q.   And then did you eventually get promoted?

5  A.   Yes.

6  Q.   And?

7  A.   From correction officer to investigator with the inspector
8  general's office, then I became a sergeant, and then I became a
9  lieutenant, then I became a regional training lieutenant, then
10 I became a captain, then I became a field commander assert
11 operations for the State of New York, and then I went back to
12 the field as a captain, then I went to deputy superintendent of
13 security, then I went -- in 2012 I became the superintendent of
14 Sing Sing Correctional Facility.

15        MS. YOON:  Thank you.  A lot of different positions
16 during your 41 years with DOCCS.

17 A.   Fifteen different assignments over the years, yes.

18 Q.   Have you worked at any other facility other than Sing Sing
19 Correctional Facility?

20 A.   Yes.  Many.

21 Q.   Which facility?

22 A.   You want me to mention them?

23 Q.   Just the ones that you can recall.

24 A.   Obviously Sing Sing, Bedford Hills Correctional Facility,
25 Green Haven Correctional Facility, Fishkill Correctional

1 Facility, Parkside Correctional Facility. I worked at the

2 training academy as a captain, I was the acting director there.

3 I think that's all I can remember right now.

4 Q. Okay, that's fine. And how is -- what kind of facility is

5 Sing Sing Correctional Facility?

6 A. So Sing Sing Correctional Facility is a maximum security

7 level one facility.

8 Q. What does that mean?

9 A. That means the worst people who are incarcerated could

10 come to me. It also means that we provide medical attention 24

11 hours a day and OMH or mental healthcare 24 hours a day.

12 Q. Is Sing Sing Correctional Facility different from other

13 maximum security facilities?

14 A. Well, it is the second oldest largest prison in New York

15 State, operating prison in New York State. The configuration

16 of Sing Sing is definitely different. Auburn was the oldest,

17 we're the second oldest operating.

18     The big thing that stands out is the configurations of our

19 housing units. So our housing units in A and B Block hold over

20 600 incarcerated people. Other facilities, for instance, Green

21 Haven, which is also a level one max, they have more inmates,

22 incarcerated people, than I do, but their galleries are smaller

23 and they can be confined to 30 or 40 inmates on one particular

24 gallery, whereas we have galleries that are 65 to 85 cells

25 long. So it creates an issue when we're trying to manage

Capra - Cross - Yoon

1  difficult people in population.

2  Q.   And when you say gallery, what do you mean by that?

3  A.   A row cells that incarcerated people that are confined to.

4  So it may be a gallery, for instance, and there may be 65 cells

5  on a gallery, and each cell is individually numbered.

6  Q.   When you said -- when you say housing block, can you just

7  describe that to us?

8  A.   So A Block, for instance, is about two football fields

9  wide.  It's four stories high.  It houses over 600 inmates on a

10 number of different galleries that are 85 cells long for each

11 gallery.

12 Q.   So is it like one big space and it's divided by different

13 galleries?

14 A.   Yes.

15 Q.   So just to go over the housing blocks in Sing Sing

16 Correctional Facility, how many are there?

17 A.   So there's A Block, there's B Block, there's 5 building,

18 which is much smaller, and there's 7 building, which is earned

19 eligibility.  Other people could consider that honor block.

20 Q.   And where was involuntary protective custody housing

21 placed?

22 A.   That's in HBC housing Block C.  So that houses both

23 protective custody inmates and disciplinary incarcerated

24 people.

25 Q.   Why was that division housed in HBC?

Capra - Cross - Yoon

1   A.   So protective custody could be, in most facilities it is

2   not housed in the same area or the same block as special

3   housing unit.  It just you just so happens that that's where

4   they designated it to be, so protective custody is in HBC, it's

5   on the top two floors, it's on the top floor, rather.  And each

6   side, 15 cells per side, downstairs in the same block or

7   building is the special housing unit for inmates or

8   incarcerated people who are confined because of disciplinary

9   reasons.

10  Q.   So the housing Block C is much smaller than the housing

11  the other housing blocks at Sing Sing, is that fair to say?

12  A.   That's right, yes.

13  Q.   And we talked about protective custody and involuntary

14  protective custody.  Can you tell us what that means?

15  A.   Yes.  So voluntary protective custody an individual may

16  come to one of our staff members and explain why he needs

17  protective custody.  That staff member would fill out a report.

18  That report would take us -- go to a higher ranking person,

19  whether it would be a senior counsel counselor or supervisor.

20  They'd interview that individual and they would send that

21  document to me for final determination.  Certain times they

22  would place the inmate directly into voluntary protective

23  custody prior to my signature because of the imminent threat to

24  safety of that person.  That's, in a nutshell, what voluntary

25  protective custody is.

1    Involuntary protective custody is another scenario where

2  we feel, the administration feels that if this person was let

3  out of their cell into general population, the likelihood of

4  them getting hurt or worse is very high.  And so there is a

5  similar document that is filled out and secondarily reviewed.

6  That person's then placed in involuntary protective custody and

7  a hearing is done within 14 days.

8  Q.    And is there any benefits to the facility if the facility

9  puts an incarcerated individual in protective custody or

10  involuntary protective custody?

11  A.    So involuntarily protective custody does me absolutely no

12  great favor.  I do not want nor does the agency want people in

13  any of those voluntary or involuntary units.  We would prefer

14  that our population move forward, get educated, get to a place

15  in their incarceration where they left criminal lifestyle so

16  when they're released they don't victimize anyone anymore and

17  they don't come back to us.  And so that's really the overall

18  goal.

19    Our first rule is to keep people safe.  So involuntary

20  protective custody, you know, it's not a good thing for me to

21  go ahead and place somebody involuntary protective custody.  As

22  my job, as my oath, my job is to protect human beings; both my

23  incarcerated people that I'm sworn to protect as well as my

24  staff.  So if I have information I believe is going to keep

25  that person safe, I'm going to get them in involuntary

1   protective custody, and then hopefully they'll be moved to

2   another facility where this he don't have the same threat level

3   as they have in my facility.

4   Q.   And is involuntary protective custody a disciplinary

5   housing?

6        Meaning is an inmate placed there to punish the

7   incarcerated individual?

8   A.   No, absolutely not.  Most of the things -- obviously they

9   can't leave the unit, and they can't leave the unit because of

10  their safety.  So I've heard that over and over again, I hope

11  that's clear.  We obviously we wouldn't let somebody in

12  involuntary protective custody go to the yard, it's against

13  exactly what we did in the first place to keep them safe.

14  There is a threat out there, and there's a threat that we found

15  viable, so therefore we need to keep them in involuntary

16  protective custody.  If they leave the unit for any reason, and

17  there might be a reason, medical, maybe they're going on a

18  trip, maybe they're seeing a doctor, although medical does come

19  down to the unit, but maybe I have a call out to go to medical,

20  we'll escort that person have very minimal people in the

21  hallways when we get from point A to point B.  Again,

22  everything is based on that person's safety.

23  Q.   And does being placed in involuntary protective custody or

24  protective custody have any impact on the length of jail

25  sentence that one person has to serve?

Capra - Cross - Yoon

1   A.   Has nothing to do with their conditional release or their

2   maximum release dated at all.

3   Q.   It doesn't lengthen the jail sentence.

4   A.   Absolutely not.

5   Q.   Now I want to talk to you about the review meetings that

6   are held to review the incarcerated individual's protective

7   custody status.  Do you personal attend these meetings?

8   A.   No, I do not.

9   Q.   So what is your role in these review processes?

10  A.   So as I said, the documents come to me.  So there are --

11  the department's policy has changed many times over the years

12  that I have been the superintendent.  And so at one point every

13  inmate that was confined to a special housing unit was

14  reviewed, every -- it started off as involuntary protective

15  custody, then voluntary protective custody, and then special

16  housing unit with those people who are in the special housing

17  unit who had a mental health condition and then everybody in

18  that special housing unit.  I can't give you the chronological

19  order, but it has changed.  So at times there were 60 forms a

20  month that I signed off on.  And I was familiar with these

21  people, because when you're dealing with risk management and

22  you have 1700 people to deal with, as well as your staff, the

23  people that stick out are generally people who are either

24  causing problems or need some kind of serious protection.  And

25  we had people and staff on those units 24 hours a day, seven

Capra - Cross - Yoon

1    days a week, and they are evaluating their behaviors and/or

2    their progress.

3        So for an instance, with the special housing unit, if a

4    person is doing well, they're not causing anymore trouble, we

5    may opt to give them an early out, so to speak, or a time cut

6    from their disciplinary hearing.  Involuntarily protective

7    custody, if his status changes, if something changes that

8    would, that myself or my team feels that we no longer need him

9    in involuntary protective custody, we certainly let the person

10   out.  In those cases, involuntary protective custody, it's not

11   that often, if at all.  In other words, I don't know if I

12   remember anybody independently we cut loose out of involuntary

13   protective custody.  And the reason for that is, for instance,

14   in voluntary protective custody many times it's an individual

15   that they are -- or individuals that they're being protected

16   from.  If those people transfer out of our facility and our

17   intelligence division has done their job and given us, myself

18   and my team, some advice and some briefings on whether or not

19   we felt that that threat was no longer there, then we would

20   interview the individual, the individuals, we would have a

21   conversation with them for the most part and then cut that

22   person loose out of protective custody back into population.

23   So that's in a nutshell how it works.

24   Q.   Would you say you are like the final reviewer of the

25   review meeting that's already been done by your staff?

Capra - Cross - Yoon

1    A.    I am the final signature, however, it is a constant

2    briefing on these particular people.  It's not this far away,

3    you know, papers at my desk, I don't know who these people are,

4    I sign off.  I'm very familiar with the people who are in the

5    special housing unit and who are on voluntary and involuntary

6    protective custody.  Myself, my executive team, my staff, as I

7    said before, the officers, the other inmates, when we go on

8    rounds -- I go on rounds once a week at least in those housing

9    units.  My executive team goes on rounds once a week.  We don't

10   do that necessarily in the entire prison, but specifically in

11   voluntary and involuntary protective custody we make rounds

12   there, we speak to inmates, we speak to the staff, we get a

13   flavor for what's going on, we understand the culture on the

14   gallery which changes constantly.  We know who are the

15   agitators are, we know the people who are quiet and timid are.

16   We do that because we measure risk management for these people.

17   Again, our job is to keep these people safe.  It really is as

18   clear as that.

19       And so if there's a change, I'll offer that we have at

20   times where several people over the years have been so

21   problematic that we've -- actually, not several very few, and

22   in this case Mr. Smolen, so problematic on the unit that we had

23   to move him to the voluntary side.  Now that's not something I

24   want to do, and my staff doesn't want to do that.  But if we

25   need to manage that person and keep that person safe, we're

1  going to do what we need to do to measure risk management for

2  that gallery.

3  Q.  Now how much details would you usually put in the review

4  forms that you sign at the end of the day?  Generally speaking.

5  A.  I already am well aware of the people that I'm signing off

6  on.  There's nothing there that I'm learning that I haven't

7  already been briefed on.  My facility and my staff and my style

8  of leadership is daily briefings from everybody.  Every single

9  day every one of my executive staff comes in to see me before

10  nine o'clock in the morning, for the most part, and gives me an

11  update on what's going on since the last time we spoke.  That

12  along with the rounds and what I'm hearing from my crisis

13  intervention unit team members, the emails I get, the letters I

14  get from the individuals who are on the gallery.  Some of them

15  might be snitching out each other.  In this case I learned of a

16  lot of letters that Mr. Smolen had sent forward to us

17  complaining about a lot of different things, but I receive

18  letters from other inmates also.

19  Q.  That's also part of your information that you use when you

20  make the determination about incarcerated individual's

21  placement in protective custody.

22  A.  I'm not counting on one form to give an overall view of

23  what's going on down there.

24  Q.  I want to talk to you specifically about Mr. Smolen.  Do

25  you remember approving Mr. Smolen's placement in protective

1    custody?

2    A.   I don't recall the day or the actual moment, but I knew

3    that he was going in protective custody, yes.

4    Q.   And do you remember reviewing the review forms for all of

5    Mr. Smolen's review meetings?

6    A.   Yes.  For the most part I got them weekly because people

7    were coming in and out of protective custody, so when they did,

8    it was a weekly thing for a few months, then 30 days

9    thereafter.  So it was a stack of those forms, as I said, at

10   one point 60 of them at a clip, for all the people that were in

11   protective custody and in disciplinary SHU.

12   Q.   What are some of the things you consider when you decide

13   to continue to place Mr. Smolen in protective custody?

14   A.   Number one thing that I consider is the person's safety.

15   Number one.  Is the person going to be safe?  If not, can I let

16   them out?  If I can let him out, that's a good thing for me.

17   Q.   Do you remember any specific incidents involving

18   Mr. Smolen during this period of time?

19   A.   Yes.  Unfortunately, Mr. Smolen sticks out more than most

20   people in my career.  I will always remember Mr. Smolen, I will

21   remember his behaviors.  They were never good.  They were very

22   difficult.  We've had a lot of difficult people to manage over

23   the years, very violent people, but Mr. Smolen had a different

24   spin to his behaviors, and they were very particular.

25   Q.   How was it particular, was he making any type of specific

Capra - Cross - Yoon

1  threat?

2  A.   His agitation towards the other members of the population

3  I don't know why he did what he did, but no matter where he was

4  he seemed to attack and target certain other incarcerated

5  individuals.  We first started noticing he seemed to attack the

6  younger individuals, younger incarcerated people.  That started

7  to cause a problem, and when other incarcerated people would

8  come to their aid, he would then make threats.  I've learned

9  that through my staff, my constant briefings from other inmates

10  while I was on galleries.  Making statements.  He made

11  statements in sum and substance is that when he gets out he

12  would hurt the other individual's who are confined family

13  members, children -- well, family members, I'll leave it at

14  that.

15  Q.   Did he make any kind of sexual advance or comments towards

16  incarcerated individuals?

17  A.   I was trying to say that.  That was the odd thing about

18  Mr. Smolen he would use he would tell people what he was

19  confined in prison for and threaten family members of the

20  inmates with that kind of behavior.

21  Q.   Did he also make any threats about parole for other

22  incarcerated individuals?

23  A.   Again, this is all part of this very different management

24  problem.  He threatened to send letters to the parole board

25  about other incarcerated people who are going to the parole

 1  board saying negative things and disparaging things about them,

 2  in essence trying to get their parole date taken.  So this is

 3  behavior that honestly is something that we don't see,

 4  certainly I don't see, and I've been around a long time and

 5  there's been a lot of violent people who do a lot of nasty

 6  things.  But this is such a different twist --

 7  Q.   And --

 8  A.   -- which is why leaving him out of the area, out of the

 9  involuntary protective would definitely have put him at risk.

10  I learned of letters he had written to my immediate staff

11  complaining about other staff members who let him out of his

12  cell, and in those letters said, the officer knows he's

13  supposed to rec me by myself, I could have been stabbed or

14  killed.

15       So these are all part and parcel of all the pieces of

16  information that I get that at the end of the day sign off on

17  somebody who I know, and his behaviors have been the same since

18  the day I met him, which is somewhere in '14, and until the day

19  he left.

20  Q.   Going back to the complaint that he made about another

21  correction officer, he was complaining that she opened his

22  cell?

23  A.   Yeah.  He was -- he wrote quite a large --

24  Q.   Just --

25            THE COURT:  Hold on, Ms. Yoon.  You asked a question,

1    the witness is trying to answer your question and then you're

2    onto your next question.  Slow down.

3            You may finish your first answer.

4            THE WITNESS:  Thank you.

5    A.    So he wrote several pages, a lot of it was snitching out

6    other people.  In this particular case, in one of the sections

7    of this letter, he writes specifically complaining about an

8    officer who opened his cell and said, you know I rec alone, you

9    know I can't go out, I have to go out by myself, meaning this

10   officer, and yet the officer still let me out and put my life

11   in peril where they know I could have been stabbed or killed.

12   Again, another piece of the puzzle for me as all these

13   different documents and advisories come to me, as well as my

14   own observation when I'm walking and talking on these units.

15   Q.    Would you say Mr. Smolen is an average incarcerated

16   individual at the facility?

17   A.    Unfortunately not.

18   Q.    Did he fall outside the guideline of average person?

19   A.    In my opinion did he fall outside an average -- yeah,

20   absolutely.  He sticks out, he always has stuck out, and he

21   will be a memory as far as me and my team, I'm quite sure.

22   Q.    Superintendent, while Mr. Smolen was in involuntary

23   protective custody, did he receive any misbehavior reports?

24   A.    He received several.

25   Q.    And was he disciplined for those misbehavior reports?

1   A.   Yes, he was, 30 days at a clip.  I can't tell you exactly

2   all of them, but about 30 days for each one of his

3   misbehaviors.

4   Q.   Do you recall how many misbehavior reports Mr. Smolen

5   received while he was in protective custody?

6   A.   In prepping for this trial, I believe I looked at seven

7   instances where he was -- had misbehavior reports done.

8   Q.   Did you make any efforts to transfer Mr. Smolen when he

9   was placed in protective custody?

10  A.   Yes.

11  Q.   What efforts did you make?

12  A.   So it's my practice to personally call the director of

13  classification and movement or deputy commissioner when I have

14  somebody who is -- I believe really needs to be moved out of my

15  facility, and that was the commission with Mr. Smolen.

16       My practices remained the same the entire time I've been a

17  superintendent.  And as frequently as last week I had a

18  scenario where I had to have somebody moved and I made a direct

19  call to the deputy super -- deputy commissioner, rather, in

20  classification and movement, and their response back was, yeah,

21  we're moving him, have your staff put a transfer order in.

22  That was the case with Mr. Smolen.  Several times, by the way,

23  over the years.

24  Q.   And typically, back in 2014 through 2017, approximately

25  how much paperwork were you reviewing and signing?

1  A.   Specific to his review?

2  Q.   Just general paperwork that you had to review.

3  A.   Oh, I have thousands of documents that come past my desk

4  for -- all the divisions at one point or another have something

5  that have to be looked at, approved, or signed off by me.  So

6  from overtime to anything to do with, many things to do with

7  the incarcerated, not all things, but many things.

8  Q.   In Mr. Smolen's case, the forms have very little

9  information or nothing filled out.  Does that mean that you

10  didn't consider all the new information when you approved

11  Mr. Smolen's placement in protective custody?

12  A.   So just to give you, again, another flavor about things.

13  The inmate status doesn't change unless I order it to change.

14  So the form comes before me, and admittedly, I should have

15  written more on it.  The fact that Mr. Smolen was with me for

16  so long in this particular status is very unusual.  Nothing had

17  changed, we all knew it, we all discussed it, it wasn't like a

18  foreign scenario that took place.  It was just a live,

19  breathing situation, every week his name was up and we

20  discussed how to manage him, how to keep him safe, which was

21  not an easy thing.  But as been said many times, the form went

22  to the two places, the Assistant Dep Prea management and

23  disciplinary.  If I had written on there remove him from

24  involuntary protective custody, my staff would have moved him,

25  and everybody on my team would have known that he was supposed

1    to be moved.  If I didn't write that, which I didn't, he

2    wouldn't have been moved.  So I'm not belittling the fact that

3    I should have written more.  It seemed to be redundant.  I

4    really didn't do it on purpose.  I'm getting through the day.

5    And I signed my name indicating that -- what's very important

6    is that the meeting and the review was done.

7         Now specifically about the review, just, again, to give

8    you a culture of how we do things, it's not a small thing if

9    it's daily, if not daily, it's weekly.  How do we manage this

10   guy?  How do we manage these people?  Not just him, other

11   problematic people.  Smolen wasn't the only -- Mr. Smolen

12   wasn't the only problem, he just happened to stick out in the

13   way he was a problem.  There are many cases where we've had

14   incarcerated people that were problematic that we discussed

15   constantly.  So this wasn't a one-off, just Mr. Smolen, he's

16   the only one I ever did this with, he just, for three years and

17   change, he was always a matter of subject.

18   Q.   You were considering new information each time you were

19   considering Mr. Smolen's status.

20   A.   If there was new information before that form got to me, I

21   would have known about it.

22   Q.   How often was Mr. Smolen discussed?

23   A.   Without a doubt, weekly.

24   Q.   Weekly?

25   A.   Without a doubt weekly.  Again, at the time, Mr. Royce was

Capra - Cross - Yoon

1    my deputy superintendent for security.  There was other deputy

2    superintendents throughout the -- I forget because I had

3    several staff, executive staff, but the deputy superintendent,

4    whoever it is is in my office first thing in the morning giving

5    me a briefing on what happened last night or the last time we

6    had spoken.  So if it was a good week and he didn't say much,

7    that was a rarity, but my recollection overall was a weekly, if

8    not daily, discussion on his well-being or lack thereof.

9    Q.   And now there are only -- currently we only have seven

10   forms.  Does that mean there are only seven meetings held to

11   review Mr. Smolen's status?

12   A.   I am beside myself with that.  No.  That form -- I signed

13   these forms monthly, and my secretary is also beside herself.

14   So I don't know what happened to them.  The issue here is, once

15   I give the direction, the form goes out to my secretary, my

16   secretary sends it to the incarcerated person.  I remember

17   speaking -- Mr. Smolen had asked me a question about one of the

18   forms that I had signed and disagreed with something I said on

19   it.  But it goes out to disciplinary and it goes out to the

20   compliance person.  We didn't keep a copy of them.  Since this

21   trial started, I changed that policy for my staff that I'll

22   keep a copy from now on, because I've never been asked

23   regurgitate that.  In all my years in all my audits that I've

24   passed, which are many -- in fact, right now there's a two-day

25   audit going on -- I've never, never been asked for that form.

1   And generally I believe my own opinion is it's my last word on

2   that form that says whether he stays or doesn't.  If I do say

3   something, the action has to take place.  If I say nothing,

4   nothing is going to happen to his status.

5   Q.   So how often was Mr. Smolen's status reviewed?

6   A.   On that form monthly.  Informally, as I said, at least

7   weekly, if not daily, depending what happened.  It was always a

8   question where do we put him where he could be safe, and it was

9   a push to get him out of the facility.  Again, phone calls and

10  a few times I know the SORC or the ORC rather put in transfer

11  orders for him.

12  Q.   Now, did you know Mr. Smolen before he moved to Sing Sing

13  facility in 2014?

14  A.   No, I did not.

15          MR. JOACHIM:  Objection.

16          THE COURT:  Overruled.

17  Q.   Did you have any feelings, personal feelings towards

18  Mr. Smolen when he first moved to Sing Sing facility?

19  A.   No, I do not.  I did not I do not.  I still don't.

20  Q.   Any feelings you have towards Mr. Smolen cause you to

21  place Mr. Smolen in protective custody?

22  A.   You know, it's funny people, I don't know how they

23  think -- if we keep him in protective custody, he has to be

24  scene by us all the time.  Some people have this thought

25  like -- if they didn't -- if I had a -- if people had a

1    feeling, my staff included, they would let Mr. Smolen to his

2    population, if they had a negative feeling about him.

3         So the fact that they said this guy who's always causing

4    trouble needs to be in protective custody speaks to the

5    validity of the staff that they care about his safety.  Now,

6    they may not care about Mr. Smolen himself, but their function,

7    their job, my job is to keep this man safe, regardless of what

8    his behaviors are.  And so to say that, you know, do I have

9    something against the guy -- if I had something against the

10   guy, I know he was a bad guy, I would have said go, to A Block,

11   have fun.  It doesn't make any sense.

12   Q.   It has all to do with his safety and security.

13   A.   100 percent.

14   Q.   Now you said -- I think at the deposition you said that an

15   incarcerated individual in general population gets 16 hours of

16   outside cell time.  Was that accurate in --

17   A.   I'm not counting hours, honestly, when I was asked that

18   question.  We have modules.  The entire prison population --

19   New York State system is run on what's called modules, so it's

20   AM, PM and evening.  Each one of those modules are about three

21   hours a piece.  It's different at Sing Sing than it is in Green

22   Haven.  For instance, in Sing Sing, the inmates come out of

23   their cell in the morning, they could go to chow, from chow

24   come back to their cells and lock in.  In Green Haven, they go

25   to chow and they go directly to their programs, so they'll be

1  out of their cells a little bit longer, so in different

2  facilities, because of the make-up of the facility and how

3  their schedules go, that time varies.  So with the mods being

4  about three, sometimes four hours, depending, three, six, nine,

5  maybe ten, eleven hours.  I wasn't speaking exactly.  The

6  question was given to me, I answered it best I could at the

7  moment.

8  Q.   Okay.  Now, are the review forms the only thing that you

9  looked at when you approved Mr. Smolen's status?

10  A.   I think I was talking about before all the different types

11  of information that comes in.

12  Q.   So it's everything else that you've heard that you were

13  reported to.

14  A.   Yeah, nothing's gonna -- there's not a lot that I don't

15  know about in my facility that I'm not briefed on every single

16  day, and half the time at night, unfortunately, for the times

17  I'm sitting home with the many phone calls that I get.  So

18  anything that rises to a level of importance or it's called and

19  you usual incident, I will get a phone call on, if it's off

20  duty.  If not, it will be that constant briefing, or when I'm

21  out walking and talking, or when we're having -- the staff is

22  coming my office, we're having a cup of coffee, what do we have

23  going on today.  And formal meetings I have an executive

24  meeting every Tuesday at 1:00, and each one of my staff members

25  brief out on their division.  Generally, that's when Smolen's

1    name used to come up.  Because generally, he was acting out in

2    a particular way.

3         Other people may have been mentioned, too.  I'm not saying

4    he was the only one, but his name definitely came up.

5    Q.   When you said at the deposition, when you said that you

6    were just reviewing the form, you meant like the paper form,

7    but there are other things you were considering when you

8    approved Mr. Smolen's placement in protective custody.

9    A.   Correct.

10             MS. YOON:  Nothing further.

11             THE COURT:  Mr. Joachim.

12             MR. JOACHIM:  Just a few, thanks.

13             THE COURT:  We'll take a break around 11:15.  Maybe

14   we'll be done with this witness.  All right?

15   REDIRECT EXAMINATION

16   BY MR. JOACHIM:

17   Q.   Superintendent Capra, you can hear me okay?

18   A.   Yes, sir.

19   Q.   Mr. Smolen was in general population at Sing Sing in 2009

20   and 2010, correct?

21   A.   I don't know that, but if you say so and the record

22   reflects it, yes.

23   Q.   And you're not aware of any assaults involving Mr. Smolen

24   when he was at Sing Sing in 2009 and 2010?

25   A.   I never looked at anything back that far.  I wasn't even

1  there myself.

2  Q.   You're not aware of any threats involving Mr. Smolen when

3  he was in general population at Sing Sing in 2009 and 2010?

4        MS. YOON:  Objection.

5        THE COURT:  It's asked and answered.

6        You can answer it again.

7  A.   I wasn't at Sing Sing back then, so I have no idea.

8  Q.   Mr. Smolen was never moved from IPC to disciplinary

9  special housing unit, correct?

10 A.   I believe that's correct.

11 Q.   And you talked a bit about making calls about transfers.

12 You never submitted a formal transfer request, correct?

13 A.   I never do that as a rule anyway.  That's not my function.

14 Q.   And it was very unusual to have an inmate in IPC for three

15 years eight months, correct?

16 A.   Yes, it is.

17 Q.   Thank you.

18       MR. JOACHIM:  No further questions.

19       MS. YOON:  Nothing from me, your Honor.

20       THE COURT:  All right, you may step down.

21       (Witness excused)

22       THE COURT:  All right, it's 11:02 by the computer.

23       We've got to get that clock fixed, Frank.

24       So why don't we take our break now, we'll be gone for

25 15 minutes and we'll bring you back in 15 minutes.

1      THE DEPUTY CLERK:  All rise.

2      (In open court; jury not present)

3      THE COURT:  All right, we're making good progress.

4  Let's be prompt at 11:17, okay.

5      MS. ONYSHKO:  Thank you, your Honor.

6      (Recess)

7      (In open court; jury not present)

8      THE COURT:  Who's the next witness?

9      MS. ONYSHKO:  The deposition transcript.  Ms. Yoon

10  and me.

11      MS. YOON:  I just need two minutes to just make sure

12  we're on the same page about all the designations.

13      THE COURT:  Do it now.  I'm not going to wait.

14      THE DEPUTY CLERK:  Jury entering the courtroom.

15      (In open court; jury present)

16      THE COURT:  All right, ladies and gentlemen, please

17  be seated.  All right, our next witness, please.

18      MS. ONYSHKO:  Your Honor, the plaintiffs we're going

19  to call Officer Vincent Tyer.  We understand that he is

20  unavailable, so we'll be reading portions of his deposition

21  into the record.

22      THE COURT:  I have already determined that

23  Corrections Officer Tyer is unavailable for testimony, so the

24  plaintiff is permitted to read portions of the testimony to

25  you.

1        MS. ONYSHKO:  So I'll be reading as the questions,

2   and Ms. Yoon will be reading as Officer Tyer.

3        THE COURT:  Okay.

4        MS. ONYSHKO:  All right.

5        MS. YOON:  I'll say answer before I start my answer

6   so it's clear that there's question and we're answering.

7        THE COURT:  Okay.  Please proceed.

8   "Question:  What's your current title and place of work

9   "Answer:  Officer, Green Haven Correctional Facility.

10  "Question:  You work for the New York State Department of

11  Corrections?

12  "Answer:  Yes

13  "Question:  How long have you had the title of officer?

14  "Answer:  I've been officer since 2006 to present.

15  "Question:  And where were you before July 2014?

16  "Answer:  I was in Sing Sing from 2008 to 2014.

17  "Question:  And what were your responsibilities while at Sing

18  Sing?

19  "Answer:  I was an HBC special housing unit officer

20  "Question:  So you mentioned you were in HBC, the special

21  housing unit, that housing unit includes -- what is included in

22  that housing unit?

23  "Answer:  A special housing unit is for the SHU inmates.

24  They're for IPCs, involuntary protective custody, and for PC,

25  protective custody, inmates.

1    "Question:  Perfect.  And so approximately how many people

2    during your time were on the HBC -- incarcerated individuals

3    were in HBC?

4    "Answer:  Well, let me see.  I want to say the whole HBC holds

5    60 inmates.  They split up in four quarters, 15 and 15 on each

6    side.  Downstairs Gallery 1 and 2 are special housing unit.

7    Upstairs on the left side, is PC.  On the right is IPC.

8    "Question:  When you were working in HBC at Sing Sing, we you

9    working more frequently with SHU or with IPC?

10   "Answer:  I worked both because I am -- I was the escort

11   officer, which I have to interact with all 60 inmates coming

12   and going

13   "Question:  What is -- my apologies.  Continue.

14   "Answer:  Coming and going inside of HBC, taking them out for

15   visits, taking them out for medical calls, taking them back and

16   forth to the yard.  And then we all as -- collective, as

17   officers, have to do rounds every half an hour.  So pretty much

18   we are stable there.  We are locked in with them and we take

19   care of HBC.

20   "Question:  In your years working in HBC at Sing Sing,

21   approximately for how long were inmates in IPC for?

22   "Answer:  Well, inmates could be up there as long as Albany

23   determines they be.  I don't see them three years, six years,

24   ten years in SHU and upstairs.  We have no judgment with that.

25   "Question:  How many hours a day, this is the 2014 period when

1   you were at Sing Sing, how many hours a day could an IPC inmate

2   be in gallery rec?

3   "Answer:  It was an hour in the morning and then the hour in

4   the evening.

5   "Question:  And where were they the other 22 hours?

6   "Answer:  They locked in.

7   "Question:  Were you ever asked when you were working in SHU to

8   give reports to anyone in management about inmates in IPC?

9   "Answer:  No

10  "Question:  Were you ever --

11  "Answer:  I mean, as an officer, as doing rounds, if we see

12  something, we let the sergeant know or higher up or even one of

13  us -- like if we see something that's not right, but you know,

14  as far as, you know, having a normal day, but as far as

15  reporting to nobody, no

16  "Question:  Have you ever been a witness at a Tier III hearing?

17  "Answer:  Yes

18  "Question:  I want to turn to the plaintiff in this case.  Do

19  you know Samuel Smolen?

20  "Answer:  Yes

21  "Question:  And how do you know him?

22  "Answer:  He was an inmate in Special Housing Unit back in the

23  day.  Usually, you know, when they come in with an old number

24  we try to help them out because they've been in jail for a long

25  time.  and He came in and he wasn't no problem at first, but he

Capra - Redirect - Joachim

1    had a rough time, I know, when he was there.

2    "Question:  What do you mean by he had a rough time?

3    "Answer:  Well, the inmates didn't like him, you know, I didn't

4    know his -- I didn't know him from, you know, nowhere, but

5    inmates, I guess through the state system knew who he was.

6    "Question:  How do you know that the inmates didn't like him?

7    "Answer:  Because they were threatening him and everything when

8    he was in HBC, because he started down in HBC.  They would

9    threaten him, tell him to come to the yard, and call him baby,

10   sniper baby, baby diaper, or something like that.  Something

11   with a baby.

12   "Question:  Did you hear the inmates making these threats?

13   "Answer:  Yes

14   "Question:  And was this threats by other inmates in HBC?

15   "Answer:  Yes.

16   "Question:  Did Mr. Smolen ever make any complaints against

17   you?

18   "Answer:  Yes

19   "Question:  How many?

20   "Answer:  I don't know.  But like I said, I was a regular, so

21   he didn't like none of the regs because he couldn't get over on

22   us because we know the protocol.  We knew the rules and

23   regulations how everything is supposed to be ran.  So like I

24   said, the biggest one was his legal work because I wrote him up

25   for a fire hazard.

Capra - Redirect - Joachim

1  "Question:  Did he ever make complaints against anyone else?

2  "Answer:  He complained against everybody.

3  "Question:  Did any of his complaints against you have

4  employment repercussions?

5  "Answer:  No.

6  "Question:  Okay, did you ever see Mr. Smolen fight with other

7  inmates?

8  "Answer:  No, not a physical fight.  Arguments, yes.  Tons of

9  those.  Threats.

10  "Question:  Threats?

11  "Answer:  Yeah.  He done made threats to other inmates,

12  officers.  He calls us by our first name.  He tells us where we

13  live and everything because he claims he gets all his

14  information from his lawyer.  He had a piece of paper hanging

15  on his wall with all the officers' name and address.  I don't

16  know how he gets that information and I know some of the

17  officers saying that it was true information.  I don't know how

18  he got it, but you know, we officers, so it's public because we

19  work for the state

20  "Question:  And did you ever see Smolen and Sergeant Nevins

21  interact?

22  "Answer:  There is really no interact with the sergeant and

23  Smolen.  What it is is we are the first responders.  We do

24  everything for the sergeant.  But if there's something we can't

25  handle, then the sergeant got to go speak to him or whatever.

Capra - Redirect - Joachim

1  "Question:  And did you ever discuss Smolen with Sergeant
2  Nevins?
3  "Answer:  Yes, because, like I said, that case when I was in
4  Downstate --
5        MS. ONYSHKO:  Wait.  Can we -- I think we're outside
6  of the agreed upon designations.  I have us picking up at
7  34/20.
8        MS. YOON:  I thought that you put 34/2 and 34/8 on
9  your designation.  Isn't that in your plaintiff's designation?
10        MS. ONYSHKO:  We can include that.
11  "Question:  Do you know if Smolen ever filed complaints against
12  Sergeant Nevins?
13  "Answer:  Yes, because like I said, that case when I was in
14  Downstate had his name on it, as far as I know, among other
15  people.  The dep of security and superintendent and all that --
16        (Counsel confer)
17        MS. ONYSHKO:  Do you want to read for yourself now?
18        MS. YOON:  No, I think the one that I want to change
19  was 31 -- it's a different part.
20        MS. ONYSHKO:  So then Ms. Yoon this is by --
21        (Counsel confer)
22  "Question:  Okay, walking back one step, I was wrong, it's
23  Captain Laporto.  Does take name ring any bells?
24  "Answer:  Yes
25  "Question:  Who's that?

Capra - Redirect - Joachim

1    "Answer:  He was the captain back then

2    "Question:  And did you ever see him interact with Smolen?

3    "Answer:  No.

4    "Question:  And so the recommendation says that he caused great

5    animosity towards other inmates.  Did you ever see him do that?

6            MS. YOON:  Are you at page 43?

7            MS. ONYSHKO:  Yes, 43 at 6.

8            MS. YOON:  Okay.

9            MS. ONYSHKO:  43, 6 through 14.

10           MS. YOON:  Okay.

11   "Question:  So the recommendation says he caused great

12   animosity towards other inmates.  Did you ever see him do

13   that?"

14           MS. YOON:  Ms. Yoon objection.  "You can answer.  I

15   think you already answered, but go ahead."  And then answer

16   from Officer Tyer.

17   "Answer:  I said, yes.  He does it with several inmates."  And

18   then we're at page 45?

19           MS. ONYSHKO:  22, yep.

20   "Question:  What you recall -- or you said earlier that you

21   recall threats made against Mr. Smolen.  Who threatened him?

22   "Answer:  Several inmates.

23   "Question:  Do you recall who?

24   "Answer:  No.

25   "Question:  Can you describe those threats?"

Angela O'Donnell, Official Court Reporter
(914)390-4025

Capra - Redirect - Joachim

1      MS. YOON:  Ms. Yoon, objection, go ahead.  You can

2  answer, but go ahead.

3  "Answer:  They would be like, come to the yard, I take care of

4  you there.  Stop staying inside.

5  "Question:  How many threats did you see made against Smolen?

6  "Answer:  I don't know the count, but like I said, he wasn't a

7  very well liked inmate from other inmates.

8  "Question:  Did you report these threats?

9  "Answer:  All the time we tell him."

10     MS. YOON:  Ms. Yoon objection.

11 "Question:  You mentioned you report them to your supervisor;

12 anyone else you would report them to?

13 "Answer:  To other officers.  We let them know that he's

14 arguing so we're going to have to do more than one rack, two or

15 three racks or we're going to have to keep separate somebody so

16 the day could be easy and nobody gets hurt.

17 "Question:  In your experience at Sing Sing, was Smolen

18 receiving unusually high amount of threats compared to other

19 inmates in SHU?

20 "Answer:  No, I won't say unusual.  But you know, the inmates

21 know who they know and like who they like.  We ain't got no

22 control over that.

23 "Question:  Did you ever see Smolen start a fight?

24     MS. YOON:  Katherine, come here for a sec.

25 "Question:  Did you ever see Smolen start a fight?

Capra - Redirect - Joachim

1          MS. YOON:  Ms. Yoon objection.  Go ahead.

2          Fight as in verbal, physical, right?

3    "Question:  Yeah.  Let's do physical.  Did you ever see Smolen

4    as part of, no matter his role, a physical fight?

5    "Answer:  I never seen a start of a physical fight with him.  I

6    know got put on his, you know, behind.  He got knocked out a

7    couple of times, you know.  We'll be downstairs doing something

8    and they'll be upstairs in gallery rec, and then next thing you

9    know the pin is pulled or they called us to respond upstairs.

10   He was on the floor, take him to medical, you know, get him

11   assessed, and whoever else take medical and lock him in or

12   whatever they tell us to do.  But I know he got in several

13   physical fights with other inmates, yes.

14   "Question:  Do you recall how many?

15   "Answer:  No

16   "Question:  Did you ever see him start a fight?

17   "Answer:  A physical fight start?  No but verbal.  I see him

18   start verbal arguments, yes.

19   "Question:  How many?

20   "Answer:  I can't recall.

21   "Question:  Always with other inmates?

22   "Answer:  He start with anybody.  It could be the law library

23   officer.  It could be us.  It could be the priest.  You

24   disrespect him, a priest could be doing rounds checking on

25   everybody.  He will curse him out.  Get away from my cell and

Capra - Redirect - Joachim

1  all that stuff.  So the verbal arguments can be with anybody

2  how, it depends how he's feeling that day.

3        MS. ONYSHKO:  Thank you, your Honor, that concludes

4  the deposition designations.

5        THE COURT:  All right.

6        MS. ONYSHKO:  And before concluding, we'd just like

7  to read stipulations into the record.

8        MS. YOON:  Your Honor, if I may, can we have an

9  instruction from the Court saying that this testimony is in

10  support of both plaintiff and defendants.

11        THE COURT:  Yes, I'm going to do that in the charge,

12  but Ms. Yoon's point is the deposition was taken and both sides

13  asked questions.  And so what they did, in order to be

14  efficient because I directed them to do it, is to merge

15  everything so that it was smooth from beginning to end as

16  opposed to having the plaintiff read their snippets of the

17  testimony that they want you to hear and then have Ms. Yoon

18  read her snippets in the testimony that she wants you to hear

19  on behalf of the defendants and on behalf of Mr. Smolen.

20  Rather than do that, it's time consuming, it takes more time.

21  They did a good job but I'm glad they have day jobs as trial

22  lawyers because reading scripts for plays I'm not so sure is

23  what their next calling will be, but they did a fine job.  You

24  heard the testimony.

25        The point is it was merged together so you should

Capra - Redirect - Joachim

1   hear it as testimony that you're to consider in the case on

2   behalf of both sides.  Am I clear?  You're all shaking your

3   heads, so I assume I'm making myself clear.  All right?

4              Now you want to read some stipulations.

5              MS. ONYSHKO:  Yes, your Honor.

6              THE COURT:  Okay, you may.

7              MS. ONYSHKO:  I'll stick with my day job.  So these

8   are stipulations agreed upon by both parties.  Defendant

9   Harrison was employed at Sing Sing Correctional Facility in

10  2014 from at least September 23, 2014, until October 22, 2014.

11             Defendant Capra was employed at Sing Sing

12  Correctional Facility from at least September 23, 2014, to

13  May 23, 2018.

14             Defendant Royce was employed at Sing Sing

15  Correctional Facility from at least September 23, 2014, to

16  May 23, 2018.

17             Defendant Izquierdo was employed at Sing Sing

18  Correctional Facility from at least September 23, 2014, to

19  August 7, 2017.

20             Plaintiff was transferred to Sing Sing Correctional

21  Facility effective 2014.  Liable defendants will be joint and

22  severally liable for any compensatory and/or nominal damages

23  awarded.

24             THE COURT:  Thank you.

25             All right, call your next witness please.

Capra - Redirect - Joachim

1        MS. ONYSHKO:  With that, your Honor, plaintiff rests.

2        THE COURT:  All right.

3        Ms. Yoon.  Mr. Doran.

4        MS. YOON:  We would like a --

5        MR. DORAN:  Your Honor, can we have just a brief

6    sidebar?

7        THE COURT:  Okay.  Emphasis on brief.

8        (Following discussion was held at sidebar:

9        MR. DORAN:  Your Honor, I apologize for not bringing

10   it up this morning, but the defendants do intend to make a Rule

11   50(a) motion now that the plaintiffs have rested.  Because we

12   understand that the jury is here, we would be willing to make

13   those arguments at the close of our case but before it's

14   submitted, which I believe the rule does permit.  I didn't want

15   to waive our ability to do so.  I certainly don't want to

16   disrupt the trial.

17       THE COURT:  I appreciate all of that.  What we'll do

18   is, once we get rid of the jury for lunch, you'll make your

19   application, and I'm happy to hear you then.  I don't want to

20   wait to the end.  I'm going to rule on it.  I'm not quite clear

21   other than to preserve your place in the 50(b), 59 rule how far

22   you're going to get with me on this, because I think there are

23   issues of fact here that the jury has to adjudicate.  So I'm

24   not sure, as a matter of law, I could.  But I will hear you,

25   and I appreciate your courtesy in telling me you want to do

1  that.  You preserved your right, and we'll deal with it later.

2              MR. DORAN:  Thank you, your Honor.

3              THE COURT:  All right.

4              End of sidebar discussion)

5              THE COURT:  Mr. Doran, Ms. Yoon, call your next

6  witness.

7              MR. DORAN:  At this time the defendants call

8  Lieutenant Andrew Nevins who I believe is just waiting outside.

9              THE COURT:  All right, let's get him in here.

10             THE DEPUTY CLERK:  Step into the box.

    ANDREW NEVINS,
11
       called as a witness by the plaintiff,
12
       having been duly sworn, testified as follows:
13

14             THE DEPUTY CLERK:  Please be seated.  Please state

15  your full name for the record and spell it.

16             THE WITNESS:  Andrew, A-N-D-R-E-W, John, J-O-H-N,

17  Nevins, N-E-V, as in victor, I-N-S.

18             THE COURT:  You may remove your mask, if you prefer.

19  Just keep your voice up.  Okay?

20             THE WITNESS:  Yes.

21             THE COURT:  All right, you may proceed, Mr. Doran.

22  DIRECT EXAMINATION

23  BY MR. DORAN:

24  Q.   Good morning, Lieutenant Nevins, can you hear me okay?

25  A.   Yes.

Nevins - Direct - Doran

1   Q.   Now, there's already been a lot of testimony in this case,

2   so I'm going to ask you a series of questions in sort of quick

3   succession to try to get us to the heart of why you're here

4   today.

5        Lieutenant Nevins, it's safe to say that you know who

6   Mr. Smolen is?

7   A.   Yes.

8   Q.   And that's because he was housed in HBC while you were the

9   sergeant there?

10  A.   Yes.

11  Q.   And HBC is a housing unit located within Sing Sing

12  Correctional Facility?

13  A.   Yes.

14  Q.   Just like the general housing units are located in Sing

15  Sing Correctional Facility?

16  A.   Correct.

17  Q.   And it's also safe to say that you were the one who made

18  the recommendation that Mr. Smolen be placed into involuntary

19  protective custody.

20  A.   Yes.

21  Q.   Lieutenant Nevins, can you very briefly just describe for

22  us what your responsibilities were as the sergeant in the HBC?

23  A.   Make sure the incarcerated individuals were safe, making

24  sure they were getting everything they were entitled to and

25  supervising other security staff make sure they were doing

1    their job.

2    Q.    Aside from the housing Block C, did you work in any other

3    portion of Sing Sing Correctional Facility?

4    A.    Yes.  I worked a lot of overtime, and most of that

5    overtime would be in the other housing blocks within the

6    facility.  And I also -- we do mutual exchanges where I would

7    work for other sergeants, work their shifts, and they would pay

8    me back and work for my shift when it was time.

9    Q.    In 2014, how much overtime in the general housing units

10   would you say you worked?

11   A.    I don't know the exact number, but I would say hundreds of

12   hours.

13   Q.    Approximately how many times a week?

14   A.    Two to three.  Two to three times a week, and each time

15   you work it's an eight-hour shift.

16   Q.    Now prior to making the recommendation Mr. Smolen be

17   placed into involuntary protective custody, was Mr. Smolen

18   asked if he wanted protective custody?

19   A.    Yes.

20   Q.    And how did he respond?

21   A.    He refused.

22   Q.    Prior to making your recommendation, can you please

23   describe Mr. Smolen's behavior towards other incarcerated

24   individuals in the HBC?

25   A.    He's very hostile, always making threats towards them.

Nevins - Direct - Doran

1  He'd stand up on his cell bars and constantly screaming at

2  them, threatening them, making comments of inviting them to his

3  private parts, making sexual gestures to them.  There was even

4  one point where inmates were complaining when they took a

5  shower he'd have his mirror on the bar staring at them while

6  they're in the shower.  Every day was just a -- he was very

7  hostile towards not just other incarcerated individuals

8  everybody that came by his cell he was very hostile towards.

9  Q.    When did Mr. Smolen start exhibiting these behaviors?

10 A.    Soon as he came to Sing Sing.

11 Q.    And how did the other incarcerated individuals respond to

12 Mr. Smolen's actions?

13 A.    They responded back very hostile, making threats back.

14 They would be arguing very loud, very disruptive, constantly

15 threatening each other.

16 Q.    Lieutenants Nevins, was Mr. Smolen the only incarcerated

17 individual in HBC making threats?

18 A.    No.

19 Q.    Were the other incarcerated individuals making threats?

20 A.    Making threats towards --

21 Q.    Towards other incarcerated individuals?

22 A.    Other?  No.  Towards Mr. Smolen they were.

23 Q.    No, I'm asking in general.  Did other incarcerated

24 individuals while in the HBC make threats towards other

25 incarcerated individuals not necessarily just towards

Nevins - Direct - Doran

1    Mr. Smolen?

2    A.    I'm sure it has happened, but I can't give you an example

3    of when.

4    Q.    How would you compare the threats that Mr. Smolen was

5    making compared to those other threats?

6    A.    Mr. Smolen's threats were very -- almost more are

7    personal, it was very personal threats.  He was making threats

8    to him saying you better hope you get out before me because I'm

9    going to come visit your children when I get out.  Things like

10   that he would say.  Other inmates would be more threats just

11   cursing him out saying you're a punk you're a chump stuff like

12   that.  But Mr. Smolen's threats were in very more in a personal

13   manner.

14   Q.    Now in your recommendation that Mr. Smolen be placed into

15   involuntary protective custody, did you include the names of

16   the incarcerated individuals who were threatening him?

17   A.    No.

18   Q.    What about when you testified at Mr. Smolen's involuntary

19   protective custody hearing?  Did you provide the incarcerated

20   individual's names at that hearing?

21   A.    No.

22   Q.    Why did you not do this?

23   A.    I have an obligation to protect everybody involved, and

24   you don't want to put -- in a prison system, you don't want to

25   put other individuals' names on paperwork, because those names

1  will get out, that paperwork will get out, and it labels them

2  as rats, and now they'll be a target.  So you try not to put

3  other peoples' names on paper if you don't have to.

4  Q.    Ultimately, why did you make your recommendation that

5  Mr. Smolen be placed into involuntary protective custody?

6  A.    For his safety.

7  Q.    What did you base that recommendation off of?

8  A.    Threats that were being made towards him inside HBC.  Even

9  when I would work overtime, I'd have incarcerated individuals

10 come up to me and inquire about him.  They'd be like, Smolen

11 still in there?  When is he getting out?  So just with all that

12 put together, also, the nature of his crime, I felt that that

13 would be the right thing to do was to put him in there.

14       MS. ONYSHKO:  Objection, your Honor.

15 A.    Or recommend him to be there.

16       MS. ONYSHKO:  Objection.  Ask to strike.

17       THE COURT:  We're going to strike the portion of the

18 witness's answer about the nature of the crime.  You're to

19 disregard that entirely.  Am I clear about that?  Please

20 disregard that entire comment.

21       Next question.

22 BY MR. DORAN:

23 Q.    Now after Mr. Smolen's involuntary protective custody

24 hearing, did Mr. Smolen's behavior towards the other

25 incarcerated individuals change after he was placed into

Nevins - Direct - Doran

1  protective custody?

2  A.   No.

3  Q.   What specifically did he do while he was in involuntary

4  protective custody?

5  A.   Same thing, making threats towards him, saying things

6  that -- inviting him to his private parts, he was going to do

7  sexual things to them.  Threatening their children, their

8  families if he gets out before him.  It was, you know, it got

9  to a point where they would come out on the unit to eat I would

10  have to not let him out when everyone else comes out.  He would

11  have to come out by himself.  Same thing with going to

12  recreation, he wouldn't go out with everybody else, he would go

13  out by himself.  One guy that was in protective custody, he was

14  walking down the gallery going to the shower, he had a five

15  gallon pail of feces, walked up to Mr. Smolen's cell and threw

16  it in on him.  He did all of that knowing he's going to kicked

17  out of PC, we can't protect him no more, and he's most likely

18  going to get another felony charge.  Mr. Smolen brought these

19  guys to that level where they were acting out.

20  Q.   Was it typical that incarcerated individuals in

21  involuntary protective custody had their own separate

22  recreational time from the other incarcerated individuals in

23  IPC?

24  A.   They would have recreational time with IPC inmates, they

25  wouldn't have recreational time with the other status inmates

1  with different status.

2  Q.   But the individuals within that particular unit, was it

3  typical that one individual would be separated from the other

4  to have their rec time alone?

5  A.   No.

6  Q.   So why in the case of Mr. Smolen was his recreational time

7  alone and not with the other incarcerated individuals in IPC?

8  A.   I had an obligation to try to protect him, and I felt that

9  if I put him with the other individuals, something might have

10 happened.

11 Q.   Were there other individuals that were making threats that

12 they were going to harm Mr. Smolen in recreation?

13 A.   Not only did he make threats, it actually happened.  It

14 was a time when he was out on the unit and an inmate attacked

15 him and assaulted him.

16 Q.   Lieutenant Nevins, looking back upon your recommendation,

17 do you believe that you made the right decision in recommending

18 that Mr. Smolen be placed into involuntary protective custody?

19 A.   100 percent.

20 Q.   Why is that?

21 A.   I feel if I didn't, he would have been physically

22 assaulted very badly.

23          MR. DORAN:  Nothing further, your Honor.

24          THE COURT:  All right.  Ms. Onyshko.

25 CROSS-EXAMINATION

1    BY MS. ONYSHKO:

2    Q.    Good morning, Lieutenant Nevins.  Can you hear me all

3    right?

4    A.    Yes.

5    Q.    You weren't aware of any threats towards Mr. Smolen that

6    were made by inmates in the general population, are you?

7    A.    Yes, they were inquiring about him, and I took that as a

8    threat.

9    Q.    Your testimony today is that you are aware or you were

10   aware of threats by inmates in the general population?

11   A.    Well, it's not a yes or no answer, it's an answer with an

12   explanation.  Like I said, when I worked in general population,

13   inmates would inquire about him if he was still in IPC and

14   asking, oh, when is he getting out, and I took that as a

15   threat.

16   Q.    Do you remember giving a deposition in this case?

17   A.    Yes.

18   Q.    And during that deposition, I asked you questions.

19   A.    Yes.

20   Q.    And your lawyer was present.

21   A.    Yes.

22   Q.    And there was a court reporter writing everything down.

23   A.    Yes.

24   Q.    And you swore an oath to tell that truth in the deposition

25   like you did today.

1  A.   Yes.

2  Q.   I'd like to show you a copy of your deposition transcript,

3  which I'll mark for identification purposes only as Plaintiff's

4  Exhibit 13 -- may the record -- 14, I apologize, your Honor.

5          THE COURT:  We're on 14.

6          MS. ONYSHKO:  We're on 14.  That's being handed up.

7          THE COURT:  All right.

8          THE WITNESS:  What page did you say?

9  Q.   I ask you to turn to page 73 through 74?

10         THE COURT:  What's the question, counsel?

11 Q.   And in your deposition under oath I had asked if you

12 recalled if inmates in the general population made threats

13 towards Mr. Smolen, and you answered, no, not that I'm aware

14 of, I don't know.  That was your testimony at the time, wasn't

15 it?

16         MR. DORAN:  I'm sorry, can I just get a line number?

17         MS. ONYSHKO:  73/19 starts "do you recall if any

18 inmates," and 74/3 ends "No, not that I'm aware of, I don't

19 know."

20         I'll ask again.

21 Q.   Lieutenant Nevins, at your deposition under oath I had

22 asked if you were aware of any inmates in the general

23 population who had made threats against Mr. Smolen and you

24 answered you did not know.  That was your testimony under oath

25 at your deposition, correct?

1    A.   I'm reading it.  I was under the impression he was asking

2    if he was in general population.  He was never placed --

3    Mr. Smolen was never placed in general population.

4    Q.   I had asked you if you recall if inmates in what I'll call

5    general population, by which I mean A, B, 7 and 5 made threats

6    towards Mr. Smolen, and you said, not that I'm aware of, I

7    don't know.  Did I read that correctly?

8    A.   Yes.

9    Q.   I'd like to turn back to your time as a sergeant in Sing

10   Sing.  When you worked, you worked with Captain Laporto,

11   correct?

12   A.   Yes.

13   Q.   And he worked in SHU.

14   A.   He was the captain at Sing Sing, he wasn't -- he didn't

15   work in SHU.

16   Q.   And you worked with Officer Tyer at Sing Sing, correct?

17   A.   Yes.

18   Q.   And he worked in SHU while you were a sergeant there?

19   A.   Yes.

20   Q.   And you saw him interact with Mr. Smolen on a daily basis?

21   A.   Yes.

22   Q.   And you testified that you knew the plaintiff, Mr. Smolen,

23   correct?

24   A.   Yes.

25   Q.   He was in IPC while you were at Sing Sing.

Nevins - Cross - Onyshko

1  A.  Yes.

2  Q.  He also filed a grievance against you, correct?

3  A.  Yes.

4  Q.  Mr. Smolen has written many grievances that you responded

5  to, correct?

6  A.  I believe so.  I don't remember how many.

7  Q.  It's a little hard to hear in this cube, I apologize.  And

8  a grievance could have employment consequences, right?

9  A.  If there's merit to it, yes.

10  Q.  Mr. Smolen was placed in IPC in September 2014 based on

11  your recommendation, correct?

12  A.  Yes.

13  Q.  And you attended his placement hearing.

14  A.  Yes.

15  Q.  You testified at the hearing.

16  A.  Correct.

17  Q.  You testified about the basis of your recommendation.

18  A.  Correct.

19  Q.  And you testified that there were threats but you didn't

20  give the details of who was making these threats, correct?

21  A.  Correct.

22  Q.  And you did not provide any documentation other than your

23  recommendation about these threats, correct?

24  A.  Right.

25  Q.  You didn't provide any video evidence about these threats.

1  A.   There was video evidence, that wouldn't be my, I wouldn't

2  have access to that.  I don't have access to that.

3  Q.   And you heard Mr. Smolen request three witnesses to

4  testify, correct?

5  A.   I don't recall that.

6  Q.   You heard defendant Harrison deny each of Mr. Smolen's

7  witness requests, correct?

8  A.   I don't recall.

9  Q.   You were the only witness who testified.  Yes?

10  A.   I don't know.

11  Q.   You don't know if Officer Tyer testified.

12  A.   I don't know.  When they do a hearing, they'll call me in

13  as a witness, I'll go in, say what I have to say, then I'll

14  step out.  Whoever is conducting the hearing will move on.  I

15  don't know what's being said, who else is being called or

16  anything like that.

17  Q.   Taking a step back from the hearing specifically, there

18  are fights between inmates in prison right?

19  A.   Correct.

20  Q.   There are fights and altercations at Sing Sing almost

21  every day.

22  A.   I don't know about every day, but there are fights and

23  altercations.

24  Q.   Not every person involved in a fight is sent to special

25  housing.

1    A.    No.

2    Q.    If an individual were to be punished, they would be sent

3    to SHU, correct?

4    A.    They with would be sent to the disciplinary part, not the

5    IPC part.

6    Q.    That's because IPC is not punitive.

7    A.    It's not disciplinary, correct.

8    Q.    And you recommended that Mr. Smolen be sent to IPC not the

9    disciplinary part, correct?

10   A.    Correct.

11   Q.    When you left Sing Sing in 2016, Mr. Smolen was still in

12   IPC.

13   A.    Correct.

14   Q.    At that point he had been there for over two years, right?

15   A.    I don't know exactly the time, about two years I'd say,

16   yeah.

17              MS. ONYSHKO:  Thank you, your Honor.

18              THE COURT:  All right.

19              Mr. Doran, anything else?

20              MR. DORAN:  Very briefly.

21   REDIRECT EXAMINATION

22   BY MR. DORAN:

23   Q.    Lieutenant Nevins, counsel asked you about testimony that

24   you gave at a recent deposition, but before I ask you my

25   question about that, you did testify at Mr. Smolen's

1  involuntary protective custody hearing?

2  A.   Yes.

3  Q.   And that hearing occurred back in October 7th of 2014?

4  A.   I don't remember the exact date, but, I believe so it was

5  around that time.  I would have to look it up.

6  Q.   Is it safe to say that the hearing occurred close in time

7  to when you made your recommendation?

8  A.   Yes.

9  Q.   And that your deposition was just earlier this year?

10 A.   Now you were asked a couple of questions about grievances.

11 Q.   When you made your recommendation to place Mr. Smolen into

12 involuntary protective custody, were you aware that he was

13 claiming to have filed grievances against you?

14 A.   I recall one grievance he did write against me.  I do -- I

15 am aware of that, something about saying I stole a bag of his

16 legal work.  I remember him making that allegation.  Besides

17 that I don't remember too many -- I don't remember allegations

18 against me from him, from Mr. Smolen.  You just answer it and

19 you move on.  It's nothing personal, it's part of the job.  You

20 know, you get grieved working in the department.  The state

21 actually encourages incarcerated individuals to write

22 grievances.  Sometimes there is merit to it.  They do an

23 investigation if something has to be changed or fixed or

24 corrected, that's the time it will be done.  So you know,

25 grievances are written quite often.

1    Q.   Did you ever take or did you take any grievance filed

2    against you by Mr. Smolen personally?

3    A.   No.

4    Q.   Were you ever disciplined for any grievance Mr. Smolen

5    filed against you?

6    A.   No.

7    Q.   And the grievance that you recall, did that occur before

8    you made your recommendation or sometime else?

9    A.   It was after.

10             MR. DORAN:  Nothing further, your Honor.

11             THE COURT:  Ms. Onyshko.

12             MS. ONYSHKO:  One moment, your Honor.

13             I'll try to keep it to a few questions, your Honor.

14             THE COURT:  You're going to.

15   RECROSS EXAMINATION

16   BY MS. ONYSHKO:

17   Q.   Lieutenant Nevins, could I ask you to open the binder in

18   front of you with the yellow cover, it will have Exhibit 8 in

19   it.  It's the hearing transcript from Mr. Smolen's IPC hearing.

20   You can go to defendant's 139 is the page number at the bottom.

21   A.   Okay.

22   Q.   Are you on 139?

23   A.   129?

24   Q.   139.

25   A.   I'm sorry.  Hold on.  Yes.

1   Q.   And if we're looking at the top of the page, you see

2   there's a statement, Harrison, colon, and then Nevins, colon,

3   Nevins refers to your testimony at Mr. Smolen's IPC HEARING,

4   right?

5   A.   Yes.

6   Q.   And in this testimony you SAY, he's made grievances an

7   against I can't recall what but -- but if I -- about clean,

8   cleanliness issues or food issues (unintelligible) --

9            (Reporter clarification)

10           THE COURT:  Hold on, you need to slow down, because

11  the court reporter is not getting it.  You need to slow down,

12  start over and get down to about 4 miles an hour, okay?

13  Thirty-five, the speed limit here is about five.

14           MS. ONYSHKO:  I'll cut back on the coffee at the

15  breaks, your Honor, I apologize.

16           THE COURT:  Don't I apologize, just slow down.

17  BY MS. ONYSHKO:

18  Q.   At the top of this page you say:  He has made grievances

19  against, I can't recall exactly what, but if I -- about clean,

20  cleanliness issues or food issues (unintelligible) things of

21  that nature, about HBC, but yes, I did address those things.

22       This is your testimony at Mr. Smolen's IPC hearing about

23  prior grievances he had made against you, correct?

24           MR. DORAN:  Objection.

25           THE COURT:  Overruled.

1        You can answer.

2  A.    These are grievances according to what I'm reading here is

3  that he would grieve policy and procedure in HBC not me

4  personally.  I'm not the only one that works in HBC.  You know

5  this is saying HBC, and if his problem is with something not

6  being clean, that's not grieving me personally.  If he has a

7  problem with something with the food, that's not grieving me

8  personally.  The grievance that he grieved me personally was

9  that he said I personally stole his legal mail.  That's what I

10 was referring to.  This is something that he's just policy and

11 procedure basically looks like he was grieving from what I get

12 out of this.

13 Q.    You were the sergeant in charge of HBC, correct?

14 A.    One of them, correct.

15 Q.    Okay.

16 A.    You've got to understand --

17        THE COURT:  There's no question.

18        MS. ONYSHKO:  Nothing further.

19        THE COURT:  Mr. Doran.

20        MR. DORAN:  Nothing further, your Honor.

21        THE COURT:  Step down, Lieutenant, before they think

22 of something else.

23        THE WITNESS:  I can take this with me?

24        THE COURT:  No, you leave everything there.

25        (Witness excused)

Mathew - Direct - Yoon

1          THE COURT:  Next witness.

2          MS. YOON:  Your Honor, defendants call s ORC Mathew

3  Benjamin, or Benjamin Mathew.  The last name is Mathew.

4          THE DEPUTY CLERK:  Step forward.

BENJAMIN MATHEW ,

5     called as a witness by the plaintiff,

6     having been duly sworn, testified as follows:

7

8          THE DEPUTY CLERK:  Please be seated.  I'm you can

9  take your mask off, but keep your voice up.

10          Please state your name for the record and spell it.

11          THE WITNESS:  Benjamin Mathew, B-E-N-J-A-M-I-N,

12  M-A-T-H-E-W.

13          THE COURT:  You may proceed, Ms. Yoon.

14          MS. YOON:  Thank you, your Honor.

15  DIRECT EXAMINATION

16  BY MS. YOON:

17  Q.   Good afternoon, SORC Mathew.

18          THE COURT:  Take your mask off, it will help the

19  volume.

20          MS. YOON:  I always forget.

21          THE COURT:  You've got to speak up, I know you can,

22  so do it.

23          MS. YOON:  Yes, thank you.

24  Q.   SORC Mathew, can you tell us what your current title is

25  and who you work for.

1    A.    Supervising offender rehabilitation coordinator.  I work

2    for New York State DOCCS.

3    Q.    AND currently, which facility do you work at?

4    A.    I work at Bedford Hills Correctional Facility.

5    Q.    Back in 2017 through '19, where were you working?

6    A.    I was working at Sing Sing Correctional Facility.

7    Q.    And what was your position at Sing Sing at that time?

8    A.    I was the offender rehabilitation coordinator.

9    Q.    And what do rehabilitation coordinators do at Sing Sing at

10   that time?

11   A.    We're responsible for meeting with the incarcerated

12   individuals, we are responsible for setting them up with

13   programming, education, if they need vocational.  Basically

14   getting them ready for release, if they're going to be

15   released.

16   Q.    Were you assigned to any specific area or group of

17   incarcerated individual when you were counselor coordinator at

18   Sing Sing?

19   A.    Yes, I was.  I was assigned to the special housing unit as

20   well as involuntary protective custody and protective custody

21   as well as some general population individuals.

22   Q.    Around what period of time did you start working as ORC

23   for the Special Housing Unit's incarcerated individuals?

24   A.    I believe late 2017 or so.

25   Q.    And did you take over any particular person's title when

Mathew - Direct - Yoon

1  you started there?

2  A.   You said title?

3  Q.   Yeah, did you take over somebody else's position?

4  A.   I took over for Ms. Izquierdo in the Special Housing Unit.

5  Q.   Again, Special Housing Unit also includes that, in

6  addition to the protective custody and involuntary and

7  protective custody; is that right?

8  A.   Correct.

9  Q.   Now, when you were working at Sing Sing as ORC, did you

10  attend any review meetings of incarcerated individuals in

11  involuntary protective custody?

12  A.   Yes, I did.  We had weekly meetings and we also had some

13  monthly meetings as well.

14  Q.   And who would attend these review meetings?

15         MR. JOACHIM:  Your Honor, objection.  This is beyond

16  the scope of what they designated this witness to testify about

17  in the pretrial order.

18         THE COURT:  Overruled.

19  A.   Could you repeat the question.

20  Q.   Yes.  What was discussed at these review meetings when you

21  were attending as ORC?

22  A.   We would discuss the individuals that were placed in

23  special housing unit as well as involuntary protective custody

24  and protective custody.  We discuss how they're doing, how

25  they're progressing.  If anybody needed to be transferred, and

1  we discussed them in detail.

2  Q.   Who would attend these review meetings?

3  A.   Myself, we would have either a lieutenant or captain

4  present.  Sometimes we would have somebody prosecute the Office

5  of Mental Health present as well.  Everybody would be there to

6  discuss them.

7  Q.   Do you know Mr. Smolen, the plaintiff, in this case?

8  A.   Yes.

9  Q.   How do you know Mr. Smolen?

10  A.   I used to see Mr. Smolen when I used to do my daily

11  rounds.

12  Q.   Was he one of the incarcerated individuals that was under

13  supervision when you were at Sing Sing?

14  A.   Yes, he was.

15  Q.   And at that time was he in involuntary protective custody?

16  A.   Yes, he was.

17  Q.   How often would you see Mr. Smolen?

18  A.   I would see him daily.

19  Q.   And why would you see him daily?

20  A.   Because I would do my rounds daily so on my rounds he'd be

21  present there, so I would stop by.

22  Q.   Can you tell us briefly what you recall about Mr. Smolen's

23  interaction with other incarcerated individuals?

24  A.   He's very abrasive with the other individuals, sometimes

25  he'd be threatening the other individuals.  Profanity thrown

1    around.  Sometimes he would say, I fuck you up to the other

2    incarcerated individuals so --

3    Q.   And sometime in 2018 did there come a time you submitted a

4    transfer request form for Mr. Smolen?

5    A.   Yes, I did.

6         MS. YOON:  At this time, your Honor, I would like to

7    publish Defendant's Exhibit A into evidence, into the screen.

8         THE COURT:  You may.

9         MS. YOON:  Just for the record, we are looking at

10   Defendant's 181 .

11   Q.   Can you see the screen?

12   A.   I cannot.

13        THE COURT:  Pull the binder out in front of you, the

14   binder on the top, to Exhibit A.  It's the first page, you see

15   it?

16        THE WITNESS:  Yes.

17        MS. YOON:  One more question before we go to the

18   exhibit.  So when you were the ORC for Mr. Smolen from 2018,

19   was Mr. Smolen discussed at the protective custody review

20   meetings?

21   A.   Yes, he was.

22   Q.   Now, I have asked you to take a look at Defendant's

23   Exhibit A Bates stamped 181.  Do you know what this is?

24   A.   Yes, it's an unscheduled transfer review.

25   Q.   Did you submit this transfer submission?

Mathew - Direct - Yoon

1    A.   Yes, I did.

2    Q.   When was it submitted?

3    A.   5/21/18.

4    Q.   And does this say what the explanation is for the

5    transfer?

6    A.   Yes, it does.

7    Q.   Can you read what you wrote for explanation for a

8    transfer?

9    A.   Sure.  Smolen is overtly cooperating with security and is

10   perceived as such amongst general population and protective

11   custody incarcerated individuals.  Unknowns are aware of his

12   instant offense and Smolen blatantly states he will victimize

13   other incarcerated individuals' children upon release.  Threats

14   from unknowns, animosity exists, protective custody as of

15   9/23/14.

16   Q.   Now is this information based on your personal knowledge?

17   A.   Some of it is from personal knowledge, other information

18   was gathered through the lieutenants and the sergeants at the

19   review meetings.

20   Q.   And so when you submitted this transfer form, do you know

21   if this was, his transfer, Mr. Smolen's transfer, was approved?

22   A.   The transfer was approved, yes.

23           MS. YOON:  Thank you, your Honor.  Nothing further

24   for now.

25           THE COURT:  All right, Mr. Joachim.

1  CROSS-EXAMINATION

2  BY MR. JOACHIM:

3  Q.   Mr. Mathew, can you hear me okay?

4  A.   Yes, thank you.

5  Q.   Is part of your general responsibilities to make transfer

6  requests for inmates, correct?

7  A.   Yes.

8  Q.   And that included inmates in IPC at Sing Sing?

9  A.   Correct.

10  Q.   And you generally tried to transfer inmates in IPC to

11  other facilities, right?

12  A.   Correct.

13  Q.   And that's because they have a better chance of doing

14  programs in another facility, right?

15  A.   Correct.

16  Q.   That would include educational programs?

17  A.   Yes.

18  Q.   Religious programs?

19  A.   Yes.

20  Q.   Employment programs?

21  A.   Employment?  That depends if they're closer to release.

22  Not necessarily.

23  Q.   Recreational programs?

24  A.   Yes.

25  Q.   So it was part of the Department of Corrections policy to

Mathew - Cross - Joachim

1   provide appropriate programs for inmates, correct?

2   A.   Correct.

3   Q.   Turning back to transfers, most IPC transfer requests are

4   put in as a priority transfer, right?

5   A.   Yes.

6   Q.   And priority transfer means these transfer requests are

7   considered over transfer requests from gen pop?

8   A.   Yes.

9          MR. JOACHIM:  I'd like to publish Exhibit 2 to the

10  jury in evidence.

11  Q.   SORC Mathew, if you could open the yellow binder and turn

12  it to Exhibit 2.  Please let me know when you have that open in

13  front of you?

14  A.   Directive?

15  Q.   Yes.

16  A.   Yes.

17  Q.   This is a Department of Corrections directive regarding

18  protective custody status, correct?

19  A.   Yes.

20  Q.   I'd like you to refer you to iii letter A.  It says:

21  Consistent with the department's policy of providing

22  appropriate programming, inmates placed in protective custody

23  status will be evaluated and recommended for transfer to

24  facilities where they may be appropriately programmed in

25  general population, correct?

1    A.    Correct.

2    Q.    So this is a policy in favoring of transferring inmates in

3    IPC to places where they can be in general population, correct?

4    A.    Correct.

5    Q.    You said yes for that?  I'm sorry.

6    A.    Yes.

7    Q.    I want to refer you to the number 1 that's at the bottom

8    of this page; you see that?

9    A.    Yes.

10   Q.    That says:  Within five days of placing an incarcerated

11   individual in PC, the facility shall complete an Unscheduled

12   Transfer Review (UTR) and submit it, using the KGNC system,

13   directly to the Office of Classification and Movement, Central

14   Office, correct?

15   A.    Correct.

16   Q.    And a UTR or unscheduled transfer review is the same thing

17   as a transfer request, correct?

18   A.    Yes.

19   Q.    So under this policy, Sing Sing is required to complete a

20   transfer request for inmates in IPC within five days of their

21   placement in protective custody, correct?

22             MS. YOON:  Objection.

23             THE COURT:  Overruled.

24   A.    Correct.

25   Q.    Let's turn back to Mr. Smolen.  I'd like to publish

Mathew - Cross - Joachim

1  Exhibit A, which we had up before.  It's in the other binder,

2  SORC Mathew, that you had open earlier.  It's the transfer

3  request.  Do you have that page up in front of you?

4  A.   Back to Exhibit A, correct?

5  Q.   Correct.  You have that in front of you?

6  A.   Yes.

7  Q.   And this is the transfer request you submitted for

8  Mr. Smolen, correct?

9  A.   Yes.

10 Q.   And here it's dated May 21, 2018, correct?

11 A.   Correct.

12 Q.   And by May 21, 2018, Mr. Smolen had been in IPC for over

13 three and a half years correct?

14 A.   Correct.

15 Q.   And this is the only transfer request you submitted for

16 Mr. Smolen, correct?

17 A.   That I submitted, yes.

18 Q.   You don't know if a transfer request was submitted for

19 Mr. Smolen when he was first placed on IPC in 2014, correct?

20 A.   I believe there was a transfer request submitted, I don't

21 know if it was in 2014.

22 Q.   And this transfer request you submitted in 2018 resulted

23 in Mr. Smolen being transferred out of Sing Sing, correct?

24 A.   Correct.

25 Q.   I'd like to ask you a few questions about your

1  interactions with Mr. Smolen.  You did not interact with

2  Mr. Smolen before 2018, correct?

3  A.   Correct.

4  Q.   And you don't recall ever seeing Mr. Smolen being part of

5  a physical altercation, correct?

6  A.   No.

7  Q.   Do you recall him being part of a physical altercation?

8  A.   No.

9  Q.   And it was common for incarcerated -- I'm sorry, let me

10  start over.

11      It was common for incarcerated individuals to yell at each

12  other, correct?

13  A.   It was common but Mr. Smolen would exacerbate the other

14  individuals on a daily basis.

15  Q.   I want to move to IPC reviews.  You attended protective

16  custody review meetings when you were at Sing Sing, correct?

17  A.   Correct.

18  Q.   And those meetings were to speak about all the inmates in

19  IPC protective custody and disciplinary housing units, correct?

20  A.   Correct.

21  Q.   You didn't have any say in discussions about whether or

22  not an individual should remain in IPC at those meetings,

23  correct?

24  A.   It would be discussed, I mean, our opinions were taken, it

25  wasn't that I wouldn't have any say.

1  Q.   Their placement was determined by security, not by you,
2  correct?

3  A.   At the end of the day, yes, but our opinions were taken
4  into account.

5  Q.   I want to refer you to your deposition transcript.

6          MR. JOACHIM:  If we could bring that up, Michelle.

7  Q.   Mr. Mathew, you had your deposition taken in this case,
8  correct?

9  A.   Yes.

10 Q.   At that deposition you swore an oath to tell the truth.

11 A.   Yes, I did.

12 Q.   Just like the oath you took today, correct?

13 A.   Correct.

14 Q.   Please let me know when you have your deposition
15 transcript in front of you.

16         THE COURT:  Yes, please, show it to the witness.

17         15 for identification has been marked.

18         MR. KLEIN:  Yes, I apologize, your Honor, marked for
19 identification, I believe it is 15.  Thank you.

20         THE COURT:  What page, counsel?

21 BY MR. JOACHIM:

22 Q.   And could you turn to page 23 of that transcript?  I want
23 to refer you to line 16 through 21 of that transcript.  Do you
24 recall you were asked at your deposition would you be part of
25 any discussions about whether or not an individual should

Mathew - Cross - Joachim

1    remain in IPC, and you responded, if I was present, I wouldn't

2    really have a say in it because I can't determine security

3    placements.

4        That was your testimony, correct?

5    A.   Yes, as a final determination, but again, we would have

6    discussions and they were taken into account?

7            MR. JOACHIM:  No further questions.

8            MS. YOON:  Nothing from us, your Honor.

9            THE COURT:  Thank you.  You may step down.

10           (Witness excused)

11           THE COURT:  All right, call your next witness

12   Ms. Yoon.  Mr. Doran.

13           MS. YOON:  Your Honor, defendants close, your Honor.

14           THE COURT:  Defendants rest?

15           MS. YOON:  Defendants rest.  Thank you, your Honor.

16           THE COURT:  Okay.  All right.  You so that's a signal

17   to all of us that the testimony, the evidence, is now in.

18           So I think what we'll do is rather than wait until

19   one, I think we'll have our luncheon break now 12:30 to 1:30,

20   we'll come back, and I can deal with the lawyers for a few

21   minutes before I excuse them, and we'll have summations.  And

22   then once the summations are done, it's my intention to charge

23   the jury this afternoon.

24           Now I had said, and I've said it a couple of times, I

25   have a criminal matter I need to deal with at four o'clock, but

Mathew - Cross - Joachim

1  if we actually get you to the part where you're deliberating,

2  which is my plan, is everybody okay staying till five so you

3  can at least begin your deliberations?

4          Is that all right?  Just shake your head yes or no.

5  If it's not, shake our head no.  We're okay to five.  Okay.

6  While I'm conducting my business you can be conducting your

7  business and it will take me about an hour or so assuming

8  everything starts on time.  So that will be the tentative plan,

9  all right?

10         So we'll excuse you now.  We'll see you back at 1:30

11  promptly for summations.

12         THE DEPUTY CLERK:  All rise.

13         (In open court; jury not present)

14         THE COURT:  Counsel, be seated.  Mr. Doran, I'll hear

15  you now, briefly.

16         MR. DORAN:  Thank you, your Honor.  To begin, the

17  plaintiffs have made it very clear that the liability that they

18  are alleging against the defendants is based off of their

19  inability or their failure to follow a DOCCS directive,

20  specifically, directive 4948 which has been punished to

21  published to the jury now multiple times.  With that in mind,

22  they're specifically alleging here that Ms. Harrison denied

23  plaintiff's witness request even though directive 4948 states

24  that Mr. Smolen should have been able to do so.

25             And then with the remainder of the defendants,

1    they're alleging that they violated that directive because the

2    IPC forms were filled out, in essence, poorly.

3         As your Honor is aware and in fact has actually

4    recently held in *Keesh v. Quick*.

5         THE COURT:  I'm here long enough that they're now

6    quoting me.  That's a good sign or a bad sign.  No that's a

7    great sign.  What did I say?

8         MR. DORAN:  Just for the record the cite is 2021 WL

9    639530, your Honor very clearly said that a violation of a

10   DOCCS directive however does not amount to a Section 1983

11   claim.  You went on to cite then *Holland v. City of New York*,

12   197 F.Supp. 3d 529.

13        Your Honor, I mean, to the extent that plaintiff

14   continues to push forward with this theory of liability, then

15   defendant should be dismissed on this ground alone.  I do,

16   however, have several more specific points towards the

17   defendants themselves.  Specifically starting with Ms. Harrison

18   and why she should be dismissed at this point.  At this point,

19   plaintiff has failed to meet his burden of providing any proof

20   that the decision in his involuntary protective custody hearing

21   would have been altered even if those witnesses which plaintiff

22   is alleging were denied had testified.  We have now read

23   transcript testimony from Officer Tyer who talked about

24   multiple incidents.  More specifically, plaintiff hasn't

25   provided a single piece of evidence.  And not only that, he

Mathew - Cross - Joachim

1    hasn't even testified when he was on the stand that it has his

2    belief that the decision would have been changed or altered.

3          So even if we assume there was no legitimate reason

4    to deny Officer Tyer, Captain Laporto, or the other

5    incarcerated individual, the charge that you're about to read

6    to the jury still says that they have to then determine whether

7    the outcome of that hearing was going to be altered.

8          Ms. Harrison on the other hand testified at least

9    four separate times that even if she made different decisions

10   today, the outcome of the hearing would not have been altered,

11   it wouldn't have been different.

12         THE COURT:  Let me just interrupt for a moment.  I'm

13   not going to grant this motion for a variety of reasons, the

14   first and most important of which is there are issues of fact

15   here.

16         Now I understand you're latching onto the theory

17   about the DOCCS directive, but this is a claim brought under

18   the Constitution of the United States, and so that's the claim

19   that's being addressed.

20         The cross-examination, frankly, by pointing to the

21   DOCCS directive is appropriate, but it doesn't create as a

22   matter of law the premise that there is no constitutional law

23   violation.  I understand your theories, but we're not

24   nitpicking.  The question I have to determine is is there a

25   sufficient predicate, is there a sufficient predicate here for

Mathew - Cross - Joachim

1  the case to go to the jury.  And there are any number of cases

2  that counsel when credibility is at issue, and credibility is

3  clearly at issue here, the plaintiff's version of the facts and

4  the individual defendant's version of the facts here are

5  entirely unrelated, separate and distinct.  If, for example,

6  the jury were to accept Mr. Smolen's testimony, I think the

7  jury would go in one direction.  If they were to reject

8  Mr. Smolen's testimony and accept the defendant's testimony, I

9  think that would be a different verdict.  So the fundamental

10  purpose for which you're asking me to rule without a jury

11  verdict is contrary to what I consider to be the gravamen of

12  this case.  The essence here is that there are two different

13  stories.

14      You know, you're clever in your presentation of the

15  premises that you made so far.  I interrupted you, and I

16  realize I interrupted you because I want you to have a lunch

17  hour and get some thinking about your closing argument.

18      There isn't a chance I would grant this motion at

19  this juncture under 50(a) because there are clearly

20  unequivocally multiple issues of fact that I'm not here to

21  determine and I wouldn't determine.  So to the extent you need

22  to preserve your record under 50(a) at the close of the

23  plaintiff's case, and we took this out of turn, and I gave you

24  permission to wait until we finished with the jury, to make

25  your motion, your motion is well noted.  You were doing fine

Mathew - Cross - Joachim

1  making your arguments, but credibility is going to get in the

2  way of every single argument you're going to give to me.  So

3  I'm going to deny the motion and suggest you spend your time

4  thinking about closing.  All right?

5         We'll see you promptly at 1:30.  It's my intention to

6  get prompt, clear, concise, closing arguments, and then I'll

7  charge the jury.  I think it will be an hour 20 minute charge

8  or so, I go by the number of pages.  We'll get the jury

9  deliberating.  You're welcome to stay, I'm just going to need

10  you to sit in the back.  I have marshals coming with a prisoner

11  that I'm going to sentence.  I'll do that work while they're

12  doing that work.  At five o'clock hopefully I'll be done with

13  my sentencing and we'll see where they are, if they have any

14  questions.  See you at 1:30.

15         THE DEPUTY CLERK:  All rise.

16         (Recess)

17         (Continued on next page)

18

19

20

21

22

23

24

25

1            (Trial resumed; jury not present)

2            THE COURT:  Be seated, counsel.  Charging issues?

3            MR. JOACHIM:  We have two things we want to address,

4    Your Honor.

5            THE COURT:  It's a little late, but okay.

6            MR. JOACHIM:  One, just we would ask for another

7    limiting instruction about the nature of Mr. Smolen's crime.

8    There's been reference to his crime in some of the documents and

9    testimony, and we know Your Honor did make one limiting

10   instruction, but we would like to request another limiting

11   instruction during the closing instructions just asking the

12   jurors not to consider the nature of Mr. Smolen's crime or to

13   speculate about the nature of the crime.

14           THE COURT:  I have said that in the charge.  Isn't

15   that in there?  I am sure it is.

16           What else do you have?  I have reread my charge now.

17   So the answer is, it's in there.  I have indicated in all my

18   charges in this kind of case; that is he's been felon in prison

19   for more than one year, and there is nothing more of it than

20   that fact.

21           MR. JOACHIM:  I apologize if I missed that.

22           The other issue we wanted to raise, we just wanted to

23   preserve our objection for appeal about the burden of proof for

24   the harmless error issue.  We understand Your Honor's view about

25   that, and I am not asking for you to reconsider that.

 1          THE COURT:  About the what issue?

 2          MR. JOACHIM:  About who was the burden of proof for

 3   the harmless error issue.

 4          THE COURT:  Okay.  As I understood it, this was an

 5   agreed-upon charge.  So the agreed-upon charge is the charge I

 6   ruled on, and I accepted.  Now you are telling me that it's not

 7   an agreed-upon charge, and you want to preserve your right to

 8   object.  So I am not quite sure what you want me to do exactly.

 9   You told me already that this was an agreed-upon charge.  Are

10   you changing your mind that it?

11          MR. JOACHIM:  Your Honor, I mean, we agreed on this

12   charge in light of your views about the burden of proof issue.

13   I think it's a live issue in the Second Circuit who has the

14   burden of proof --

15          THE COURT:  What specific charge do you want to

16   reserve your right to?

17          MR. JOACHIM:  It's on page 17 under constitutionally

18   sufficient process in a voluntary protective custody hearing,

19   the second paragraph.

20          THE COURT:  You have reserved your right.

21          MR. JOACHIM:  We want to reserve your right to argue

22   that this is an affirmative defense.

23          THE COURT:  With respect to substantive instructions

24   (iii) at paragraph F in its entirety?

25          MR. JOACHIM:  Just the second paragraph of that

1  instruction.

2          THE COURT:  Beginning with "moreover"?

3          MR. JOACHIM:  That paragraph, correct.

4          THE COURT:  All right.  Beginning with the paragraph

5  "moreover" and ending with the words "no effect on the hearing's

6  outcome," you have reserved your right to raise that on appeal.

7          Anything else?

8          Ms. Yoon, anything else?  Oh, let's bring the jury in.

9          While you are getting them, Mr. Cangelosi, they have

10 indicated they may not want to stay until 5:00.  I am trying to

11 move this along because I find that -- you can go get them -- I

12 find that getting the juries engaged immediately is better.  So

13 I'm trying to push them, but if they come in and say, Judge, we

14 really don't want to, I'll let them begin tomorrow morning.  I

15 think it's fine.  I don't think there is any issue.

16         I am not anticipating long-winded closing arguments,

17 so I think we will have plenty of time.  Should they be long-

18 winded, we will have to push the charge until the morning, which

19 is something I don't think we should do.  All right.

20         THE DEPUTY CLERK:  Jury entering the courtroom.

21         (In open court; jury present)

22         THE COURT:  All right.  Ladies and gentlemen, please

23 be seated.  All right.  I got your message.  We will end today

24 at 3:45, and so we will just see where we get to in terms of the

25 closings because it will take me a while to charge, and I may

 1  have to push that back, depending on when we get done.

 2          Okay.  We are ready to close.  Who's closing?

 3          MR. RAMAGE:  I am, Your Honor.

 4          THE COURT:  Oh, Mr. Ramage.  Terrific.  All right.

 5  Let's go to work.

 6          MR. RAMAGE:  Can everyone hear me?  All right.

 7          THE COURT:  They hear you fine.  Keep that voice up.

 8          MR. RAMAGE:  Excellent.  All right.  Good afternoon,

 9  ladies and gentlemen.  I thank you for your patience.  This is

10  almost over.

11          Now, as we told you from the beginning, this trial was

12  about two words:  Safety and process.  And by that I mean the

13  process by which the defendants ensured Mr. Smolen's safety and

14  went through extraordinary lengths to guarantee his safety.

15          Let's be clear right from the start, process does not

16  equal paperwork.  They are not the same.  Process is the

17  meetings, the conversations, the observations, and then the

18  decisions that are made on those conversations, observations,

19  and decisions.

20          Right from the start we told you that there is missing

21  paperwork in this case; paperwork that should have been able to

22  be located and produced, and that would have backed up each of

23  the defendants' testimonies about all of the different hearings

24  that happened during those years.

25          But that is not what the case is about.  This case is

1  not about whether or not some paperwork could be found or not or

2  whether or not paperwork was filled out properly or certain

3  things that were missing.  The witnesses have come up and told

4  you that, yes, these things should have been found.  Certain

5  things should have been filled in; but that's not what the case

6  is about, and you will receive no instruction that if you find

7  that the paperwork is missing, if you find that something is

8  filled out, therefore, someone's constitutional rights have been

9  violated.  Nor will you be instructed that if anyone violated a

10  business regulation or a regulation of the Department of

11  Corrections, that that in and of itself is a violation of

12  someone's constitutional rights.

13          The process you will be asked to find, when you listen

14  to all of the testimony from all of the witnesses was:  Did the

15  defendants make decisions about Mr. Smolen based on the evidence

16  that was available to them?  Right?  Did they evaluate his terms

17  of confinement?  Did they look at the facts?  Did they take in

18  information, and did they make decisions based on that

19  information?  And the answer through all of the consistent and

20  credible testimony throughout this trial is an unequivocal yes.

21  How do you know that?  The testimony all points to each of the

22  defendants discussing and dealing with Mr. Smolen on an almost

23  daily basis.

24          Now, you will be asked to focus on two primary

25  processes.  The first is the initial hearing.  That was the

1  hearing with which Mr. Smolen was determined to be appropriate

2  to be placed into protective custody.  Now, let's be clear what

3  the hearing is, as you heard from testimony from Ms. Harrison.

4  The hearing is an administrative hearing.  Administrative.  It

5  wasn't punishment.  It wasn't a trial in a court of the law.  It

6  wasn't to determine guilt or innocence.  It was only held for

7  one reason only, to determine if Mr. Smolen's safety was in

8  danger such that he could not be in the general population and

9  needed to be put in protective custody with or without his

10  consent for his own safety and those of other incarcerated

11  individuals.  That's what this hearing was.

12         Ms. Harrison got up on the stand and told you about

13  how she held that hearing, and the processes, and she even told

14  you at the time that she hadn't yet been trained, and that after

15  years of holding these hearings and training, that certain

16  decisions she would have been made would have been different,

17  specifically with regards to the witnesses.

18         Now, as you heard from, not just Ms. Harrison, but

19  Mr. Royce, that not all witnesses are called.  There's reasons

20  for that.  All right.  Because the only thing at issue was

21  whether or not something happened.  It's not about character.

22  It's not about someone who didn't see it, right, or someone that

23  might have a rumor.  The question is, did this happen, yes or

24  no?  And Ms. Harrison at the time used her best judgment and

25  came to a decision.  She now says that based on other hearings

1 that I have done and my experience, I would have done things

2 differently.  However, that would not have changed the outcome

3 of my decision.  And that, ladies and gentlemen, is critical

4 because you will have to ask:  Would the outcome be different

5 had these witnesses been called?  And we know that is also an

6 unequivocal no.

7          How do we know this?  Well, first of all, you heard

8 the testimony of Officer Nevins that backed up his testimony

9 that he gave at the hearing about the insults, the threats, the

10 dangers that Mr. Smolen both received and gave that his

11 determination that he should recommend him for protective

12 custody.

13          Then you heard the -- or it was read into the record,

14 the testimony of Officer Tyre, who Mr. Smolen wanted to call,

15 and you heard his testimony.  Who did this testimony

16 corroborate, Mr. Smolen's story or Officer Nevins?  It was

17 Officer Nevins.  So even if they would have called Officer Tyre

18 to the stand, he would have corroborated everything that Officer

19 Nevins would have said, and his appearance would have made no

20 difference.

21          And calling the captain who wasn't even a part of the

22 decisionmaking process, he wasn't there to see -- I should

23 rephrase that.  He did not see the actual incident.  So

24 therefore, he was not a relevant witness.  All right.

25          So -- and on top of that, Officer Harrison herself

1  told you, it wouldn't have made a difference.  So that error,

2  ladies and gentlemen, if you find one, is harmless.  What does

3  that mean?  Would the outcome would have been different?  The

4  answer is no.  If the answer is no, then Officer Harrison is not

5  liable, and she did not violate Mr. Smolen's constitutional

6  rights.

7         Next, you will be asked to consider his continued

8  placement into involuntary protective custody.  Now, to be

9  clear, Mr. Smolen was in custody, and he was confined at Sing

10 Sing.  So the question was, was it going to be in general

11 population or was it going to be involuntary -- involuntary

12 protection, or some other unit?  So he was still in custody.

13 Decisions were made through the hearing that for his own safety

14 and the safety of others in the institution that he needed to be

15 placed in protective custody.

16        Now, you will be asked to determine the process, which

17 each of these defendants used to determine whether or not he

18 should maintain and be kept in protective custody.

19        Again, the process, ladies and gentlemen, is not the

20 paperwork.  The process is the discussions, the deliberations,

21 the conversations, the meetings that they had, and the

22 information that they took in to determine whether or not Mr.

23 Smolen should be kept in involuntary protective custody.

24        Now, plaintiffs want you to believe that if the

25 paperwork was missing, then it just didn't happen; that over

1  months and years that every single person within involuntary

2  protective custody, protective custody, wasn't even talked

3  about.  Well, ladies and gentlemen, that just doesn't track with

4  the evidence, and it doesn't track with logic or it doesn't

5  track with common sense.

6          How do we know that's not the case?  First we heard

7  from the witnesses.  Ms. Izquierdo got up and testified about

8  attending meetings weekly for years talking about various

9  individuals within protective custody, about the issues that

10 came up.  She was just one part of three individuals.  She would

11 talk about making daily rounds, going by, talking with

12 individuals, specifically with Mr. Smolen.  She told you about

13 her interactions with him, about his behavior, and that she took

14 that behavior and relayed it to Superintendent Royce, I'm sorry,

15 DSS Royce at the time, and it was brought up at the meetings,

16 and she said that this occurred every single week, and that

17 sometimes she even brought up Mr. Smolen's name almost daily

18 occurrence.

19         So we know through her testimony that these meetings

20 took place, and she also told you with these paperwork forms,

21 she signed these forms, and those forms were passed along, but

22 she didn't keep them.  She had no idea what happened to them

23 afterwards, and was not responsible for producing them.  She had

24 no idea where they went after she signed them.

25         And you also heard the testimony of Officer Mathew,

1 who came up and testified, who basically did the job after

2 Officer Izquierdo, who also gave consistent testimony about the

3 behavior of Mr. Smolen both in confinement and his general

4 behavior within PC.  He was also consistent in that he had

5 meetings weekly with the committee, and they consistently talked

6 about other inmates and specifically Mr. Smolen.  So that is

7 consistent testimony.

8          Then you also heard from DSS Royce, Mr. Royce, who got

9 up and testified about running these meetings over years and

10 about what they discussed, and the topics they discussed, how

11 they discussed incidents with inmates, specifically Mr. Smolen;

12 about new incidents that came up, that they are aware of prior

13 incidents, all of that again consistent with other testimony.

14          And then you heard from Superintendent Capra, who got

15 up there and talked about outside of these committee meetings,

16 that he was briefed almost on a daily basis by other individuals

17 in executive staff, and those issues were raised directly to

18 him, independent of whether or not these committee --

19 independent of the committee meetings.

20          So not only did they meet weekly, they -- and Mr.

21 Smolen's name was brought up outside of his regular 30-day

22 rotation.  He was also briefed when they talked about him each

23 month, and any issues were also brought up to Superintendent

24 Capra.  So we know that the process, the discussions, the

25 deliberations, about all of the incidents, went into their

1 decision to keep him in protective custody.

2      And you will be asked, when you analyze whether or not

3 that was the correct process, you will be asked, you know, was

4 their decisions based on evidence?  We know that's a fact.  Why?

5 Because you heard their testimony.  They gave you specific

6 incidents that spanned the course of years about various

7 threats, various instances, letters, misbehaviors.  The list

8 goes on and on that they talked about.

9      So yes, they determined evidence and individual

10 factors that came to their attention that drove their decision.

11      Next, did they evaluate past evidence, new evidence,

12 evidence that could come in the future?  Again, based on the

13 consistent credible testimony from each of the witnesses, the

14 answer again is yes.

15      And was safety and security of the institution their

16 primary goal?  Again, yes.  You heard every single one of the

17 witnesses, especially Superintendent Capra, who took the stand

18 this morning and explained to you in detail security is the

19 number one focus of the facility.  Not just other inmates, but

20 the inmates themselves -- sorry -- incarcerated individuals

21 themselves because incarcerated individuals are wards of the

22 state.  It is their responsibility, the defendants', whether

23 they like it or not, to keep them safe.  That is their primary

24 goal.  And the safety and security, as their primary principle,

25 the primary driving goal, they took in information, had

1 meaningful discussions about Mr. Smolen, and made the decision

2 to keep him in protective custody for his own safety, and they

3 did their job, evidenced by the fact that Mr. Smolen is sitting

4 right in front of you today.  They kept him safe.

5       And that is the process that you have to decide.

6 Again, process is not forms.  As Superintendent Capra said, as

7 did Royce, on the executive level they deal with, you know,

8 dozens and dozens of forms a day added up over weeks, added up

9 over months, it can be a bureaucratic nightmare.

10      But this trial, again, ladies and gentlemen, is not

11 about forms.  It is about the process, and since it's the

12 process you must decide and then gave the appropriate process

13 and consideration that none of the defendants are liable for

14 violating Mr. Smolen's constitutional rights by keeping him in

15 protective custody.

16      Now, even though there is no liability, you will be

17 asked to consider any possible damages.  $1.  If any liability

18 is found, nominal, which is $1 should be found.  Why?  Because

19 the plaintiff did not suffer physical, emotional or any

20 financial harm.  If anything, it's the opposite.  He was kept

21 safe.  He was kept secure.

22      Likewise, there is no compensatory damages.  Why?

23 Because, again, he was not harmed, and he did not suffer

24 emotional or financial harm that can be compensated.

25      Now, protective custody is not like we are going to

1  compare protective custody to general population because there's
2  been a lot of discussions about that.  Because plaintiff wants
3  to give you the impression that the general population at Sing
4  Sing was this wonderful place where if he was allowed to go and
5  be housed, that he would be safe and secure, and that protective
6  custody was the opposite.

7          But as you heard from each of the witnesses, that
8  cannot be further from the truth.  Why?  Because between
9  protective custody and general population is a distinction
10 without a difference.  Any of the changes or limited differences
11 in protective custody is solely to keep the individuals safe.
12 It is not punishment.  They are not being punished for an action
13 that they took.  They are not being punished for who they are.
14 They are not being punished, period, and they are not being
15 disciplined.  An individual in protective housing, no, they
16 couldn't do go to the chow hall to eat.  Why?  Because they
17 would be in part of general population.  That's why they are
18 being separated.  They couldn't go to the library.  Why?
19 Because then you would be around other inmates -- sorry --
20 incarcerated individuals from general population.  Again, that
21 would be a violation of safety.  The same thing to go to the
22 religious services; the same with, you know, other facilities
23 within the prison.

24          However, they didn't go to chow, but food was brought
25 to them.  Religious members were brought -- were brought to

1  them.  Books were brought to them.  They were not deprived of

2  this.  The only reason why there is a difference between

3  protective custody and general population was solely due to the

4  safety of the individuals.  That was the focus, and that's the

5  only difference.  And, ladies and gentlemen, that is not

6  punishment.  It's not something to be compensated for.

7          And finally, there was no extreme or outrageous

8  conduct here on behalf of the defendants.  In other words, there

9  is no basis for any type of punitive damages.  Actually, it is

10  the exact opposite; that each defendant bent over backwards to

11  keep Mr. Smolen safe.  Even Superintendent Capra got up there

12  and testified that it was like, listen, these individuals --

13  it's not just Mr. Smolen, it's many people -- can be very

14  difficult, but it's their job, whether they like it or not,

15  within the Department of Corrections to keep them safe; and if

16  they really wanted to punish them, if they really wanted to harm

17  them, they really didn't care, that they would just send them to

18  the general population because they knew, based on the evidence

19  and their experience, what would happen to them if they were

20  released into the general population.

21          And you can use your common sense and experience when

22  you listen to the testimony to realize that that would have been

23  the case.  So, if anything, they kept him close, much to their

24  detriment.  You heard them testify there was nothing more that

25  they would love to transfer him out of there, to get him away

1 from them, but they couldn't. So they kept him there, and they

2 did everything they could to keep him safe because that was

3 their goal, to protect him.

4      They didn't beat him. They didn't keep him in

5 isolation. He wasn't alone. He wasn't starved. He wasn't

6 forgotten. He wasn't injured. He wasn't targeted. So none of

7 the conduct you have heard at trial is extreme or outrageous,

8 and none of it warrants any type of punitive damages. Again,

9 it's just the opposite. It's about safety.

10      So when you go back and you deliberate, please

11 remember that the plaintiff, Mr. Smolen, has the burden in this

12 case. Mr. Smolen has to show that each of these defendants by

13 their own actions, not the actions of others, but by their own

14 actions violated his constitutional rights. And when you look

15 at the evidence and testimony that was given to you over these

16 past two days, and you listen to the law as the judge is going

17 to instruct it to you, we are confident there is only one

18 conclusion that you will come to when you look at the facts and

19 you apply it to the laws as the judge gives it to you, and that

20 we are confident you will conclude that each of these defendants

21 is not liable, and that you have found -- you will find for each

22 of the defendants. Thank you.

23      THE COURT: Thank you, Mr. Ramage.

24      Okay. Ms. Onyshko?

25      MS. ONYSHKO: May I proceed, Your Honor?

1          THE COURT:  You may.

2          MS. ONYSHKO:  Stuck in a cell for 20 hours a day for

3   1,338 days.  Mr. Smolen was deprived of his constitutional due

4   process rights, restricted and confined for three years and

5   eight months because of the actions of the defendants.

6          This case is about whether the defendants followed the

7   rules, and as you saw, the evidence shows they did not.  They

8   broke rules in two ways.  There are two elements of our claim:

9   First, that Defendant Harrison incorrectly denied Mr. Smolen's

10  request for witnesses at his hearing; and second, that

11  Defendants Izquierdo, Royce, and Capra failed to hold meaningful

12  reviews of Mr. Smolen's IPC placement.

13         Both of these are violations of his rights.  This case

14  is not about whether Mr. Smolen should have been in IPC.  This

15  case is not about whether Mr. Smolen should have stayed in IPC.

16  This case is about whether or not his due process rights were

17  violated.  And ultimately, this case is your decision to make.

18  So let's talk about how you are going to do that.

19         After my argument, you will receive instructions from

20  the judge on how to reach your verdict, and I ask that you

21  listen to the judge's instructions.  You will need to decide if

22  we have proven our case by a preponderance of the evidence, and

23  as you heard at the outset, this is not a criminal case.  The

24  standard is not beyond a reasonable proof, but rather a

25  preponderance of the evidence, which is the same thing as saying

1  if the facts are more likely true than not.

2         If you find that the scale tips, however slightly, in

3  plaintiff's favor, then you must find for the plaintiff and

4  against the defendants.  You must find them liable.

5         At the beginning of the trial, defense counsel told

6  you that the defendants did everything right, but you have now

7  heard that that is not the case.  So let's walk through the

8  claims starting first with the denial of witnesses.

9         The documents and testimony agree; Mr. Smolen was

10 allowed to call witnesses.  Exhibit 5, the hearing notice, said

11 that.  It says he is entitled to call witnesses.  At the bottom,

12 a hearing will be conducted within 14 days.  You are entitled to

13 call witnesses on your own behalf.  And we all know Mr. Smolen

14 tried to call witnesses.  He tried to call Officer Tyre.  He

15 tried to call Captain Laporto.  He tried to call Inmate McClean.

16         You heard from Defendant Harrison herself that she

17 denied these witnesses.  Exhibit 6 shows you why he wanted to

18 call these witnesses and that Defendant Harrison denied each of

19 these witnesses.  According to the hearing transcript, during

20 the hearing, Ms. Harrison first said she was denying Officer

21 Tyre's testimony because he was a character witness, but she

22 then changed her mind and said she was denying him because he

23 was redundant.  She told you on the stand that she would not

24 have denied that witness today.  She said that she does not

25 believe that Officer Tyre was a character witness.  She said

1  that his testimony would have been relevant.  She said that it

2  would not have been redundant.  She said, if asked today, she

3  would have allowed Officer Tyre to testify.

4       Officer Tyre said in his deposition that the threats

5  he heard were not unusual.  That is testimony Defendant Harrison

6  refused to hear at Mr. Smolen's IPC hearing.  The transcript

7  shows Defendant Harrison also denied Captain Laporto.  Captain

8  Laporto we know signed off on the IPC recommendation.  At the

9  hearing, Defendant Harrison didn't say why she was denying

10 Captain Laporto, and then on Exhibit 6 she had a different

11 reason.  Her denial is confused.

12      But finally, we know she denied Inmate McClean, which

13 she said because he wasn't -- he was going to be a character

14 witness, but as we know, now know, character witnesses are

15 permitted.  You heard that Inmate McClean was going to testify

16 about whether or not there were threats against Mr. Smolen.

17 That doesn't sound like character witness testimony.  That

18 sounds like it goes to the heart of the IPC recommendation, and

19 the heart of whether or not Mr. Smolen should have been in IPC

20 in the first place, the heart of her determination.

21      This denial is not harmless.  Defendant Harrison said

22 she would have allowed this testimony if asked today, but she

23 said that the testimony didn't change her decision, the

24 testimony she didn't hear, she doesn't know.  Yesterday Judge

25 Halpern asked you to keep an open mind when you hear one side of

1  a story because you are going to hear the second side.

2  Defendant Harrison didn't do that.  It was a one-sided hearing.

3  So did this happen?  Would she make the same determination?  She

4  didn't hear the other side of the story.

5          Stripped of his ability to call any witness, Mr.

6  Smolen was unable to mount an effective defense.  Denied a

7  witness to testify about whether or not Sergeant Nevins was

8  biased because of the grievances; denied two corrections officer

9  witnesses; denied a witness who approved the IPC recommendation;

10 denied a witness to testify about whether or not Mr. Smolen was

11 in any danger.

12         The evidence shows that by denying these witnesses,

13 Defendant Harrison violated Mr. Smolen's constitutional rights.

14 It affected the outcome of the hearing.

15         But the deprivation of Mr. Smolen's constitutional

16 rights does not stop there.  No, it continued month after month

17 after month when Defendants Izquierdo, Royce, and Capra failed

18 to conduct meaningful evaluations.

19         So the question is not about whether or not Mr. Smolen

20 should have been in IPC, but about what the defendants did.  Did

21 they follow the rules?  And the evidence shows that they did

22 not.  In Mr. Smolen's own recollection, he recalls receiving

23 only a handful of forms, and even though he requested them at

24 one point, he does not recall receiving them.  But you don't

25 have to rely only on what Mr. Smolen says.  We have documents

1  and testimony to support his case.  Exhibit 2 shows that there
2  should have been a meeting every 30 days.  Defendants Royce and
3  Izquierdo testified to that.  You heard testimony that these
4  meetings from Defendant Royce took 30 minutes to an hour.
5  Defendant Izquierdo recalled that sometimes they were 20 to
6  30 minutes, even though they had upwards of 30 people to discuss
7  sometimes.  That's a minute or two a person.  You have been
8  listening to me for much longer than that so for.  And the
9  person in charge of keeping those forms, Defendant Royce,
10 couldn't even tell you if Mr. Smolen ever received those forms.

11      Defendant Izquierdo could not tell you after those
12 forms were requested of her whether they were sent.  You have
13 the 2015 request from Mr. Smolen for these forms, and we don't
14 know if he ever got them.  Defendant Izquierdo had previously
15 testified that she couldn't recall any discussion of Mr. Smolen
16 before 2017.  She changed her testimony today.  Defendant
17 Izquierdo had previously testified that she didn't recall any of
18 these meetings.  She changed her testimony today.

19      Defendants Royce, Izquierdo and Capra told you they
20 were supposed to be filling out the forms at every meeting for
21 every inmate every month.  Defendant Royce said that there
22 should be at least three copies of each of the forms.  That
23 means that Mr. Smolen should have more than 40 months of review
24 forms.

25      This isn't a case about a few missing forms.  Between

 1  September 2014 and May 2018, we had seven forms.  We have July

 2  and August 2017.  Then there is a gap.  Then we have

 3  December 2017 to April 2018.

 4       Defendant Capra told you that they have had to change

 5  the policy because of their actions related to this case.  The

 6  defendants have tried to say that they did all of this work, but

 7  it's just conveniently absent from a few of the forms we have;

 8  that there were all of these discussions, and it's just not on

 9  the documents.

10       Discussing Mr. Smolen in passing is not giving him the

11  due process.  This is not formally reviewing his status as is

12  required.  We have heard justifications for IPC placement four

13  years after Mr. Smolen left IPC, but this case is not about

14  whether they can justify his status today, whether they can

15  justify their former decisions today.  This is about the process

16  they took or what they did not do.

17       A few of the review forms you saw, and a handful of

18  the later period, these are pre-filled.  Filling out forms

19  before a meeting is not meaningful evaluation.  That's an

20  evaluation with a conclusion in mind.  That's not the right

21  process.

22       The defendants have listed their credentials, but that

23  doesn't mean they can't make mistakes, and we saw those

24  mistakes.  Defendant Capra said he should have done more.

25  Defendant Royce said he should have filled out the forms.

1  Defendant Harrison said she should have called those witnesses.

2          The forms you do see have errors.  The year Mr. Smolen

3  was in IPC isn't right on many of these.  The forms you do see

4  have blanks.  Defendant Capra said he should have filled these

5  forms out.  You can see the blanks.  Forms with errors and forms

6  with blanks are not meaningful, intentional evaluation.  It's

7  careless.

8          The final tip of the review process was Defendant

9  Capra.  He was supposed to sign off.  He had previously

10  testified -- though changed it today -- that the only form --

11  the only document he looked at were these forms.  But, again,

12  the documents show his review was not meaningful.  In many

13  cases, he did not take the one second required to tick the box.

14  Ask yourself:  Is it more likely true than not?  We only have

15  some of these forms.  We have heard these meetings were not long

16  with many people to discuss.  You can see errors and blanks on

17  these forms.  Is this meaningful evaluation?  Did they meaning-

18  fully evaluate his IPC status?  No.  The defendants spent so

19  little time on Mr. Smolen's reviews they were not guided by a

20  valid reason.  They just assumed Mr. Smolen should stay in IPC

21  indefinitely and made that conclusion without meaningful review.

22          You will be asked to evaluate if these reviews were

23  meaningful, and we have seen that the evidence does not support

24  that.

25          To find for the plaintiff you do not need to evaluate

1  their decision.  You do not need to evaluate institutional goals

2  of safety and security.  You don't have to decide if he should

3  have been in IPC.  You just need to decide that these reviews

4  were not meaningful.  You need to decide the defendants didn't

5  follow the right process.

6          Now the defendants have said this is not a case about

7  process; that this is a case about safety.  You have heard,

8  though, from Defendant Izquierdo that threats are common in

9  prison.  Officer Tyre's testimony was that the threats that he

10 heard were not unusual.

11         The defendants have tried to put Mr. Smolen's

12 character on the stand.  They have tried to make this about his

13 actions, but the questions for you to answer, as the judge will

14 tell you, are not about Mr. Smolen's actions, but about what the

15 defendants did or about what the defendants didn't do; not about

16 whether or not he should have been in IPC.

17         The defendants have shown you how they feel about this

18 process.  It's only a formality, Defendant Capra said.

19 Constitutional rights are not only a formality.  The evidence

20 will show you that the defendants deprived Mr. Smolen of his

21 constitutional rights by denying the witnesses, which impacted

22 the hearing result, and by failing to hold meaningful reviews.

23 They did not follow the right process.

24         We all have processes and policies at work that we are

25 supposed to follow.  You can't fire someone without filling out

1  the right paperwork, even if that termination is warranted.  And

2  in prison, the rules we are talking about exist for a reason.

3          Because of the defendants' actions, Mr. Smolen was

4  locked in his cell most hours of the day for over three and a

5  half years.  Mr. Smolen told you about the emotional and mental

6  impact of this confinement.  He described it as a living hell.

7  You heard how restrictive IPC was.  You heard that for the few

8  hours a day that he wasn't forced to be in his cell he was

9  either in a small concrete patch or a room with a few tables.

10  He had a few hours outside, at most, a day, and unlike in

11  general population, where the yard was big and had an equipment,

12  this yard was more of a cage.  No bathrooms, no trees, no grass,

13  no telephones, just a concrete patch.

14          Defendant Capra had previously testified under oath

15  that the general population is allowed outside of their cell for

16  16 hours a day.  You also heard that Mr. Smolen had a delay in

17  access to medical appointments.  Defendant Izquierdo told you

18  that IPC inmates were not allowed to go outside of IPC.  You

19  heard that Mr. Smolen was deprived of books, legal research,

20  newspapers, and religious services.  Yes, he had some access,

21  but he was limited in ways the general population was not.

22          It's because of these restrictions that when an inmate

23  is placed in IPC, there is a process in place to make sure that

24  their placement in IPC is warranted, and they are not in IPC for

25  longer than necessary.  If what defendants say is true, that

1 being in IPC wasn't such a big deal, why are there so many

2 processes around this?  Why are there so many requirements for a

3 hearing, requirements for reviews, for the first -- four a week

4 for the first knew months and then requirements for review every

5 month after that?  There are so many rigorous processes in place

6 for a reason:  To protect inmates from the hardships of IPC.

7          You have heard that three and a half years in IPC is

8 unusual.  Mr. Smolen didn't know anyone who was there for

9 longer.  Defendant Royce said three and a half years is a long

10 time.  Defendant Capra agreed that it is unusual that someone is

11 there for three and a half years.  Defendant Izquierdo didn't

12 know of anyone who had been there for that long.

13          The defendants have argued that these restrictions

14 were minor; that there is really no difference between the

15 confinement of IPC and being incarcerated generally, but you've

16 heard about the restrictions.  You've heard that IPC is

17 different.  And even a minor restriction on freedom day after

18 day, month after month, year after year, can still be a

19 significant deprivation.

20          Mr. Smolen suffered damages because of the defendants'

21 actions because they deprived him of his rights.  How much would

22 it take to compensate you to put up with that for one day?

23 Think about what jurors are paid to sit in a climate-controlled

24 well-lit room, albeit listening to us.  It's more than a dollar

25 a day.  Think about how Mr. Smolen was confined for nearly

1 | 24 hours a day for 1,338 days.

2 |          Ladies and gentlemen of the jury, thank you for the

3 | attention that you have given to our case thus far.  As I

4 | mentioned, soon the judge will give you instructions on the law;

5 | and after that, you will be given a verdict form, and it will be

6 | your time to weigh the evidence and to deliberate.  The form

7 | will ask whether Mr. Smolen has proven that each defendant, or

8 | any defendant, deprived him of his rights, and you will know by

9 | weighing the evidence that it is more likely true than not that

10 | they did.

11 |          This case is not about whether Mr. Smolen should have

12 | been in IPC.  It is about if defendants followed the right

13 | rules.  The evidence shows that they did not.

14 |          When you get the verdict form, you will be asked if

15 | the defendants violated Mr. Smolen's constitutional rights.  We

16 | urge you to answer "yes" and find the defendants liable for

17 | their actions and compensate Mr. Smolen for the damages he

18 | suffered.  Thank you.

19 |          THE COURT:  Thank you, Ms. Onyshko.

20 |          All right.  In a moment, ladies and gentlemen, I am

21 | going to instruct you on the law.  By statute, I have to give

22 | you these instructions verbally, but I find it's a lot to take

23 | in just through the ears.  So we are going to hand out -- Mr.

24 | Cangelosi will hand out to you a copy of what I am reading from

25 | so you can follow along.

1    The one rule, though, is literally we have got to stay

2 on the same page.  Don't read ahead.  If you think you missed

3 something, don't go back and look at it because I do think that

4 one recipe for confusion is if what you are hearing through your

5 ears is different than what you are seeing through your eyes.

6 So if you just read along with me, when you go in to deliberate,

7 there will be a copy of the charge in the jury room for you to

8 look at.  So you will have that there.

9    All right.  Let's begin.

10    Members of the jury, we have almost reached that point

11 where you begin your final function as jurors, which, as I hope

12 you all appreciate, is one of the most important duties of

13 citizenship in this country.

14    My instructions to you will be in four parts.  First,

15 I will give you some general introductory instructions about the

16 role of the Court, and the jury, and the burden of proof.

17 Second, I will give you instructions concerning the evaluation

18 of evidence.  Third, I will describe the law to be applied to

19 the facts as you find them to be established by the evidence.

20 The fourth and final section of these instructions will be

21 relative to your deliberations.

22    It's been obvious to me and counsel that until now you

23 have faithfully discharged your duty to listen carefully and

24 observe each witness who testified.  Your interest never

25 flagged, and you followed the testimony with close attention.  I

1  ask you to give me the same careful attention as I instruct you

2  on the law.

3        It's my duty to instruct you as to the law, and it is

4  your duty to accept these instructions of law and apply them to

5  the facts as you determine them.  If an attorney stated a legal

6  principle different from any that I state to you in my

7  instructions, it is my instructions to you that you must follow.

8  You should not single out any instruction as alone stating the

9  law, but you should consider my instructions as a whole when you

10 retire to deliberate.  You should not be concerned about the

11 wisdom of any rule that I state regardless of any opinion you

12 may have about what the law may be or ought to be.  It would be

13 a violation of your oath to base your verdict on any view of the

14 law other than that which I give you.

15       You, the members of the jury, are the sole and

16 exclusive judges of the facts.  You pass on the evidence,

17 determine the credibility of witnesses, resolve such conflicts

18 as there may be in the testimony, draw whatever reasonable

19 inferences you decide to draw from the facts as you determine

20 them, and determine the weight of the evidence.  In doing so,

21 remember that you took an oath to render judgment impartially

22 and fairly, without prejudice or sympathy or fear based solely

23 on the evidence and the applicable law.

24       The plaintiff has the burden to prove each and every

25 element of his claims by a preponderance of the evidence.

1    What does "preponderance of the evidence" mean?  To

2 establish a fact by the preponderance of the evidence means to

3 prove that the fact is more likely true than not.  A

4 preponderance of the evidence means the greater weight of the

5 evidence.  It refers to the quality and persuasiveness of the

6 evidence, not the number of witnesses or documents.

7    In determining whether a claim has been proven by a

8 preponderance of the evidence, you may consider the relevant

9 credible testimony of all witnesses, regardless of who may have

10 called them, and all the relevant credible exhibits received in

11 evidence, regardless of who may have introduced them.  The

12 credible evidence means the testimony or exhibits that you find

13 to be worthy of belief.

14    If, after considering all the evidence, you are

15 satisfied that the plaintiff has carried his burden on each

16 essential element of his claim, then you must find in his favor.

17 If, after consideration, you find that the evidence produced by

18 the plaintiff is outweighed by the evidence against his claim,

19 or that the credible evidence on a given issue is evenly divided

20 between the plaintiff and the defendant, then you must decide

21 the issue against the plaintiff.  That is because the plaintiff

22 must prove more than simple equality of evidence.  He must prove

23 each element of the claim by a preponderance of the evidence.

24    On the other hand, the plaintiff need not prove more

25 than a preponderance.  So long as you find that the scales tip

1 however slightly, in favor of plaintiff, that what he claims is
2 more likely true than not, then that issue will have been proven
3 by a preponderance of the evidence.

4       There are four defendants in this case.  Mr. Smolen
5 must satisfy his burden as to each defendant.  If, for example,
6 you find that Mr. Smolen satisfied his burden as to one
7 defendant, but not as to other defendants, then you must find in
8 favor of Mr. Smolen only against the first defendant, but you
9 may not find in favor of Mr. Smolen with respect to the other
10 defendants.

11       You may have heard of proof beyond a reasonable doubt,
12 which is the proper standard of proof in a criminal trial.  That
13 requirement does not apply to a civil case such as this, and you
14 should put it out of your minds.

15       You are to consider only the evidence in the case.
16 The evidence in the case is the sworn testimony of the
17 witnesses, the exhibits received in evidence, and any
18 stipulations which the parties have agreed to.  A stipulation is
19 simply an agreement between parties as to what certain facts
20 were or what the testimony would be if certain people testified
21 before you.  The stipulations are the same for your purposes as
22 the presentation of live testimony.  You should consider the
23 weight to be given such evidence just as you would any other
24 evidence.

25       Exhibits which have been marked for identification may

1  not be considered by you as evidence until and unless they have

2  been received in evidence by the Court.  To constitute evidence,

3  exhibits must be received in evidence.  Exhibits marked for

4  identification, but not admitted into evidence, are not

5  evidence, nor are materials brought forth only to refresh a

6  witness's recollection.

7       It is for you alone to decide the weight, if any, to

8  be given to testimony you have heard and the exhibits you have

9  seen.  Testimony or exhibits that I have excluded or stricken or

10 told you to disregard are not evidence and may not be considered

11 by you in rendering your verdict.  Similarly, with respect to

12 any evidence that I directed you to consider for a limited

13 purpose during the trial, you should consider such evidence only

14 as I have directed you.

15      You are not to consider as evidence the questions

16 asked by the parties' lawyers.  It is the witnesses' answers

17 that are evidence, not the questions.  Arguments by the

18 attorneys are not evidence because the attorneys are not

19 witnesses.  What they have said to you in their openings and in

20 their summations is intended to help you understand the evidence

21 to reach your verdict.  If, however, your recollection of the

22 evidence differs from the statements made by the lawyers in

23 their opening statements or summations, it is your recollection

24 that controls.

25      Further, any statements or rulings that I may have

1  made do not constitute evidence.  Because you are the sole and

2  exclusive judges of the facts, I do not mean to indicate any

3  opinion as to what the facts are or what the verdict should be.

4  The rulings I have made during the trial are not any indication

5  in my views.  Also, you should not draw any inference from the

6  fact that I may on occasion have asked certain questions of

7  witnesses.  Those questions were intended only to clarify or

8  expedite and are not an indication of my view of the evidence.

9  In short, if I have said or done -- if anything I have said or

10 done seemed to you to indicate an opinion relating to any matter

11 you need to consider, you must disregard it.

12        You may be surprised at this, but a federal trial

13 judge, unlike the judge in state court, has the power to comment

14 on the evidence and give you the judge's estimate.  I have a

15 perfect right to say with regard to a witness, "I wouldn't

16 believe him on a stack of bibles reaching from the floor to the

17 ceiling."  On the other hand, I have a perfect right to say,

18 "Such and such witness spoke the gospel truth."

19        All the law says I have to add is, "Remember, I am not

20 the factfinder.  You may adopt or disregard my estimate."

21        I have never done it in either a civil or a criminal

22 case.  That's your function.  I don't want anybody entering into

23 the orbit of your powers as ministers of justice, and I would

24 resent it and cut it off, as I would anyone who interferes with

25 my function as a judge of the law.

1    The reason I don't comment on evidence is that I

2 refuse to believe if I emphasize how I feel in that regard, I

3 would not automatically convert at least one, and if I were

4 impressive on the occasion, many more of the jurors who would

5 then say, "The judge spoke well, and I adopt what he said."

6    I don't want that.  I want the thinking, the voice,

7 the attitude, the approach, and the estimate of each and every

8 one of the ministers of justice who had have to determine this

9 case.

10    So since I have a perfect right to comment on the

11 evidence, if I chose to do it, and I will not do it, I do not

12 want you, and I forbid you from reading into the tone of my

13 voice, or the emphasis I put on one proposition or another of

14 law, as to how I feel about the facts.  If I wanted to tell you,

15 I would tell you outright -- I am not bashful -- because I have

16 the power under the law to do exactly that.

17    There are two types of evidence that you may properly

18 use in reaching your verdict.  One type of evidence is direct

19 evidence.  Direct evidence is a witness's testimony about

20 something he or she knows by virtue of his own or her own

21 senses; something the witness has seen, felt, touched or heard.

22 Direct evidence may also be in the form of an exhibit.

23    The other type of evidence is circumstantial evidence.

24 Circumstantial evidence is evidence that tends to prove one fact

25 by proof of other facts.  Here is a simple example of

1 circumstantial evidence:

2       Assume that when you came into the courthouse this

3 morning, the sun was shining, and it was a nice day.  Assume

4 that the courtroom blinds were drawn, and you cannot look

5 outside.  As you are sitting here, someone walks in with an

6 umbrella that is dripping wet.  Someone else then walks in with

7 a raincoat that is also dripping wet.  You can't look outside

8 the courtroom, and you can't see whether or not it is raining.

9 So you have no direct evidence of that fact, but on the

10 combination of the facts that I have asked you to assume, it

11 would be reasonable and logical for you to conclude that between

12 the time you arrived at the courthouse and the time these people

13 walked in, it had started raining.

14       That's all there is to circumstantial evidence.  You

15 infer on the basis of reason, experience, and common sense from

16 an established fact the existence or nonexistence of some other

17 fact.

18       Some facts, such as a person's state of mind, can only

19 rarely be proven by direct evidence.  Circumstantial evidence is

20 of no less value than direct evidence.  The law makes no

21 distinction between the two, but simply requires that you, the

22 jury, decide the facts in accordance with all the evidence, both

23 direct and circumstantial.

24       I have used the term "infer," and the lawyers in their

25 arguments have asked you to draw inferences.  When you draw an

1  inference, you conclude from one or more established facts that

2  another fact exists, and you do so on the basis of your reason,

3  experience, and common sense.  The process of drawing inferences

4  from facts in evidence is not a matter of guesswork, suspicion,

5  or speculation.  An inference is a reasoned, logical deduction

6  or conclusion that you, the jury, may draw, but are not required

7  to draw, from the facts which have been established by either

8  direct or circumstantial evidence.  In considering inferences,

9  you should use your common sense and draw from the facts that

10 you find to be proven whatever reasonable inferences you find to

11 be justified in light of your experience.

12        Now for the important subjects of evaluating

13 testimony.  How do you evaluate the credibility or believability

14 of the witnesses?  The answer is that you use your plain common

15 sense.  There is no magic formula by which you can evaluate

16 testimony.

17        You should use the same test for truthfulness that you

18 would use in determining matters of importance in your everyday

19 lives.  You should ask yourselves:  Did the witness impress you

20 as honest, open and candid or was the witness evasive and edgy

21 as if hiding something?  How did the witness appear?  That is,

22 the witness's bearing, behavior, manner and appearance while

23 testifying.  How responsive was the witness to the questions

24 asked on direct examination and on cross-examination?  You

25 should consider the opportunity the witness had to see, hear,

1  and know about the things which the witness testified; the

2  accuracy of the witness's memory; the witness's candor or lack

3  of candor; the witness's intelligence, the reasonableness and

4  probability of the witness's testimony; its consistency or lack

5  of consistency with other credible evidence, and its

6  corroboration or lack of corroboration by other credible

7  evidence.

8         In short, in deciding credibility, you should size up

9  the witness in light of the witness's demeanor, the explanations

10  given, and all of the other evidence in the case.  Always

11  remember to use your common sense, good judgment, and life

12  experience.

13         Few people recall every detail of every event

14  precisely the same way.  A witness may be inaccurate,

15  contradictory, or even untruthful in some respects and yet

16  entirely believable and truthful in other respects.  It is for

17  you to determine whether such inconsistencies are significant or

18  inconsequential.  If you find that a witness intentionally

19  testified falsely, that is always a manner of importance you

20  should weigh carefully.  If you find that any witness has

21  willfully testified falsely as to any material fact -- that is,

22  as to an important matter -- the law permits you to disregard

23  completely the entire testimony of that witness upon the

24  principle that one who testifies falsely about one material fact

25  is likely to testify falsely about everything.  You are not

1  required, however, to consider such a witness totally

2  unbelievable.  You may accept so much of the witness's testimony

3  as you deem true and disregard what you feel is false.

4         By the processes which I have just described, you, as

5  the sole judges of fact, decide which of the witnesses you will

6  believe, what portion of their testimony you will accept, and

7  what weight you will give it.

8         In deciding whether to believe a witness, you should

9  specifically note any evidence of bias, hostility or affection

10 that the witness may have toward one of the parties.  Likewise,

11 you should consider evidence of any other interest or motive

12 that the witness may have in cooperating or not cooperating with

13 a particular party.  If you find any such bias, hostility,

14 affection, interest, or motive, you must then consider whether

15 or not it affected or colored the witness's testimony.

16        You should also take into account any evidence that a

17 witness may benefit or suffer in some way from the outcome of

18 the case.  Such interest in the outcome may create a motive to

19 testify falsely and may sway a witness to testify in a way that

20 advances the witness's own interests.  Therefore, if you find

21 that a witness has an interest in the outcome of this trial,

22 then you should bear that factor in mind when evaluating the

23 credibility of the witness's testimony and accept it with great

24 care.

25        Keep in mind, though, that it does not automatically

1  follow that testimony given by an interested witness is to be

2  disbelieved.  There are many people who, no matter what their

3  interest in the outcome of the case may be, would not testify

4  falsely.  It is for you to decide, based on your own perceptions

5  and common sense, to what extent, if at all, the witness's bias

6  or interest has affected the witness's testimony.  You are not

7  required to disbelieve an interested witness.  You may accept as

8  much of the witness's testimony as you deem reliable and reject

9  as much as you deem unworthy of acceptance.

10            You have heard evidence that at some earlier time a

11 witness has said or done something that counsel suggested was

12 inconsistent with the witness's trial testimony.  If that prior

13 inconsistent statement was sworn testimony, such as deposition

14 testimony, it can be considered as evidence.  Likewise, if the

15 prior inconsistent statement was that of a party, it can be

16 considered as evidence against the party.  Otherwise, evidence

17 of a prior inconsistent statement is not to be considered by you

18 as affirmative evidence in determining liability.  Evidence of a

19 prior inconsistent statement was placed before you for the more

20 limited purpose of helping you decide whether to believe the

21 trial testimony of the witness who made the contradictory

22 statement.  If you find that the witness made an earlier

23 statement that conflicts with the witness's trial testimony, you

24 may consider that fact in deciding how much of the witness's

25 trial testimony, if any, to believe.

1          In making this determination, you may consider whether

2   the witness purposefully made a false statement or whether it

3   was an innocent mistake; whether the inconsistency concerns an

4   important fact or a small detail; whether the witness had an

5   explanation for the inconsistency, and whether that explanation

6   appealed to your common sense.

7          It is exclusively your duty, based upon all of the

8   evidence and your own good judgment, to determine whether the

9   prior statement was inconsistent, and if so, how much, if any,

10  weight to give to the inconsistent statement in determining the

11  credibility of the witnesses.

12         You have heard the testimony of Mr. Smolen, who was

13  previously convicted of a felony.  This prior conviction was put

14  into evidence only for you to consider in evaluating Mr.

15  Smolen's character for truthfulness.  You may not consider this

16  evidence for any other purpose.

17         In this case, the Defendants Harrison, Capra, Royce,

18  and Izquierdo are current or former employees of the New York

19  State Department of Corrections and Community Service, and

20  Plaintiff Samuel Smolen is an incarcerated individual.  All

21  parties are equal before the law.  Defendants and plaintiff are

22  entitled to the same fair consideration.

23         During this trial, you have heard testimony from

24  correctional officers and other prison officials.  The fact that

25  a party or a witness may be employed as a corrections officer

1 does not mean that his or her testimony is deserving of any more

2 or less consideration or greater or lesser weight than that of

3 an ordinary party or witness.  It is your decision, after

4 reviewing all of the evidence, whether to accept or reject all

5 or parts of the testimony of the law enforcement witnesses as

6 you would any other witness and to give that testimony whatever

7 weight, if any, you find it deserves.

8           Likewise, you have heard testimony from incarcerated

9 individuals.  The fact that a party, or witness, may be

10 incarcerated or convicted of a crime does not mean that his or

11 her testimony is deserving of any more or less consideration or

12 greater or lesser weight than that of an ordinary party or

13 witness.  It is your decision, after reviewing all of the

14 evidence, whether to accept or reject all or parts of the

15 testimony of each witness as you would any other witness and to

16 give that testimony whatever weight, if any, you find it

17 deserves.

18           There are people whose names you heard during the

19 course of the trial but who did not appear to testify.  I

20 instruct you that each party had an equal opportunity, or lack

21 of opportunity, to call any of these witnesses.  Therefore, you

22 should not draw any inferences or reach any conclusions as to

23 what they would have testified to had they been called.  Their

24 absence should not affect your judgment in any way.

25           It is the duty of the attorney for each side of a case

1  to object when the other side offers testimony or other evidence

2  which the attorney believes is not admissible.  Counsel also

3  have the right and the duty to ask the Court to make rulings of

4  law.  All of those questions of law must be decided by me.  You

5  should not show any prejudice against an attorney or his client

6  because the -- or her client -- because the attorney objected to

7  the admissibility of evidence or asked for a conference out of

8  the hearing of the jury and asked the Court for a ruling of law.

9         As I indicated to you already, my rulings on the

10  admissibility of evidence do not indicate any opinion about the

11  weight or effect of such evidence.  You are the sole judges of

12  the credibility of all witnesses and the weight and effect of

13  all evidence.  If, however, I sustained an objection to any

14  evidence, or if I ordered evidence stricken or disregarded, that

15  evidence must be entirely ignored.

16         You should also draw no inference against an attorney

17  or his or her client if I admonished or reprimanded the

18  attorney.  The attorneys have a duty to zealously represent

19  their clients, and they have done so in this case

20  conscientiously.  It is irrelevant whether you like an attorney

21  or believe I like an attorney.  The issue before you is not

22  which attorney is more likeable or the better attorney, but

23  rather, whether or not the relevant party has met its burden of

24  proof.

25         Some of the testimony before you is in the form of

1 deposition that has been received into evidence. A deposition

2 is simply a procedure where, prior to trial, the attorneys for

3 one side may ask questions, may question a witness or an

4 adversarial party under oath before a court stenographer. You

5 may consider the testimony of a witness given by -- given at a

6 deposition according to the same standards you would use to

7 evaluate the testimony of a witness given at trial.

8        Halfway home, ladies and gentlemen.

9        I will now discuss the third part of these

10 instructions: The principles of law you must apply to the facts

11 as you determine them.

12        Mr. Smolen's claims are brought under the Civil Rights

13 Act of 1871, which is also known as Section 1983 of Title 42 of

14 the United States Code. This is a federal civil rights law that

15 provides a remedy for individuals who have been deprived of

16 their constitutional rights under color of state law.

17        In this case, Mr. Smolen alleges that the defendants

18 deprived him of certain rights protected by the U.S.

19 Constitution, specifically his rights to due process under the

20 Fourteenth Amendment. The individual defendants deny violating

21 his rights to due process under the Fourteenth Amendment. You

22 must consider the claims against each individual defendant

23 separately.

24        The defendants are represented by the same counsel.

25 You should, however, consider the evidence against each

1  defendant separately and ask with respect to each defendant

2  whether the plaintiff has proven the elements of his claims

3  against the individual defendant you are considering.  Each

4  defendant is entitled to a fair consideration of the credible

5  evidence relating to that defendant, and is not to be prejudiced

6  by any finding you make for or against another defendant.

7         I will now proceed to explain the elements of Mr.

8  Smolen's claims.

9         To establish his claims under Section 1983, Mr. Smolen

10  must establish by the preponderance of the evidence -- by a

11  preponderance of the evidence the following three elements:

12  First, that the acts explained of were committed by a defendant

13  acting under color of state law; second, that in committing

14  these actions, a defendant deprived Mr. Smolen of a right

15  protected by the Constitution of the United States; and third,

16  that a defendant's acts were the proximate cause of the injuries

17  sustained by Mr. Smolen.

18         I will explain each of these elements to you

19  separately.

20         As to the first element, a state employee who is

21  acting in his or her official capacity is acting under color of

22  state law.  Here it is undisputed that during the time period of

23  the alleged incidents, each of the individual defendants was

24  employed by the State of New York and was acting in his or her

25  official capacity as an employee of the State of New York.

1          Therefore, I instruct you that the first element of

2   the plaintiff's Section 1983 claim has been met.

3          The second element of each of plaintiff's Section 1983

4   claims is that one or more of the defendants, in committing the

5   acts complained of, intentionally or recklessly deprived

6   plaintiff of a federal right.  An act is intentional if it is

7   done voluntarily and deliberately, and not because of mistake,

8   accident, negligence, or other innocent reason.  Please note

9   that like anything else, intent can be proven directly or it can

10  be proven by reasonable inference from circumstantial evidence.

11         An act is reckless if done in conscious disregard of

12  its known probably consequences.  In other words, even if a

13  defendant did not intentionally seek to deprive a plaintiff of

14  his rights, if he or she nevertheless purposely disregarded the

15  high probability that his or her actions would deprive plaintiff

16  of his rights, then this aspect of the second element would be

17  satisfied.

18         A defendant's failure to comply with a state law or

19  state regulation does not, in and of itself, mean that the

20  defendant deprived the plaintiff of a federal right.  Instead,

21  federal constitutional standards define the federal right, and I

22  will explain what these standards are momentarily.

23         Mr. Smolen claims that the defendants violated his due

24  process rights under the Fourteenth Amendment of the United

25  States Constitution in two ways:  First, he alleges that he was

1  denied due process because Defendant Shanikqua Harrison denied

2  him the opportunity to call his witnesses to testify at the

3  initial involuntary protective custody hearing.

4       Second, he alleges that he was denied due process

5  because he was placed in involuntary protective custody for

6  approximately three years and eight months without meaningful

7  periodic monthly reviews of his placement by Defendants Capra,

8  Royce, and Izquierdo.

9       I will address these alleged constitutional violations

10 separately in a moment.

11      The Due Process Clause of the Fourteenth Amendment to

12 the United States Constitution protects persons from the

13 deprivation of life, liberty, or property without due process of

14 law.  That is, notice and an opportunity to be heard.  Thus, to

15 show a deprivation under the Due Process Clause, plaintiff must

16 demonstrate two elements:  First, that defendants deprived him

17 of a cognizable interest in life, liberty, or property; and

18 second, that the defendants did so without affording him

19 constitutionally sufficient process.

20      With regard to the first prong of the test, to

21 establish the existence of a protected liberty interest,

22 plaintiff must show that his incarceration in involuntary

23 protective custody constituted an atypical and significant

24 hardship on him in relation to the ordinary incidents of prison

25 life.  Administrative segregation, like involuntary protective

1  custody, can impose an atypical and significant hardship to

2  inmates.  In determining whether the plaintiff has met his

3  burden, you must consider both the conditions of the confinement

4  and the duration of the confinement.

5         If you find that plaintiff has established the

6  existence of a protected liberty interest, you can move on to

7  the second prong of the test and determine whether plaintiff was

8  afforded -- I guess accorded -- constitutionally sufficient

9  process.  Let me say that again.

10        If you find that the plaintiff has established the

11 existence of a protected liberty interest, you can move on to

12 the second prong of the test and determine whether plaintiff was

13 afforded with constitutionally sufficient process.

14        With regard to plaintiff's initial involuntary

15 protective custody hearing, an incarcerated individual is

16 entitled to advance written notice of the charges against him; a

17 hearing affording him a reasonable opportunity to call witnesses

18 and present documentary evidence; a fair and impartial hearing

19 officer; and a written statement of the disposition, including

20 the evidence relied upon, and the reasons for the administrative

21 actions taken.  Here, plaintiff alleges that Defendant Harrison

22 refused to call any of the inmate or staff witnesses he

23 requested.  Inmates are allowed to call witnesses and present

24 documentary evidence in his defense when permitting him to do so

25 will not unduly -- will not be unduly hazardous to institutional

1  safety or correctional goals.  For example, prison officials

2  must have the necessary discretion to keep the hearing within

3  reasonable limits and to refuse to call witnesses that may

4  create a risk of reprisal or undermine authority, as well as to

5  limit access to other inmates to collect statements or to

6  compile other documentary evidence.  The right to call witnesses

7  can also be denied on the basis of irrelevance or lack of

8  necessity.

9        Moreover, I instruct you that if you find that

10  plaintiff's request to call witnesses was denied without a

11  legitimate justification, you must then decide whether the

12  denial was harmless error.  Defendant Harrison cannot be held

13  liable unless plaintiff proves he was prejudiced by the alleged

14  procedural errors in the sense that the errors affected the

15  outcome of the hearing.  In other words, Defendant Harrison's

16  alleged failure to call certain witnesses must be more than -- I

17  am sorry.  Let me say it again.  In other words, Defendant

18  Harrison's alleged failure to call certain witnesses must be

19  more than a harmless error where the absence of their testimony

20  would have had no effect on the hearing's outcome.

21        In order to determine whether the plaintiff was

22  afforded constitutionally sufficient proces during his continued

23  placement in involuntary protective custody, you must determine

24  whether defendants conducted periodic and meaningful reviews of

25  plaintiff's involuntary protective custody status.

1      To determine whether any reviews of plaintiff's
2 involuntary protective custody status were meaningful, you must
3 consider the following three factors:  First, the defendants, as
4 the officials who reviewed plaintiff's involuntary protective
5 custody status, must have actually evaluated if plaintiff's
6 continued placement in involuntary protective custody was
7 justified.  Defendants must have done more than simply go
8 through the motions of conducting a review, but rather, must
9 have formulated a decision based on what the evidence showed.  A
10 review in which defendants have a preordained conclusion in mind
11 that will not change no matter what the evidence is before them
12 is insufficient to provide meaningful review.

13      Second, defendants, as the officials who reviewed
14 plaintiff's involuntary protective custody status, must have
15 evaluated if the justification for the confinement in
16 involuntary protective custody existed at the time of the
17 review, or would exist in the future, and whether they
18 considered new relevant evidence as it became available.  The
19 reviews must take into account prison conditions and inmate
20 behavior, as those change over time.  Defendants are required to
21 have assessed whether the plaintiff remained a security risk as
22 of the date of each review.  However, keep in mind that this
23 requirement to assess changing conditions and behavior over time
24 does not bar defendants from affording significant weight to
25 events that occurred in the past, and does not require that

1  defendants find recent events to be categorically more important

2  to the review than past events.  This is not to say that prison

3  officials are barred from according significant weight to events

4  that have occurred in the past.  They are to look to the

5  incarcerated individual's present and future behavior and

6  consider new events to some degree to ensure that prison

7  officials do not use past events alone to justify indefinite

8  confinement.

9          Third and finally, defendants, as the officials who

10  reviewed plaintiff's involuntary protective custody status, must

11  maintain institutional safety and security or another valid

12  administrative justification as their guiding principle for the

13  decision to keep plaintiff in involuntary protective custody.

14  In other words, you should consider whether the evidence before

15  you shows that defendants' decisions to keep plaintiff in

16  involuntary protective custody was guided by the purpose of

17  maintaining safety and security or another valid purpose rather

18  than the improper purpose of imposing an indefinite punishment

19  for past occurrences.

20          Importantly, when considering whether the reviews were

21  meaningful, you are not to review the substance of the

22  defendants' decision to continue to place plaintiff in

23  involuntary protective custody, but rather you must evaluate

24  whether the defendants' method for coming to their determination

25  to continue to place plaintiff in involuntary protective custody

1  was sufficient.  In other words, you are not determining whether

2  the defendants' determinations to keep plaintiff in involuntary

3  protective custody were correct, but rather whether the

4  defendants provided the appropriate process and consideration

5  when making those determinations.

6          The third element that Mr. Smolen must prove in

7  connection with his Section 1983 claims is that the defendants'

8  acts were a proximate cause of the injuries sustained by Mr.

9  Smolen.

10         An act is the proximate cause if it was a substantial

11 factor in bringing about the injury, and if the injury was a

12 reasonably foreseeable consequence of the defendants' act.  If

13 an injury was a reasonably foreseeable consequence or a direct

14 result of one of the defendants' acts, the injury was

15 proximately caused by such act.

16         A proximate cause need not be the nearest cause either

17 in time or space.  A proximate cause also need not be the sole

18 cause of an injury.  Many factors, or the conduct of two or more

19 people, may operate at the same time, either independently or

20 together, to cause an injury.  Proximate cause exists as long as

21 the defendants' conduct was a substantial factor in bringing

22 about the plaintiff's injury, and if the injury was a reasonably

23 foreseeable consequence of the defendants' act.

24         Furthermore, in order to prove a claim under

25 Section 1983, a plaintiff must prove that a defendant, through

1  their own actions, has violated the Constitution.  The plaintiff

2  must establish fault and causation on the part of the defendant

3  to satisfy the requirements of Section 1983.

4           If you find that Mr. Smolen has proven each element of

5  his claims by a preponderance of the evidence, then Mr. Smolen

6  is entitled recover money, also known as damages, from the

7  liable defendants.

8           I will now instruct you on the law for measuring

9  damages.

10          The fact that I am instructing you as to the proper

11 measure of damages does not indicate any view of mine as to

12 which party is entitled to your verdict in this case.

13 Instructions as to the measure of damages are given for your

14 guidance only in the event you should find in favor of the

15 plaintiff in accordance with my other instructions.

16          If you do find that damages should be awarded, you

17 should not take into consideration attorneys' fees or court

18 costs, which will be decided by the Court.  If you make any

19 award of damages, such an award is not subject to federal income

20 tax, and you should not consider such taxes in determining the

21 amount of damages if any.

22          The verdict form I will give you will assist you in

23 regarding the determinations, if any, that you make as to

24 damages.

25          If you return a verdict in favor of Mr. Smolen, you

1  must first award him such money -- such sum of money as you

2  believe will fairly and justly compensate him for any injury

3  that you believe he sustained as a result of the defendants'

4  violation of his rights.  These are known as compensatory

5  damages.  Compensatory damages seek to make the plaintiff whole,

6  that is, to compensate him for the damage suffered.

7         Compensatory damages can include damages for physical

8  injury, any economic injury sustained by Mr. Smolen, as well as

9  suffering, pain, inconvenience, and other nonmonetary losses

10 that Mr. Smolen proves were proximately caused by the

11 defendants' actions.  The parties have agreed that Mr. Smolen is

12 not seeking damages related to any hearing or vision loss.

13        I think we just strike that.  I don't think that has

14 anything to do with us.  So we will just disregard that sentence

15 I read.

16        In assessing compensatory damages, you may include an

17 amount for pain, suffering, and emotional distress -- past,

18 present and future -- that you determine to be reasonable

19 compensation in light of all of the evidence in this case.

20 There is no requirement that evidence of the monetary value of

21 such intangible things, such as an injury, pain or suffering, be

22 introduced into evidence.  There is no exact standard for any

23 figuring -- for figuring the compensation to be awarded for

24 these types of damages, and no expert testimony need be

25 introduced.  Any award that you make should be fair in light of

1  the evidence presented at trial.

2          Compensatory damages must not be based on speculation

3  and sympathy, however.  It must be based on the evidence

4  presented at trial and only that evidence.  Therefore, to

5  recover damages for physical injury, Mr. Smolen must present

6  credible testimony with respect to his injuries.  The purpose of

7  compensatory damages is not to punish a defendant.

8          Medical treatment is not a precondition to recovery.

9  Physical injury may be proved by Mr. Smolen's own testimony,

10 corroborated by reference to the circumstances of the

11 defendants' alleged conduct.

12         In determining the amount of any damages that you

13 decide to award, you should be guided by your dispassionate

14 common sense.  You must use sound discretion in fixing an award

15 of damages, drawing reasonable inferences from the facts in

16 evidence.

17         If you do find that damages should be awarded, you

18 should not take into consideration attorneys' fees or court

19 costs, which will be decided by the Court.

20         Finally, let me caution you against awarding a double

21 recovery.  I said to you that if you return a verdict for Mr.

22 Smolen, you must award him such sum of money as you believe will

23 fairly and justly compensate him for any damage or injury you

24 believe he sustained as a result of the defendants' conduct.  In

25 this case, Mr. Smolen brings claims for relief against multiple

1  defendants.  You must remember at that, in calculating the

2  damages, Mr. Smolen is entitled to be compensated only once for

3  the damages he actually suffered.  Thus, you must be careful in

4  determining the proper measure of damages that you do not award

5  double compensation for a single injury, even if multiple

6  defendants were responsible for the violation.

7        If you find, after considering all of the evidence

8  presented, that one or more defendants violated Mr. Smolen's

9  rights, but that Mr. Smolen has suffered no injury as a result

10 of this violation, you may award Mr. Smolen nominal damages.

11 Nominal damages are awarded as recognition that a plaintiff's

12 rights have been violated.  You would award nominal damages if

13 you conclude that the only injury Mr. Smolen suffered was a

14 deprivation of his constitutional rights without any resulting

15 physical, emotional or financial damages.

16       You may also award nominal damages if, upon finding

17 that some injuries resulted from a given unlawful act, you find

18 that you are unable to compute monetary damages except by

19 engaging in pure speculation and guessing.

20       You may not award both nominal and compensatory

21 damages to Mr. Smolen.  Either he was measurably injured, in

22 which case you must award compensatory damages, or else he was

23 not, in which case you must award nominal damages.

24       Nominal damages must be a token sum not to exceed $1.

25       If you award Mr. Smolen compensatory or nominal

1 damages, you may also in your discretion make an award of

2 punitive damages.  Punitive damages are awarded, in the

3 discretion of the jury, to punish a defendant for extreme or

4 outrageous conduct, and to deter and prevent a defendant and

5 others from committing such conduct in the future.

6        You may award Mr. Smolen punitive damages if you find

7 that the acts or omissions of an individual defendant were done

8 maliciously and wantonly.  An act or failure to act is

9 maliciously done if it is prompted by ill will or spite toward

10 the injured person.  An act or failure to act is wanton if it is

11 done with a reckless or callous disregard for the rights of the

12 injured person.  Mr. Smolen has the burden of proving, by a

13 preponderance of the evidence, that an individual defendant or

14 defendants acted maliciously or wantonly with regard to Mr.

15 Smolen's rights.

16        If you find by a preponderance of the evidence that

17 one or more defendants acted with malicious intent to violate

18 Mr. Smolen's constitutional rights or unlawfully injure him, or

19 if you find that one or more defendants acted with callous

20 disregard of Mr. Smolen's rights, then you may award punitive

21 damages against those defendants.  An award of punitive damages,

22 however, is discretionary.  That is, if you find that the legal

23 requirements for punitive damages are satisfied, then you may

24 decide to award punitive damages or you may decide not to award

25 them.

1        In making this decision, you should consider the
2  underlying purposes of punitive damages.  Punitive damages are
3  awarded in the jury's discretion to punish a defendant for
4  outrageous conduct or to deter him and others like him from
5  performing similar conduct in the future.  Thus, in deciding
6  whether to award punitive damages, you should consider whether
7  the defendants may be adequately punished by an award of actual
8  damages only, or whether the conduct is so extreme and
9  outrageous that actual damages are inadequate to punish the
10 wrongful conduct.  You should also consider whether actual
11 damages, standing alone, are likely to deter or prevent those
12 defendants from similar wrongful conduct in the future if the
13 conduct was, in fact, wrongful, or whether punitive damages are
14 necessary to provide deterrence.  Finally, you should consider
15 whether punitive damages are likely to deter or prevent other
16 persons from performing wrongful acts similar to those that the
17 defendants may have committed.

18       If you decide to award punitive damages, these same
19 purposes should be kept in mind as you determine the appropriate
20 sum of money to be awarded as punitive damages.  That is, in
21 fixing the sum to be awarded, you should consider the degree to
22 which the defendants should be punished for their wrongful
23 conduct, and the degree to which an award of one sum or another
24 will deter the defendants or persons like them from committing
25 wrongful acts in the future.

1    In a few minutes, probably tomorrow, you are going to

2 the jury room to begin your deliberations.  It is your duty as

3 jurors to consult with one another and to deliberate with a view

4 to reaching an agreement.  Each of you must decide the case for

5 yourself, but you should do so only after consideration of the

6 case with your fellow jurors.  Your verdict and the answers to

7 each question on the verdict form must be unanimous.  Discuss

8 and weigh your respective opinions dispassionately, without

9 regard to sympathy, without prejudice or favor toward any party,

10 and adopt that conclusion which in your good conscious appears

11 to be in accordance with the evidence.

12    As you deliberate, please listen to the opinions of

13 your fellow jurors and ask for an opportunity to express your

14 own views.  Every juror should be heard.  No one juror should

15 hold center stage in the jury room, and no one juror should

16 control or monopolize the deliberations.  You should all listen

17 to one another with courtesy and respect.  If, after stating

18 your own view, and if after listening to your fellow jurors, you

19 become convinced that your view is wrong, do not hesitate

20 because of stubbornness or pride to change your view.  On the

21 other hand, to not surrender your honest convictions and beliefs

22 concerning the weight or the effect of the evidence solely

23 because of the opinions of your fellow jurors, or because you

24 were outnumbered, or for the mere purpose of returning a

25 verdict.  Your final vote must reflect your conscientious belief

1  as to how the issues should be decided, and your verdict must be

2  unanimous.

3           You are not to discuss the case until all jurors are

4  present.  Five, six, or seven jurors together is only a

5  gathering of individuals.  Only when all eight jurors are

6  present do you constitute a jury, and only then may you

7  deliberate.

8           Your first task when you retire to deliberate is to

9  vote on one of you to sit as your foreperson.  The foreperson

10 does not have any more power or authority than any other juror,

11 and the foreperson's vote or opinion does not count for any more

12 than any other juror's vote or opinion.  The foreperson is

13 merely your spokesperson to the Court.  The foreperson will send

14 out any notes for the Court, and when the jury has reached a

15 verdict, the foreperson will sign the verdict sheet, notify Mr.

16 Cangelosi, and give the verdict in open court.

17          The exhibits will be provided to you in a binder

18 containing hard copies of the documents, which will be placed in

19 the jury room.  If you want any of the testimony read back to

20 you, that can be arranged.  Bear in mind that it is not always

21 easy for the court reporter to locate the particular testimony

22 that you might want, so be as specific as you possibly can as to

23 what witness and what portion of that witness's testimony you

24 would like to hear.

25          Any communication with the Court should be in writing,

1  signed by your foreperson, and given to Mr. Cangelosi, who will

2  be here in the courtroom while you deliberate.  I will respond

3  to any questions or requests you have as promptly as possible,

4  either in writing or by having you return to the courtroom so I

5  can speak with you in person.

6       If at any time you are not in agreement, you are not

7  to reveal the standing of the jurors -- that is, the split of

8  the vote -- to anyone, including me, at any time during

9  deliberations.  So do not ever indicate in a note or otherwise

10  what the vote is or which way the majority is leaning or

11  anything like that.  Nobody outside the jury should know how the

12  jury stands on any issue until a unanimous verdict is reached.

13       If you took notes during the course of the trial, you

14  should not show your notes to, or discuss your notes with, any

15  other juror during your deliberations.  Any notes you have taken

16  are to be used solely to assist you.  The fact that a particular

17  juror has taken notes entitles that juror's view to no greater

18  weight than those of any other juror.  Finally, your notes are

19  not to substitute for your recollection of the evidence in the

20  case.  If you have any doubt as to any testimony, you may

21  request that the testimony be read back to you as I mentioned a

22  moment ago.

23       Under your oath as jurors you are entitled to evaluate

24  the evidence calmly and objectively, without prejudice or

25  sympathy.  You are to be completely fair and impartial.  You are

1 to be guided solely by the evidence, or the lack of evidence, in
2 this case.  It would be improper for you to consider in deciding
3 the facts of the case any personal feelings you may have about a
4 person who appeared in this trial on account of that person's
5 race, color, national origin, ancestry, gender, gender identity
6 or expression, religion, religious practice, age, disability or
7 sexual orientation.  And further, a fair juror must be mindful
8 of any stereotypes or attitudes about people or about groups of
9 people that the juror may have, and must not allow these stereo-
10 types or attitudes to affect their verdict.

11         We all develop and hold unconscious views on many
12 subjects.  Some of those unconscious views may come from stereo-
13 types and attitudes about people or groups of people that may
14 impact on a person's thinking and decisionmaking without that
15 person even knowing it.  As a juror, you are asked to make a
16 very important decision about another member of the community.
17 I know you would not want to make that decision based on such
18 stereotypes or attitudes, that is, on implicit biases, and it
19 would be wrong for you to do so.  A fair juror must guard
20 against the impact of such stereotypes or attitudes.  You can do
21 this by asking yourself during your deliberations whether your
22 views and conclusions would be different if the plaintiff,
23 defendants, or witnesses, or others that you have heard about or
24 seen in the court were of a different race, color, national
25 origin, ancestry, gender, gender identity or expression,

1  religious practice, age or sexual orientation, or did not have a

2  disability.  If the answer is yes, then, in keeping with your

3  promise to be fair, reconsider your views and conclusions along

4  with the other jurors, and make sure your verdict is based on

5  the evidence and not on stereotypes or attitudes.  Justice in

6  this case requires no less.

7          It would be equally improper for you to consider any

8  sympathy you might feel for an individual in a lawsuit.  All

9  parties are entitled to the same fair trial at your hands.  They

10  stand equal before the law and are to be dealt with as equals in

11  this court.

12          This case will be decided on the basis of the answers

13  you give to certain written questions that will be submitted to

14  you.  When you retire to deliberate, the foreperson will receive

15  a verdict form on which to record your verdict.  Each question

16  calls for a yes or no answer or some numerical figure.  You will

17  see that it has various questions for you to answer in the order

18  they appear.  Follow the instructions on the verdict form

19  regarding which questions you need to answer.  When the

20  foreperson has completed the verdict form, the foreperson must

21  sign it, and the form will be marked as a court exhibit.

22          Throughout your deliberations, you may discuss with

23  each other the evidence and the law that has been presented in

24  this case, but you must not communicate with anyone else by any

25  means about the case.  You also cannot learn from outside

1 sources about the case, the matters in the case, the legal

2 issues in the case, or individuals or other entities involved in

3 the case.  This means that you may not use any electronic device

4 or media such as a phone, computer, tablet, the Internet, any

5 text or instant messaging service, or any social media apps such

6 as Twitter, Facebook, Instagram, LinkedIn, YouTube, WhatsApp,

7 and Snapchat to research or communicate about what you have seen

8 and heard in this courtroom.

9        These restrictions continue during deliberations

10 because it is essential, under our Constitution, that you decide

11 this case based solely on the evidence and law presented in this

12 courtroom.  Information you find on the Internet or through

13 social media might be incomplete, misleading or inaccurate.

14 And, as I noted in my instructions at the start of the trial,

15 even using your smart phone, tablets or computers, and the news

16 and social media apps on those devices, may inadvertently expose

17 you to certain notices such as pop-ups or advertisements that

18 could influence your consideration in the matters you have heard

19 about in this courtroom.

20        You are permitted to discuss the case only with your

21 fellow jurors during deliberations because they have seen and

22 heard the same evidence and instructions on the law that you

23 have, and it is important that you decide this case based solely

24 on the evidence presented during the trial without undue

25 influence by anything or anyone outside the courtroom.  For this

1  reason, I expect you to inform me at the earliest opportunity

2  should you learn about or share any information about this case

3  outside of this courtroom or the jury room or learn that another

4  juror has done so.

5          The most important part of this case, members of the

6  jury, is the part that you as jurors are about to play as you

7  deliberate on the issues of fact.  It is for you alone to decide

8  whether plaintiff has proven the elements of his claims against

9  defendants by a preponderance of the evidence.  I know you will

10 try the issues that have been presented to you according to the

11 oath you have taken as jurors.  In that oath you promised that

12 you would well and truly try the issues in this case and render

13 a true verdict according to the law and the evidence.  Your

14 function is to weigh the evidence in the case and reach your

15 decisions based solely on the evidence.  Your duty is to decide

16 the issues before you fairly and impartially and to see that

17 justice is done.

18          All right.  I now need to see the attorneys at the

19 side bar for a moment.  I will ask you to remain.

20          (At the side bar)

21          THE COURT:  Are you satisfied with the charge to the

22 jury?  Plaintiff?

23          MR. JOACHIM:  I have one thing on page --

24          THE COURT:  Shhh...

25          MR. JOACHIM:  It says, "plaintiff, Samuel Smolen, is

1  an incarcerated individual."  It should say "was an incarcerated
2  individual."
3          THE COURT:  Okay.
4          MS. YOON:  I'm fine with that.
5          I also have one correction that I --
6          THE COURT:  Wait a minute.  I've got to be on the same
7  page as you.  Because my eyes are so old, I need a bigger font
8  to read.  So let me get to page 11.
9          Okay.  Ms. Yoon?
10          MS. YOON:  Yes.  Judge, just a minor correction.
11  Plaintiff's counsel was seeking damage for emotional injury
12  only, not a physical damage, physical injuries, and there is
13  instructions --
14          THE COURT:  Shhh...you are way too loud.  You are in
15  the box, you don't talk loud enough.  Over here, you scream.
16          What page are you talking about?
17          MS. YOON:  On page 21 and 22.
18          MR. JOACHIM:  We don't need an instruction.  It's --
19          THE COURT:  What line?  Where are you?  Page 21 and --
20          MS. YOON:  Page 21, the second-to-the-last paragraph,
21  and the last sentence there, "The parties have agreed that Mr.
22  Smolen is not seeking damages related to any hearing or vision."
23          THE COURT:  You and I both know that that doesn't
24  belong in this trial.
25          MS. YOON:  So should be, he is not seeking physical

1  damage for injury or just damages related to --

2          THE COURT:  Wait, wait, wait.  That sentence that you

3  know, Ms. Yoon, came from the last trial.  Okay?  So it

4  shouldn't be here at all.  So I really don't think I need to

5  emphasize.  I told them to disregard that thought, and I don't

6  want to -- and you all agreed, by the way.  This was an

7  on-consent charge, and I draw my law clerk in.  He should have

8  caught this, too.  I should have caught it, too, but I told them

9  to disregard it.

10          MS. YOON:  There is another reference to physical

11  injury, and the parties have --

12          THE COURT:  What page?

13          MS. YOON:  This is page 22, the paragraph, medical

14  treatment is not a precondition to recovery.  Physical injury

15  may be proved --

16          THE COURT:  Right.  I got it.  So what is it you want

17  me to say, that there is no physical injury?

18          MS. YOON:  That plaintiff is not seeking damage for

19  physical injury.

20          MR. JOACHIM:  He's not seeking compensatory damages

21  for physical injury.

22          THE COURT:  Hold on.  I am going to take these as

23  supplements because you've all agreed and consented to the

24  charge.  I am not taking these as exceptions to the charge, but

25  I will, in deference to the hard work you put in, I will make

 1  these two notes to the jury, but do not consider these as

 2  exceptions to the charge I just gave on consent by all parties.

 3  Okay?  All right.  Thank you.

 4          (In open court)

 5          THE COURT:  All right.  Ladies and gentlemen, the

 6  lawyers have asked me to clarify very simply two things:  In the

 7  charge I said to you, plaintiff, Mr. Smolen, is an incarcerated

 8  individual.  I need to change that to say, Samuel Smolen was an

 9  incarcerated individual.

10          And two, when I was talking to you about compensatory

11  damages, I made reference to physical injuries to Mr. Smolen.

12  Mr. Smolen is not seeking compensatory damages for physical

13  injuries.  Okay?

14          So those are modifications that the lawyers have asked

15  me to provide, and I am delighted to do it.

16          So with that, you are now fully charged.  It's 3:30.

17  I don't know that you are going to get very much done in

18  15 minutes.  So what I think I will do is I will release you for

19  the day, and remind you that it's so critical now that you have

20  been charged do not talk to anybody about this case.  Do not

21  look on the Internet.  I realize all of us -- maybe those of us

22  with more gray hair than less don't -- but a lot of people go to

23  the Internet and Google and do things like that.  Please,

24  please, don't do that.  Just try to remember that if you weren't

25  sitting in those seats, you were sitting in these seats, you

1  would want to be treated that way, right?  So treat people the

2  way you want to be treated.  That's a good rule of thumb in any

3  event.  But please, please, it's so important that you not

4  discuss it at home.  You are in the middle of a jury trial.  The

5  case is now in your hands.  Don't talk to anybody.

6          I will ask you in the morning when you get here

7  whether you have adhered to that rule.  I am sure you will.  I

8  know you will.  I thank you.  Have a good day today.  It was a

9  good busy day in my courtroom.  A lot of testimony, a lot of

10  law.  Go home.  Get a good night's sleep.  When you get here in

11  the morning, let Mr. Cangelosi know you are here.

12          Again, please be here.  I want you deliberating almost

13  immediately at 9:30.  We will get you a lunch.  The government

14  provides lunch when you are deliberating.  So we will give you a

15  luncheon menu.  That's not to say you will be here for lunch,

16  you won't be here for lunch, but in case you are here for lunch,

17  we want you to have lunch because we can't let you go out in the

18  streets while you are deliberating.  Okay?  And so your first

19  order of business, you will pick a foreperson.  Anything comes

20  up, get ahold of Mr. Cangelosi.  See you bright and early in the

21  morning.

22          All right.  Mr. Cangelosi.

23          THE DEPUTY CLERK:  All rise.

24          (Jury excused)

25          (In open court; jury not present)

 1          THE COURT:  All right.  Be seated for a moment,

 2   counsel.

 3          Let me just say that I very much appreciate the

 4   Covington law firm for participating pro bono in this case.

 5   It's happened several times your law firm has.  I think their

 6   representation -- I don't know what the verdict will be -- is

 7   superior.  You did an excellent job.

 8          And Mr. Ramage and Mr. Doran, I think we are the first

 9   time together -- Ms. Yoon, I so much admire how much energy you

10   put into it.  You were under stress because of Covid exposures

11   and things, but I have to say that, without exception, every

12   case I have tried where I have had young lawyers in front of me

13   from the attorney general's office, they have just done

14   excellent work, and this is no exception.

15          You can't figure what a jury is going to do.  You

16   never know, right?  That's the system we live in.  But nobody

17   here can complain about the lawyering.  And so I admire, and I

18   thank you for the extended effort.  I know I push.  I know I

19   push you as hard as I can because sitting in this room, after

20   you do it for a few decades, you kind of figure out what's

21   important and what's not, and I hope you take with you the

22   notion of what's important is getting the documents and the

23   testimony into the evidence bucket, not making speeches about

24   it.  You get to make your speech once, right?  At your close you

25   get to tell everybody what you think, but along the way, and I

1  think you all handled yourself beautifully, and I think we have

2  a very good clean record.  And so I just want to say how much I

3  appreciate the hard work you put in.

4           All right?  I have got to get ready for a 4 o'clock.

5  I will see you all in the morning.  Have a good evening.

6           MR. JOACHIM:  Your Honor, would you like us here at

7  9:00 or 9:30 tomorrow?

8           THE COURT:  I think you should be here at 9:00.

9  Because you don't know, a juror could come in and say, Judge,

10  I --

11          MR. JOACHIM:  Understood.

12          THE COURT:  -- Googled something.  Hopefully not, but

13  you never know.  So I would say at least one of you here at

14  9:00.  9:15 is fine.  See you tomorrow.

15          (Adjourned to December 9, 2022 at 9:30 a.m.)

16

17

18

19

20

21

22

23

24

25

1                     INDEX OF EXAMINATION

2      Examination of:                        Page

3      SHERRY IZQUIERDO

4      Direct By Mr. Joachim                   205

5      Cross By Ms. Yoon . . . . . . . . . . . . 217

6      Redirect By Mr. Joachim . . . . . . . . . 228

7      Recross By Ms. Yoon . . . . . . . . . . . 229

8      MICHAEL CAPRA

9      Direct By Mr. Joachim                   234

10     Cross By Ms. Yoon . . . . . . . . . . . . 246

11     Redirect By Mr. Joachim . . . . . . . . . 268

12     ANDREW NEVINS

13     Direct By Mr. Doran                     283

14     Cross By Ms. Onyshko . . . . . . . . . . . 291

15     Redirect By Mr. Doran . . . . . . . . . . 296

16     Recross By Ms. Onyshko . . . . . . . . . . 298

17     BENJAMIN MATHEW

18     Direct By Ms. Yoon                      301

19     Cross By Mr. Joachim . . . . . . . . . . . 307

20

21

22

23

24

25